```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA      )
                              )
        v.                    )    CRIMINAL NO. 05-10001-WGY
                              )
GREGORY WRIGHT                )
                              )
```

**GOVERNMENT'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

The United States, by and through its attorneys, Michael J. Sullivan, U.S. Attorney for the District of Massachusetts, Nadine Pellegrini, and S. Waqar Hasib, Assistant U.S. Attorneys, hereby files the government's Proposed Findings of Fact and Conclusions of Law as follows:

**I.   Findings of Fact[1]**

Officer Gregory Brown is a police officer with the Boston Police Department ("BPD") Youth Violence Strike Force. [Tr. I:11]. On November 8, 2004, at approximately 7:30 in the evening, Officer Brown was on duty near the intersection of Morton Street and Blue Hill Avenue in Dorchester, Massachusetts. [Tr. I:13-14]. Officer Brown was traveling in an unmarked police car in that area with BPD Officer Craig Jones and Massachusetts State Trooper Derek Outerbridge. [Tr. I:13]. All three officers

---

[1] Citations to the transcript refer to a particular day of testimony at the pre-trial suppression hearing, and relevant page.

1

were dressed in plain clothes. [Tr. I:14]. Officer Jones was driving, Officer Brown sat in the front passenger seat, and Trooper Outerbridge sat in the rear passenger seat. [Tr. I:14].

Officer Brown's car was the lead car in a four-car caravan. [Tr. I:15; II:19, 42]. In the second car were BPD Officers Mark Bordley and Vance Mills, and Massachusetts State Trooper Arthur Somerville. [Tr. I:15; Tr. II:19, 42]. In the third car were BPD Officer Lawrence Celester, Massachusetts Bay Transportation Authority ("MBTA") Officer Michael Raye, and Massachusetts State Trooper Steve Lopes. [Tr. I:15, 71; II:42].[2] In the fourth car were BPD Officers Mark Friere and Tom Foley. All of the vehicles were unmarked Ford Crown Victorias. [Tr. I:15]. None of the officers were in uniform. [Tr. I:16]. At least one of the officers displayed his badge on a chain around his neck, and testified that the other officers in the Youth Violence Task Force always did the same. [Tr. I:80].

While traveling in this caravan, Officer Brown saw a car blocking a driveway to a mini mart. [Tr. I:17]. Officer Brown recognized the driver. [Tr. I:17]. Officer Brown then saw the rear passenger, later identified as the Defendant, put his hands on the front seat, and raise himself up as though to gauge where

---

[2] Officer Celester initially testified that he, Raye, and Lopes were in the second car, and that only three, not four cars were present that night. [Tr. I:73]. However, he later testified, consistent with the rest of the testimony in this case, that a fourth car may have been present. [Tr. I:76].

Officer Brown's car was going. [Tr. I:17, 40]. Officer Brown continued to watch the Defendant's actions through the rear view mirror. [Tr. I:18]. Officer Brown then saw the Defendant open the door to that car, get out, turn to his right, and run down Blue Hill Avenue. [Tr. I:19-20]. At about the same time, Officer Jones brought Officer Brown's car to a halt, and Officer Brown got out and began to pursue the Defendant. [Tr. I:20, 42-43].

Upon seeing the Defendant and Officer Brown running down Blue Hill Avenue, Officers Bordley and Celester also got out of their cars and joined the pursuit. [Tr. I:74; II:22, 37]. As the chase continued, the Defendant clutched onto the right pocket of a hooded sweatshirt that he was wearing. [Tr. I:19, 73-74; II:22]. Officer Bordley was able to catch the Defendant after a chase of approximately 50 to 60 feet, less than a block. [Tr. I:74; II:23, 34]. A scuffle ensued. [I:21, 75; II:23]. In the course of the scuffle, the Defendant continued to reach for his right front pocket. [I:21, 74]. Officer Celester conducted a patdown search of the Defendant, and discovered a loaded silver semiautomatic handgun in the Defendant's right front pocket. [I:21, 75; II:23].

Officer Brown has been with the BPD for 17 years, and with the Youth Violence Task Force for 12 years. [Tr. I:11-12]. From his experience, he knows that the area around the 1200 block of

Blue Hill Avenue, near the intersection of Blue Hill and Morton, "is a very high crime area... for all types of street crimes." [Tr. I:16]. He has personally responded to and investigated several crimes in that area. [Tr. I:16].

Officer Celester has been with the BPD for 11 years, and had been with the Youth Violence Task Force for approximately 5 years at the time this incident occurred. From his experience, he knows that the area around the 1200 block of Blue Hill Avenue is "a trouble spot... a high crime area." [Tr. I:70]. He has personally made arrests and witnessed crimes being committed in that area. [Tr. I:70-71].

Officer Mark Bordley has also been with the BPD for 11 years, and the Youth Violence Task Force for 5 years. [Tr. II:16-17]. From his experience, he knows that the level of criminal activity around the 1200 block of Blue Hill Avenue "would be considered high," with "numerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, [and] firearm arrests," among other things. [Tr. II:18]. He usually visits the area as part of his duties on the Youth Violence Task Force once a day. [Tr. I:18].

At the time this incident occurred, the BPD held biweekly meetings known as "gang meetings," at which officers from various BPD departments, including the Youth Violence Task Force would be given statistics and maps depicting criminal activity throughout

the city of Boston for the past two weeks. [Tr. II:17, 24-27; D. 50 - Attachments A-C].³ The maps created for the two gang meetings that occurred prior to the incident at issue here both highlight Blue Hill Avenue (or "BHA") as "Armed Violent Crime Hot Spots." [D. 50 - Attachments A, B].

**II. Memorandum of Law**

If a person in a high crime area flees headlong from police officers without provocation, the officers have reasonable suspicion to stop that person. Illinois v. Wardlow, 528 U.S. 119 (2000), citing Terry v. Ohio, 392 U.S. 1 (1968); see also United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2000). Upon stopping that person, officers may conduct a brief patdown search for weapons. Terry, 392 U.S. at 30; accord Wardlow, 528 U.S. at 126.

In Wardlow, uniformed Chicago police officers were driving in a four-car caravan through a neighborhood known as a high crime area. Id. at 121. The Defendant looked in the direction of the officers and then ran. Id. at 122. The officers got out of their cars, chased after the Defendant, stopped him, and conducted a patdown frisk for weapons, discovering a handgun. Id.

The Court found that unprovoked flight in a high crime area gives rise to sufficient reasonable suspicion to support a Terry

---

³ Docket No. 50 - Attachments A-C are documents relating to the BPD's biweekly gang meetings that the government produced pursuant to this Court's order. [Tr. II:74-75].

stop. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. at 124. Similarly, "[h]eadlong flight--wherever it occurs-- is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. In short, unprovoked flight from police coupled with evidence that such flight took place in a known high crime area supports a finding of reasonable suspicion to conduct a Terry stop. Scott, 270 F.3d at 41, citing Wardlow.

    The operative facts here are virtually identical to those in Wardlow. Here, there can be no question that the Defendant was in a high crime area. Three officers with a combined 34 years of experience with the BPD and a combined 22 years of experience on the Youth Violence Task Force all testified unambiguously that based on their experience they knew the area around the 1200 block of Blue Hill Avenue to be a high crime area. All three testified that their duties on the Youth Violence Task Force brought them to that area on numerous occasions to investigate shootings, assaults, and other violent crimes. All three testified that they frequently visited that area as part of a proactive police effort to combat crime in high crime areas. One officer even testified that he visited the area every time he was

on duty.

Moreover, putting aside the unambiguous testimony of three experienced BPD officers, the maps from the two gang meetings held immediately prior to the incident at issue here both clearly indicate Blue Hill Avenue (or "BHA") as an "Armed Violent Crime Hotspot."  Though Blue Hill Avenue is a long street that runs through several neighborhoods, the maps show that several crimes occurred at the very least in the general vicinity of the incident at issue here.  While the government maintains that the testimony of the officers is more than sufficient on its own to support a finding that the 1200 block of Blue Hill Avenue was a known high crime area, these maps only bolster that testimony.  In short, there is simply nothing in the record to support a finding that the area around the 1200 block of Blue Hill Avenue is anything but a high crime area.[4]

The second prong of <u>Wardlow</u>, unprovoked flight, is equally satisfied here.  The testimony that the Defendant here fled is unchallenged; all three officers testified that upon getting out of the car parked in the mini mart driveway, the Defendant was running, not walking, down Blue Hill Avenue.  The testimony that his flight was unprovoked by any police actions is equally

---

[4] In contrast to the evidence presented by the government with respect to the issue of a high crime area, the Defendant has presented an affidavit by counsel, which consists of counsel's opinions regarding incidents in the area.

7

unchallenged.  Officer Bordley testified as follows:

> Q: Did you see any of the officers have any conversation with the person who was running down the street before he got out of the car?
>
> A: No.
>
> Q: Did you see any kind of interaction between any of the officers and the person who ran down the street before that person got out of the car?
>
> A: No.
>
> Q: Did you see any kind of hand gestures from any of the officers before that person got out of the car?
>
> A: No.

[Tr. II:21-22].  Officer Celester testified as follows:

> Q: Officer Celester, let me direct your attention to the moment where the Defendant got out of the car.  Did you see any interaction between the Defendant and any of the officers before the Defendant got out of the car?
>
> A: No.
>
> Q: Did you see any conversation take place between any of the officers and the Defendant before he got out of the car?
>
> A: No.
>
> Q: Did you see any officers making any hand gestures towards the car before the Defendant got out of the car?
>
> A: No.
>
> Q: Did anyone roll down their windows to try to have a conversation with the Defendant?
>
> A: I don't know.  I don't think so.  I don't know.  Not from my car.

[Tr. II:14-15].  Finally, Officer Brown, who was in the first car

8

of the caravan, testified as follows:

>   Q: Okay, now when you made your observation of the person in the back seat, how did you do this?
>
>   A: I was looking through the rear view mirror.
>
>   Q: And did you – what did you continue to do at that point, if anything?
>
>   A: I was, I was watching as he raised up from the seat, raised his body up from the seat, and continued to watch, and then the next thing I knew I seen the rear door open on that vehicle.
>
>   ...
>
>   Q: Okay. And what else did you observe after you made the observation about the rear door opening?
>
>   A: I observed the rear passenger to exit the vehicle, stand up, and, ah, he immediately turned to his right and eh grabbed onto like his sweatshirt pocket.
>
>   ...
>
>   Q: Okay. Could you further, if you can, describe that motion for the Court?
>
>   A: Yes. once he exited the vehicle, he turned, turned to his right, grabbed onto his hooded sweatshirt pocket right about here, and began to run up Blue Hill Avenue.

These facts are virtually identical to the facts at issue in Wardlow. There, the Court concluded that the Defendant's flight was unprovoked. There is no reason to reach a different outcome here.

The First Circuit has not directly addressed the meaning of "unprovoked flight" in the wake of Wardlow. However, a recent decision in the Eleventh Circuit is instructive. United States v. Franklin, 323 F.3d 1298 (11th Cir. 2003). In Franklin, a SWAT

9

team traveling in one marked van and one unmarked sport utility vehicle was patrolling the "problem areas" of Riviera Beach, Florida, to combat drug trafficking and other crimes. The officers were dressed in body armor, fatigues, boots, and sidearms. Id. at 1300. The officers noticed the Defendant loitering underneath a "no loitering" sign in front of a Chinese restaurant. Id. The officers pulled their vehicles up to the Defendant, and began to step out of their vehicles to ask the Defendant what he was doing. Id. As soon as the Defendant saw the officers, he fled. Id. The officers gave chase, caught the Defendant, conducted a patdown frisk, and discovered crack cocaine. Id.

The Defendant there argued that his flight was provoked.[5] The court accepted that officers cannot "improperly provoke – for example, by fraud – a person into fleeing and use the flight to justify a stop." Id. at 1302. The court reasoned that the Defendant's flight "was undoubtedly provoked in some sense - that is, brought about - by the presence of the police." Id. at n.4. "But in this sense, the flight in Wardlow... would have been provoked as well." Id. Rather, the appropriate test is whether a reasonable person would have fled in the same manner as the

---

[5] Here, the Defendant through counsel sought to elicit testimony from the government's witnesses regarding the issue of unprovoked flight and the officers' familiarity with Wardlow. [Tr. I:63-67]. Defendant failed to elicit any such testimony.

Defendant.  Id. at 1302.

The court flatly concluded that the Defendant's argument failed this reasonableness test.  "While... a SWAT team can sometimes be intimidating, nothing was extraordinary about how the team arrived.  A reasonable person could have believed the team was arriving to place an order at the Chinese restaurant.  While a reasonable person might have believed the team's arrival indicated some imminent violence (a possibility, we suppose, when a SWAT team is involved), we cannot say a reasonable person would have reacted like [the Defendant].  A reasonable person might have dropped to the ground.  A reasonable person might have moved away from the building."  Id.  But a reasonable person, the court concluded, would not have fled like the Defendant.  Id.

The facts here are even more compelling than those at issue in Franklin.  Here, the officers were dressed in plain clothes, not in fatigues.  They were not a SWAT team, so there was no threat of imminent violence.  They arrived in unmarked Crown Victorias, not in a marked police van.  They made no attempt to get out of their cars to speak to the Defendant until he got out of his car and began to run away from them.  Similar to Franklin, a reasonable person could have concluded that Officer Brown's car was stopping to pick up food from the mini mart.  A reasonable person might have recognized the Crown Victoria as a police vehicle, and stayed in his car for safety's sake.  But a

reasonable person would not have fled headlong down Blue Hill Avenue simply because Officer Brown looked in his rear view mirror and slowed his car down in front of the Defendant's. Thus, as in <u>Franklin</u>, this Court should find that the Defendant's flight was unprovoked.

### III.  Conclusion

For the reasons described above, the Defendant's motion to suppress should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ S. Waqar Hasib
Nadine Pellegrini
S. Waqar Hasib
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by electronic filing:

>Charles Rankin, Esq.
>Rankin & Sultan
>One Commercial Wharf North
>Boston, MA 02110

This 26th day of July, 2005.