# United States Court of Appeals
## For the First Circuit

No. 06-1351

UNITED STATES OF AMERICA,

Appellee,

v.

GREGORY WRIGHT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Charles W. Rankin, with whom Michelle Menken and Rankin & Sultan were on brief, for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

May 4, 2007

**LIPEZ, Circuit Judge.** After several Boston police officers approached the car in which appellant Gregory Wright was sitting, the officers saw Wright run from the car and grab the right side of his sweatshirt. Wright then refused to stop when ordered to do so. Apprehended almost immediately and found to be carrying a gun, he was arrested for being a felon in possession of a firearm. Wright unsuccessfully moved to suppress the gun, arguing that the stop was illegal. He then entered a conditional guilty plea. Because a legal error in the district court's analysis affected its factual findings underlying the issue of reasonable suspicion, we must vacate the judgment and remand for further proceedings.

I.

## A. Factual Background

On the evening of November 8, 2004, a caravan of four unmarked police cars was patrolling in Dorchester, Massachusetts. The cars were Crown Victorias, a model widely associated with police departments. The plainclothes officers in the caravan were members of the Boston Police Department Youth Violence Task Force.

At about 7:45 p.m., the caravan was driving north on Blue Hill Avenue and slowed down as the lead car passed a vehicle that had just pulled over in front of a mini-mart at 1216 Blue Hill Avenue. The parked car was partially blocking one of two driveway entrances to the mini-mart parking lot. Officer Brown, who was

-2-

sitting in the lead car's front passenger seat, looked to his right as they passed the parked vehicle and observed three people, one of whom he recognized as Omar Edwards, a neighborhood resident. He did not recognize the driver or the passenger seated in the back seat of the parked car. Immediately after passing this parked vehicle, Officer Brown's car pulled over to the right parking lane, in front of the parked car. The rest of the caravan came to a stop in the right travel lane to the rear of the parked car. The front passenger of the second police car, Officer Bordley, then observed the back seat passenger of the parked car, later identified as Gregory Wright, lean forward as though he was looking at the Crown Victoria that had just pulled over in front of his car.[1] Wright then exited his car, on the passenger side, and began to run southward down Blue Hill Avenue. As he ran, Wright put one hand on the right side of his sweatshirt, grabbing or holding onto the sweatshirt pocket.

Officer Brown quickly exited his car, as did a number of the other officers in the caravan. The police ordered Wright to stop running, but he did not obey this directive. Within a matter

---

[1] There was some disagreement about the order in which the police cars were driving. Officers Brown and Bordley both testified that their cars were first and second, respectively, of the four cars. However, Officer Celester testified that his car was second and Officer Bordley's was third. The district court did not make any factual findings about the order of the vehicles. We assume, for ease and clarity, that Officer Bordley's car was second and Officer Celester was in the third car.

of seconds, the officers caught up to Wright, who resisted the officers' attempts to frisk him. The police succeeded in patting Wright down and recovered a silver pistol from his sweatshirt pocket. Wright was arrested for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Wright moved to suppress the gun on the ground that the stop was unlawful. After a hearing, which included testimony by Officers Brown, Bordley, and Celester, the district court made a series of factual findings and concluded, based on those findings, that the officers had reasonable suspicion to stop Wright. Given their centrality to this appeal, we recount those findings in detail.

## B. The Court's Findings

1. Wright's Conduct

The first, and most significant, factual issue at the suppression hearing was whether Wright had fled from the police. Wright argued that he had not "fled," but simply had arrived near his pre-designated destination, exited the car, and run to that destination. Given well-established precedent that a defendant's flight from the police contributes to reasonable suspicion, Wright argued that there was insufficient evidence that his running could properly be characterized as flight. In support of a finding of flight, the government argued that the police officers had seen Wright lean forward in his seat, enabling him to better observe the

-4-

car that had pulled over in front of his vehicle, and that Wright ran when he recognized it as a police car. Two officers, Brown and Bordley, testified to seeing Wright lean forward.

The district court did not credit Officer Brown's testimony, finding it implausible that he had observed Wright's movement through a rearview mirror. Therefore, the pivotal testimony was that of Officer Bordley, who was in the second vehicle, behind Wright's car. Bordley testified that after the lead vehicle pulled over, he saw Wright "lean[] forward to observe the unmarked motor vehicle that had pulled over." He stated that after Wright leaned forward, Wright got out of the car, grabbed the right side of his sweatshirt, and ran down the street.

The court credited Officer Bordley's testimony,[2] and found that when Wright leaned forward in his seat, he was able to see the Crown Victoria and its occupants, thereby becoming aware that it was a police car which contained police officers. The court also found that Wright then promptly opened the rear passenger door and exited the car, in response to the police presence, and fled down Blue Hill Avenue to avoid interaction with those officers. The court summarized its reasoning as follows: "Can I reason backwards from the fact that what happened next was

_____

[2] The district court stated that its finding was also based upon Officer Celester's testimony. Both parties agree, however, that Officer Celester testified that he did not see anything that occurred inside of Wright's car, and only observed Wright's movements after he exited his car.

that the police officers discovered the weapon on Mr. Wright?  I
think it is undisputed he was carrying a weapon and I do so
reason."

    The court then proceeded to its second factual finding —
that Wright "clutched" or grabbed at his sweatshirt while running.
All three police officers who testified described Wright "grabbing"
or "tugging at" the right side of his sweatshirt while he ran.
Officer Brown described Wright's movement as follows: "Once he
exited the vehicle he turned, turned to his right, grabbed onto his
hooded sweatshirt pocket right about here and began to run up Blue
Hill Avenue."  Officer Celester testified that Wright was "tugging"
at his clothes with his right hand, in his "waist area," and that
he "appeared to be trying to pull something out of his waist area."
Officer Bordley said that Wright "stepped out of the motor vehicle,
grabbed the right side of his sweater and took off running up Blue
Hill Avenue."  These statements were the only evidence presented to
the district court on this issue.

    The court, however, found not simply that Wright had made
a grabbing movement, but that he did so because he was carrying a
gun.  The court explained: "Because he was carrying the weapon in
his sweatshirt and the weapon was heavy, naturally, he clutched it
and his, he clutched it through the, through the sweatshirt and his
clutching of the weapon, the better to run while carrying a heavy
object, was observed by the police officers . . . ."

-6-

2.  High Crime Area

The district court also considered the character of the area in which the stop occurred, in response to the government's attempt to show that it was a "high crime area."

Officer Brown testified that "that area of Blue Hill Avenue, as well as that corridor, is a very high crime area consisting of firearm violence, drug activity, street robberies, breaking and enterings, all type of street crimes actually." He added that he had personally investigated crimes and responded to shootings and drug incidents "in that area."[3]  Officer Celester described the 1200 block of Blue Hill Avenue as a "trouble spot," and explained that "there's been shootings there, there's been a lot of crime there. It's a high crime area." He further testified more generally that he had previously made arrests "in that neighborhood" and had witnessed crimes being committed "in that area." Officer Bordley explained how he, and other members of the Youth Violence Task Force, determine whether a particular area is a high crime area: "There are weekly and biweekly reports that are done. They keep stats on what's happening in the city, and they have a meeting every two weeks and they report those stats in the meeting." He went on to explain that the "neighborhood around the 1200 block of Blue Hill Avenue" has a "level of criminal activity

---

[3] None of the officers offered boundaries or a definition of the "area" being described as a "high crime area."

[that] would be considered high for that area.   Numerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature."   Like the others, he had personally visited the neighborhood for previous criminal incidents.

After the government completed its presentation of the officers' testimony, Wright requested the Police Department reports mentioned by Officer Bordley.   These reports provided the number of violent crimes that had occurred throughout the city during the preceding two weeks, broken down by police precinct.   In addition, the reports identified certain "hot spots," or specific locations where crime had been particularly high.   The district court permitted some additional limited discovery and the city produced incident reports for August 2004.⁴   Wright then offered these reports into evidence and relied on them in his closing argument to the court.   Wright cited the reports as evidence that the location of his arrest was not high in crime, according to the Boston Police Department's own definition, because it was not encompassed by any of the "hot spots" identified in the August incident reports.

---

⁴ The court ordered the government to provide the two reports produced immediately before Wright's stop on November 8, 2004. Although Officer Bordley testified that these reports were typically generated for biweekly meetings, the government stated that the Police Department was altering the "format and procedures" for those meetings during the months of September and October in 2004.   Therefore, no reports were available for the months immediately preceding Wright's stop and the August reports were the most recent.

The district court deemed most of the evidence presented on this issue — including the officers' testimony and the Boston Police Department incident reports — credible:

> I find that the Boston Police Department has [a] mapping system and it maps criminal incidents. I find that the evidence that I have received as to where those incidents occurred and when is credible. I find that the internal operations of the Boston Police Department quite properly results in periodic updates of these maps and based in part upon the maps and the officers' own law enforcement skills and intelligence information about what's going on on the street they deploy their resources accordingly and in good faith and not in a stereotypical or racially motivated or any improper basis. I find all that evidence credible.

However, the court acknowledged a concern about the relevant scope of a high crime area designation: "It may be crucial here to conclude that the specific mini mart area, this specific portion of Blue Hill Avenue and Morton Street is a high crime area." Describing the high crime finding first as "a mixed question of fact and law" and later as "a legal conclusion," the court concluded that it could not find that the relevant area, whatever it might be, was a high crime area.

> I reject the argument that because there were four police unmarked police cruisers coming up Blue Hill Avenue in this area, filled with a number of police officers, skilled and experienced police officers, that somehow by definition because they're there it's a high crime area. And I do not conclude on this evidence that the area is a, quote, high crime area, close quote. Primarily because I'm not clear what that is. I mean, I

-9-

have a common sense definition of it. And
it's quite clear to me, I think I could take
judicial notice that the incidence of crime in
the Dorchester area of Boston is higher in an
absolute sense than the surrounding suburbs.
I am not insensitive, though I don't know that
I could take judicial notice of the fact that
as it is reported in the newspapers and as
this Court has had some experience in other
cases, gang violence is a phenomenon seen more
often in certain residential sections of the
City of Boston than in surrounding suburbs.
Any common sense judgment would corroborate
that.

But does that constitute a, quote, high
crime area as the Supreme Court of the United
States was referring to it in Illinois v.
Wardlow?[5]    I'm not clear that it does.
Because in that case, though on the surface it
seems so similar, the language of Chief
Justice Rehnquist when he says they were
converging on a specific area known for heavy
narcotics traveling, and they expected to
encounter drug customers and individuals
acting as lookouts.    That's different than
this.    This was aggressive patrolling where
they intend, I infer, to get out of their
cruiser, make inquiry of the Wright vehicle,
if   not   of   other   people,   lawfully   but
aggressively to find out where they were going
and what they were doing.

---

[5] In Illinois v. Wardlow, 528 U.S. 119, 124-26 (2000), the
Supreme Court held that officers had reasonable suspicion when they
encountered a man who fled from them without provocation in a "high
crime area."    The Court explained that

> [a]n individual's presence in an area of expected
> criminal activity, standing alone, is not enough to
> support a reasonable, particularized suspicion that the
> person is committing a crime.    But officers are not
> required to ignore the relevant characteristics of a
> location in determining whether the circumstances are
> sufficiently suspicious to warrant further investigation.
> Accordingly, we have previously noted the fact that the
> stop occurred in a "high crime area" among the relevant
> contextual considerations in a Terry analysis.

Id. at 124.

## C.  **Reasonable Suspicion**

Having made its factual findings regarding Wright's conduct, and having rejected the government's assertion that Wright was arrested in a high crime area, the district court addressed the legal question of reasonable suspicion.

> Mr. Wright got out [of the car] and started to run clutching the weapon in his sweatshirt.  When he did that, I rule the officers  had  sufficient  reasonable suspicion . . . to compel him to stop for a brief interaction, a Terry interaction.  And since that's so, everything that happened thereafter was appropriate police conduct and the motion to suppress is denied.
> I make this ruling on the specific facts of this case, and the specifics of this particular case without drawing what I think is a legal conclusion that this was a high crime  area  but  finding,  really  without equivocation, that he did lean forward, he knew that was a police car that had stopped in front of him, that's why he got out of the car and that's why he ran.

With the motion to suppress denied, the gun that was recovered when the officers frisked Wright became admissible evidence.

Wright entered a conditional guilty plea, while reserving his right to appeal the district court's suppression ruling.  He was sentenced to 70 months' imprisonment and filed this appeal.  He now argues that some of the district court's factual findings underlying its conclusion of reasonable suspicion of criminal activity were clearly erroneous.

-11-

**II.**

Wright raises two questions on appeal. He asserts that the district court's factual finding of flight was erroneous, and, alternatively, requests that we reverse the legal finding of reasonable suspicion. We do not address the court's reasonable suspicion analysis because we find an impermissible error in its antecedent factual findings. Thus, we express no opinion as to whether the facts of this case, had they been appropriately found, provided a sufficient basis for the officers to reasonably believe that Wright was engaged in criminal activity.

**A. Wright's Conduct**

On appeal, Wright first challenges as unsupported the district court's factual finding of flight — specifically, that Wright leaned forward to see the Crown Victoria's occupants, recognized them as police officers, and ran because of their presence. We typically review a district court's factual findings for clear error. United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006). This case, however, presents an unusual complication. Throughout its oral ruling, the district court relied on the later-acquired knowledge that Wright possessed a gun to evaluate the evidence about his conduct. Indeed, the court candidly acknowledged its backwards reasoning: "Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he

-12-

was carrying a weapon and I do so reason." It is a central tenet of Fourth Amendment jurisprudence that the fruits of a search cannot be used to establish that same search's validity. "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light . . . ." Byars v. United States, 273 U.S. 28, 29-30 (1927). Similarly, a court evaluating the validity of a stop must determine whether the officer, at the time he began the stop, had reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 19-20 (1968). Use of the results of the stop to determine whether the objective facts available to the officer justified the stop is a legal error. See United States v. Ubiles, 224 F.3d 213, 218-19 (3d Cir. 2000) ("The District Court's rationale for not suppressing the firearm in this case is troubling, therefore, insofar as it seems to endorse the stop based on the fruits obtained as result of the subsequent search. This post-hoc justification for stops and searches has been repeatedly rejected.").

Wright claims that the district court's finding on flight should be rejected because it was infected with self-described "backwards" reasoning. Although the government concedes that the reasoning was erroneous, it contends that the factual finding on flight may still be affirmed because the error was harmless. The government claims that the district court's reliance on the eventual recovery of a gun was limited to its comments regarding

-13-

Wright's motives for running, and motive is irrelevant to the reasonable suspicion analysis. Noting that a stop is valid if an "objectively reasonable" appraisal of the facts available to the officers supports their suspicion of the defendant, Coplin, 463 F.3d at 100, the government argues that the court's finding about Wright's flight from the police officers was not affected by its "backwards" reasoning.

We disagree. The court explained that it found Wright had fled not simply because it credited Officer Bordley's testimony about his observations and the inferences he drew from them, but also because that testimony was corroborated by the logical notion that Wright was running from the police because he had a gun.

> I also, I want complete candor here, but of course I, I find that Mr. Wright was carrying a weapon. There's been no evidence he was licensed or not. But given the nature of these charges, I infer that Mr. Wright knew that at least there was some question about his carrying that weapon and he didn't want to confront the police. And so I infer that it made perfect sense for him, seated in the back seat of a car, to lean forward to assure himself that the vehicle that had pulled out of the traveled way and come to a stop in front of the car in which he was riding was in fact a police vehicle.
> Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he was carrying a weapon and I do so reason.

We find it impossible to discern whether the court would have concluded that Wright knowingly fled from the police if it had

-14-

not considered the eventual recovery of the gun. At the hearing, Wright argued that Officer Bordley's testimony, alone, was insufficient to support a finding of flight because Bordley was behind Wright's car and could not see what Wright did while leaning forward (i.e., whether Wright leaned forward to look at the car in front of him, or to talk to the front seat passengers, or for some other reason altogether). The district court appears to have responded to this argument by citing the fact of the gun as corroboration that Wright's running was specifically a response to the police presence. Given that explanation, we cannot determine how much weight the court gave to the gun and how much it gave to Officer Bordley's testimony describing what he saw before Wright ran. Moreover, we are unable to say that the error was confined to irrelevant comments on Wright's motives for running. The court's oral ruling suggests that the court used the gun to illuminate a likely motive, and, more importantly, further relied on that motive for its finding of flight. The legal error committed by the district court is thus significant and, we conclude, incurable. See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil § 2585 (2d ed. 1995) ("Insofar as a finding [of fact] is derived from the application of an improper legal standard to the facts, it cannot be allowed to stand.").

The same type of "backwards" reasoning affected the court's analysis of the testimony by the officers that Wright was

**B. High Crime Area**

The district court discussed, at some length, the character of the area where Wright was stopped. It stated that it "d[id] not conclude on this evidence that the area is a 'high crime area.' Primarily because I'm not clear what that is." The court also expressed its doubts about whether the character of the area was a legal question or a mixed question of fact and law.

The parties dispute whether the court made a high crime area finding or declined to do so. Wright insists that the court explicitly found that the area of his arrest was not a high crime area. The government insists that the court's uncertainty about the nature of a high crime area means that the court did not actually make a high crime area finding. We need not resolve this dispute. Instead, in light of the remand we must order, we respond to the court's acknowledged uncertainty about the nature of the high crime area determination and the factors relevant to that determination.

We see no reason to treat the character of the stop's location as other than a factual issue. See, e.g., United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004) (applying the clearly erroneous standard to the factual finding that an area was not high in crime); United States v. Diaz-Juarez, 299 F.3d 1138, 1142 n.2 (9th Cir. 2002) (applying clearly erroneous standard to factual finding that area was high in crime); United States v. Trullo, 809

-17-

F.2d 108, 111 (1st Cir. 1987) (collecting cases showing that the character of an area is an "articulable fact" that may be considered in the reasonable suspicion analysis).

In most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, e.g., Wardlow, 528 U.S. at 124 (noting that the area was not simply generally crime-ridden, but was particularly "known for heavy narcotics trafficking," where the defendant was suspected of drug activity); United States v. Edmonds, 240 F.3d 55, 60 (D.C. Cir. 2001) (noting that the finding of a high crime area was supported by the similarity between the type of crime commonly found at that location and the type of crime for which the police suspected this defendant); (2) limited geographic boundaries of the "area" or "neighborhood" being evaluated, e.g., United States v. Caruthers, 458 F.3d 459, 468 (6th Cir. 2006) (affirming a district court's finding of a high crime area, in part, because the evidence of frequent crime was specific to the exact intersection where the stop occurred); United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to

-18-

specific, circumscribed locations where particular crimes occur with unusual regularity."); and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue, e.g., United States v. Bailey, 417 F.3d 873, 874-75, 877 (8th Cir. 2005) (affirming high crime area finding, in part, because of criminal activity during week prior to the stop at issue, occurring in same location as the stop). Evidence on these issues could include a mix of objective data and the testimony of police officers, describing their experiences in the area.

Given the significance of location in evaluating the totality of the circumstances, see, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."), and in light of the considerations set forth herein, the district court, upon remand, may wish to reevaluate the high crime area issue. However, we wish to be clear that we are not directing the district court to reconsider its high crime area finding, and we are not suggesting what that finding should be, if it chooses to revisit the issue.

-19-

## III.

Because of the legal error that impermissibly tainted the district court's factual findings on Wright's conduct, we vacate the judgment below and remand this case for further proceedings consistent with this opinion.

**So ordered.**