UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

CRIMINAL NO. 05-10001-WGY

---

UNITED STATES

v.

GREGORY WRIGHT

---

**POST-REMAND MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**

---

### INTRODUCTION

Defendant Gregory Wright was indicted on January 5, 2005 on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress evidence obtained from a warrantless search on April 4, 2005. The motion urged that police lacked reasonable suspicion to stop Wright as he ran down Blue Hill Avenue in the Mattapan neighborhood of Boston. This Court conducted an evidentiary hearing on June 10, July 18, July 27, and July 29, 2005. The key disputed issues were: (1) was it reasonable for police to suspect that Wright was 'fleeing' their presence, rather than simply running for innocent reasons; and (2) was the neighborhood of the arrest a 'high crime area.' The motion was denied orally on July 29, 2005. This Court declined to find that the neighborhood was a 'high crime area,' yet found sufficient indicia of 'flight' to warrant a stop.

A conditional guilty plea and reservation of the right to appeal was entered pursuant to Fed. R. Crim. P. 11(a)(2) on September 27, 2005. Wright timely appealed the denial of his suppression motion in the First Circuit. The Court of Appeals issued a decision on May 4, 2007, remanding the

case for further proceedings.  United States v. Wright, 485 F.3d 45 (1st Cir. 2007).  That Court instructed that the evidence as to 'flight' must be reevaluated without reference to the eventual recovery of a firearm.  Wright, 485 F.3d at 52-53 ("We find it impossible to discern whether the court would have concluded that Wright knowingly fled from the police if it had not considered the eventual recovery of the gun ... The same type of 'backwards' reasoning affected the court's analysis of the testimony ... that Wright was 'clutching' or 'grabbing' at his sweatshirt as he fled").  The Court of Appeals also offered guidance on how to assess whether a given location may be characterized as a 'high crime area' for purposes of a reasonable suspicion analysis, and suggested that this question might be – but need not be – revisited on remand.  Id. at 53-54 ("we wish to be clear that we are not directing the district court to reconsider its high crime area finding, and we are not suggesting what that finding should be, if it chooses to revisit the issue").  On June 7, 2007, the Court of Appeals clarified that the district court's reevaluation of the evidence should be performed by the same judge who conducted the suppression proceedings originally.

The purpose of this memorandum is to reprise the record evidence, and to make proposed findings of fact and rulings of law.  For this Court's convenience, a copy of United States v. Wright, 485 F.3d 45 (1st Cir. 2007), is submitted herewith as Exhibit A, and a transcript of this Court's Findings and Rulings on Defendant's Motion to Suppress is submitted herewith as Exhibit B.

**OVERVIEW OF THE SUPPRESSION HEARING**

Gregory Wright moved to suppress a .22 caliber firearm found on his person at the time of his arrest on November 8, 2004 by members of the Boston Police Youth Violence Strike Force.  The parties agreed in their papers and during argument that the touchstone for the analysis of whether the search and seizure were lawful was Illinois v. Wardlow, 528 U.S. 119 (2000), which held that

officers may conduct an investigative stop of a person who runs at the sight of police in a high crime area, consistent with Terry v. Ohio, 392 U.S. 1 (1968).

## A.     The Government's Evidence.

At the evidentiary hearing on Wright's motion, the government called three of the arresting officers as witnesses: Boston Police Officer Gregory Brown (Tr.I/11), Boston Police Officer Lawrence Celester (Tr.I/68), and Boston Police Officer Mark Bordley (II/16).[1] The officers testified that on the evening of Wright's arrest, they had been patrolling an area of Boston surrounding the intersection of Morton Street and Blue Hill Avenue which they described as a "high crime" area. Tr.I/14,16. Each witness was in a separate unmarked Crown Victoria traveling in a four-car caravan manned by eleven or twelve members of the Youth Violence Strike Force. Tr.I/14-15. The "multi-agency unit," comprised of Boston Police, State Police, and MBTA Police, was engaged in "proactive policing," meaning they would "aggressively patrol areas" by "approaching people, talking to people ... that [were] gathered." Tr.I/12,69,77; Tr.II/17. They had no special instructions that night. Tr.I/77. Officer Brown was in the first car of the procession, and Officers Bordley and Celester were in the second and third cars, respectively.[2] Tr.I/13-15. The cars were "rolling" through the neighborhood slowly, at speeds ranging from 10 to 30 miles per hour. Tr.I/36-37. None of the officers or troopers in the caravan was in uniform. Tr.I/15-16.

---

[1]     References to the transcript of the suppression hearing are abbreviated as Tr.(volume)/(page).

[2]     There was some dispute as to this order. Both Brown and Bordley testified that Bordley was in the second car. Tr.II/41-42. Celester, on the other hand, testified that he was in the second car, immediately behind Brown. Tr.I/72-73. The Court of Appeals noted the inconsistency, and assumed, "for ease and clarity, that Officer Bordley's car was second and Officer Celester was in the third car." Wright, 485 F.3d at 47 n.1.

The officers further testified that at approximately 7:45 p.m., the car that Officer Brown was in passed by the car that defendant Wright was in. Wright's car was stopped in the parking lane beside 1216 Blue Hill Avenue, a retail "mini mart" anchored by the Fernandez Liquor Store. Tr.I/17;Tr.II/13. Just south of the mini-mart, there were two triple-decker residences at 1220 and 1222 Blue Hill Avenue. Tr.I/29-30. Brown's car slowed and came to a stop in the mini-mart area, approximately ten feet in front of Wright's. Tr.I/36-37,41-43. Officer Brown testified that he recognized the car's front-seat passenger to be Omar Edwards, a recent shooting victim who lived "right in the area there," but did not recognize either the driver or Wright, who was seated in the back seat. Tr.I/17-18,38; Tr.II/59.

According to Officer Bordley, Wright "leaned forward to observe the unmarked vehicle that had pulled over," but the specific reason for his leaning in this manner was not clear. Tr.II/21,40. Wright exited the car, turned to his right, "grabbed onto his hooded sweatshirt pocket," and began to run south on Blue Hill Avenue past the other Crown Victorias trailing Brown's. Tr.I/19-20,83. The officers alighted and gave chase, apprehending Wright within 60 feet of the starting point, just in front of 1222 Blue Hill Avenue. Tr.I/20-21; Tr.II/22. As Wright was being forcibly restrained, a .22 caliber semiautomatic pistol was found in the pocket of Wright's sweatshirt. Tr.I/21.

## B.    The Defendant's Evidence.

The defense challenged the officers' claim that Wright had identified them as police, and presented evidence bearing on Officer Brown's credibility on that point. Specifically, the testimony of Special Agent Lisa Rudnicki of the Bureau of Alcohol, Tobacco, and Firearms, who had been involved in the federal aspects of the investigation, revealed contradictions among various reports of Officer Brown's observation that Wright had leaned forward in his seat. Tr.II/54; Tr.IV/3. In

addition, evidence concerning an Internal Affairs investigation into falsification of records by Officer

Brown was reviewed *in camera*.  Tr.III/2-3,7.

The defense also challenged the officers' claim that the location of the arrest was a "high

crime area" through cross-examination and documentary exhibits.  A collection of incident reports,

which the prosecution had obtained from the Boston Police Department and then furnished to the

defense, was put in evidence as proof that the actual frequency and degree of firearm incidents in the

proximity of Wright's arrest were not substantial.  Tr.II/48-53.  See Affidavit of Charles W. Rankin,

re-filed herewith as Exhibit C.  In addition, after Officer Bordley testified that high crime areas are

identified by the Boston Police Department in bi-weekly statistical reports, the defense was allowed

to inspect the reports for August 2004 (the August reports were closest in time to Wright's

November arrest because no such reports had been prepared for September, October, or November).

See Further Affidavit of Charles W. Rankin, re-filed herewith as Exhibit D.    Those reports were

then put in evidence as proof that the location of Wright's arrest had not been flagged to the arresting

officers as a "hot spot."  Id.; Tr.III/18-19.  Ultimately, the district court found that the area where

Wright was arrested was not proven to be a "high crime area."  A.18; Tr.IV/42 ("And I do not

conclude on this evidence that the area is a quote, high crime area, close quote").

## PROPOSED FACTUAL FINDINGS

Where a defendant objects to the admission of evidence seized without a warrant, it is the

government's burden to establish that its evidence is not tainted.  *United States v. Jeffers*, 342 U.S.

48, 51 (1951); *United States v. Bonilla-Romero*, 836 F.2d 39 (1st Cir. 1987).

**A.    The Government Did Not Prove That Wright's Movements Inside the Car Evinced His
Recognition of Plainclothes Officers in an Unmarked Car as Police.**

Two of the three Boston Police Officers testifying for the government, Officers Brown and Bordley, claimed to have seen Wright lean forward in his seat in the back of the stopped car.[3]  As noted earlier, Officer Brown's testimony on this score was impeached through the use of prior inconsistent statements, through the testimony of ATF Special Agent Lisa Rudnicki, and through Boston Police Internal Affairs documents tending to undercut Officer Brown's veracity.  This Court quite rightly chose not to credit Officer Brown's account, explaining:

> I do not, having considered all the evidence, credit Officer Brown seeing him lean forward through his rear-view mirror.  There would be no reason for Officer Brown to apprehend for his safety at that point or to keep the occupants of the vehicle in immediate view because I infer these officers intended to stop, get out, and indeed make inquiry of the citizenry in that area.  They were doing aggressive patrolling.  So I don't believe that.

Tr.IV/37.

Officer Bordley did testify that Wright "leaned forward" and "looked at the other car," but the testimony was implausible.  Tr.II/39.  Bordley was in the second car, or possibly the third car, in a caravan of cars traveling with "a couple of car lengths" between them.  Tr.I/72-73,83;Tr.II/41-42.  He was behind Wright's car.  Tr.II/38.  Since it was about 7:45 at night in November, there was no natural light outside.  Tr.I/26.  The claim that Bordley could see Wright leaning forward at all, let alone the claim that he could see what Wright might have been looking at, from a measurable distance **behind** Wright in the dark of night is simply not believable.  Further, when asked to describe Wright's movements in detail, Bordley could only say, "I just remember him leaning forward."  Tr.II/40.  He could not say whether Wright had leaned to one side of the person he was sitting behind or not.  Id.  Indeed, Bordley acknowledged that he could not specifically tell Wright's

---

[3]    The third officer, Lawrence Celester, testified that he had not seen Wright's movements inside the car.  Tr.II/13.

reason for leaning forward.  Id.  This lack of detail betrays a lack of veracity.

Even if Bordley's testimony is credited, his observations establish, at most, that he saw Wright lean forward in his seat in the rear of the car.  No other aspect of Bordley's testimony can explain why he inferred from that simple motion that Wright was observing the unmarked police car in front of him.  He did not claim, for example, that Wright was tracking the police car as it passed; it is undisputed that the suspect "lean" occurred only after the police car had stopped directly in front of Wright's.  Tr.II/39; Tr.IV/23-24.  Since Bordley did not describe a single observation that evidenced Wright's purpose for leaning forward – and since Bordley himself had to admit that he could not discern Wright's purpose – his testimony regarding Wright's movements inside the car do not support an inference that Wright was aware of police presence.

**B.    There Was No Other Indication in the Evidence That Wright Had Identified the Police Before Running.**

Aside from the dubious claim that Wright leaned forward in his seat in some telling way, the universe of facts known to the police at the moment they gave chase was as follows: (1) Wright "stepped out of the motor vehicle;" (2) Wright "grabbed" his sweatshirt pocket; and (3) Wright ran down Blue Hill Avenue.  Tr.I/19;Tr.II/21-22.  This meager evidence is not an adequate factual predicate to support an inference that Wright's conduct  was a response to police presence, as opposed to "normal travel."  See United States v. Zanghi, 189 F.3d 71, 83 (1st Cir. 1999) ("Evidence of an accused's flight may be admitted at trial as indicative of a guilty mind, so long as there is an adequate factual predicate for the inference that the defendant's movement was indicative of a guilty conscience, and not normal travel"); United States v. Sharpe, 452 F.2d 1117, 1119 & n.3 (1st Cir. 1971) (evidence that defendant was seen walking at 1:00 a.m. near the scene of a crime was

insufficient to support inference of flight).

The evidence respecting Wright's initial exit of the car is far more consistent with innocent travel than with flight. Officers Brown and Bordley testified that Wright's car had been driving ahead of the caravan and had pulled over beside the mini-mart area shortly before Officer Brown's car did. Tr.I/32; Tr.II/20. Officer Brown believed the car's engine was idling as Wright got out. Tr.I/53. He also knew that Omar Edwards, the front-seat passenger, had friends who lived in one of the houses on that block, and that Edwards himself "lived right in the area there." Tr.I/38. It was not unusual to see Omar Edwards in that precise location. Id. The officers described the manner of Wright's exit from the car in notably benign terms. Officer Brown said Wright "exited the vehicle" and looked around before going on his way. Tr.I/19. Officer Bordley said Wright "ended up getting out of the rear seat, stepped out of the motor vehicle." Tr.II/21. There is nothing innately furtive or evasive about "exiting," "getting out of," or "stepp[ing] out" of a car; the testimony does not suggest any haste or anxiety in Wright's conduct whatsoever. The only fair interpretation of the circumstances described is that Wright was simply being dropped off at his destination when the police first observed him.

The testimony that Wright "grabbed" his pocket after stepping out of the car lends little else to the notion that Wright had spotted the police. Officer Brown's description of this motion was innocuous: "He grabbed onto like his sweatshirt pocket." Tr.I/19. Bordley also used the word "grabbed" consistently. Tr.II/22,37. Wright's movement, as described, exposed no effort at concealment. Contrast, e.g., United States v. Moore, 235 F.3d 700, 704 (1st Cir. 2000) ("Upon seeing the officers, [the defendant] clenched his hand in a manner indicating that he was attempting to hide something from the officers"). Nobody testified to seeing a suspicious bulge, or other visual

indication of contraband within the pocket.  Contrast, e.g., United States v. Aitoro, 446 F.3d. 246, 249 (1st Cir. 2006) (police officer "saw a bulge that he thought was a gun").  This Court observed that Wright's "clutching" of the sweatshirt pocket would be "the better way to run while carrying a heavy object."  Tr.IV/38.  During the government's closing argument, this Court remarked:

> Anyone who runs in a sweatshirt with something in their pocket clutches onto it.  If he had a tape measure, you know, a really industrial tape measure, its going to bang around there in a loose sweatshirt and you would hang onto it ... It could have been anything.

Tr.III/24.  Since the officers' testimony bore no indication that Wright's pocket contained some item that he would not want police to discover, there was no articulated basis for an inference that he grabbed his pocket in response to police presence.

        Finally, there was nothing in the manner of Wright's flight to suggest he had spotted police and was not simply running "in the exuberance of youth" or because "he had an appointment and was running back there," to name a few of the innocent possibilities articulated by this Court during closing arguments. Tr.III/16.  Unlike the defendant in Aitoro, who was heard to exclaim "oh shit" before fleeing in the opposite direction from police, Wright made no verbal acknowledgment of police.  Aitoro, 446 F.3d. at 249, 252.  Nor did he run in the opposite direction.  In fact, the testimony was that he ran straight down Blue Hill Avenue right past the other Crown Victorias in the procession.  Tr.I/19-20,83.  If he had actually recognized the first Crown Victoria as a police car, it is inconceivable that he would attempt to evade those officers by running **toward** three identical, cooperating cars.  Wright did not cross the street, enter the adjacent mini-mart area, duck into an alley, jump a fence, or even run at a particularly high rate of speed.  Contrast Illinois v. Wardlow, 528 U.S. 119, 122 (2000) (defendant ran "through the gangway and an alley"); United States v. Sculco, 82 F.Supp.2d 410, 414 (E.D. Pa. 2000) (upon the arrival of uniformed police, suspect ran

at high speed across the street, through back yards, and over fences); <u>Aitoro</u>, 446 F.3d. at 249 (defendant "sprinted" away). Wright simply "ran" down the block. Tr.I/20,45,73; Tr.II/21,33. Officers were able to apprehend him almost immediately. Tr.I/74; Tr.II/22.

In short, the evidence presented at the suppression hearing does not fairly support a finding that Wright had recognized the plainclothes officers in unmarked cars as police. The conduct witnessed by the officers signaled nothing more than a person being dropped off and running to his destination oblivious to the presence of undercover police.

**C.    The Government Failed to Establish That the Location of the Arrest Could Be Characterized as a "High Crime Area."**

The First Circuit has now instructed that relevant evidence for a factual finding as to the character of a stop's location includes the following: (1) "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case;" (2) "limited geographic boundaries of the 'area' or 'neighborhood' being evaluated;" and (3) "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue." <u>Wright</u>, 485 F.3d at 53-54. Addressing each of the enumerated factors in turn, it becomes clear that this Court's initial view of the matter was correct – the government did not establish that the location of Wright's arrest was a "high crime area" for purposes of the reasonable suspicion analysis.

1.    <u>The Nexus Between the Type of Crime Most Prevalent or Common in the Area and the Type of Crime Suspected in the Instant Case</u>.

There can be no link forged between the type of crime prevalent in the area of Wright's arrest and the type of crime suspected in this case for two reasons. First, the testifying police officers were unable to articulate the particular type of crime they expected to encounter at the mini-mart area. Unlike <u>Wardlow</u>, these officers described the area as "simply generally crime ridden." <u>See</u> <u>Wright</u>,

485 F.3d at 54, citing Wardlow, 528 U.S. at 124.  Officer Brown testified that crime in that area consisted of "firearm violence, drug activity, street robberies, breaking and enterings, all types of street crimes actually."  Tr.I/16.  Officer Celester could only state that the area was "a trouble spot. There's been shootings there, there's been a lot of crime there.  It's a high crime area."  Tr.I/70. Officer Bordley described the typical misconduct as "drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature."  Tr.II/18.  On the night that Wright was stopped, police "just happened to be" in the area; they usually went by that area "at least once" in a tour of duty.  Tr.II/31-32,43.  As this Court observed in its original findings, this evidence merely established that the incidence of crime in the Mattapan area "is higher in an absolute sense than the surrounding suburbs."  Tr.IV/42-43.

Second, the police never stated what type of crime they suspected Wright of committing. While there was testimony that Wright was seen clutching his pocket, there was no testimony regarding what might have been in his pocket.  Contrast Moore, 235 F.3d at 704 (where officers were in a neighborhood known for drug activity, in a building where they had just observed indicia of ongoing drug sales, suspect's act of clenching hand "attempting to hide something" suggested involvement in illegal drug activity).  And while there was testimony that Wright leaned forward in the car, there was no suggestion that he was engaged in any criminal misconduct inside the car. Contrast United States v. Ivery, 427 F.3d 69, 70-71, 73 (1st Cir. 2005) (driver was observed driving in an area of Chinatown known for drug activity, leaning to the right where open glove compartment revealed a box of plastic sandwich bags).  The character of the neighborhood where Wright was stopped, as described, cannot be relied upon as somehow informing the officers' interpretation of Wright's conduct, since no such link was articulated.  It would be unconstitutional to allow police

to interrogate anybody looking generally suspicious simply because they were doing so in an area with a relatively high rate of "all types of street crime." Compare United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005).

      2.    Limited Geographic Boundaries of the 'Area' or 'Neighborhood' Being Evaluated.

As the Court of Appeals observed, "[n]one of the officers offered boundaries or a definition of the 'area' being described as a 'high crime area.'" Wright, 485 F.3d at 49 n.3. Police spoke of the "neighborhood" or "corridor," and had little to say about the precise section of the corridor where Wright was arrested. Tr.I/16, II/18. See United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.") See also  United States v. Caruthers, 458 F.3d 459, 468 (6th Cir. 2006) (concerns raised in Montero-Camargo were alleviated because, inter alia, "the 'high crime' area is circumscribed to a specific intersection rather than an entire neighborhood").

The empirical evidence produced by the defense actually showed that the immediate vicinity of Wright's arrest could not properly be characterized as having a high incidence of crime. The incident reports produced by the Boston Police department describing the incidence of crime within a 1000-foot radius of the arrest showed that during the six week period prior to the arrest, there were only two incidents of violent crime. Exhibit C. The nearest "hot spots" identified in Boston Police Department tabulations were 1.5 miles and over 2 miles away from the location of the arrest. Exhibit D. The evidence before this Court fell short of providing the "specific data" relative to crime in a "circumscribed area" that is required. Montero-Camargo, 208 F.3d at 1138 & n.32.

3.    Temporal Proximity Between Evidence of Heightened Criminal Activity and the Date of the Stop or Search at Issue.

The record is devoid of any indication that the incidence of criminal activity in the area of Wright's arrest had increased near the date of the arrest. Officer Bordley was questioned directly on this point and offered no specifics, other than the possibility that there were reports. Tr.II/29-31. In response to this testimony, the government was asked to produce the reports referenced by Officer Bordley. The government produced records from August 2004, and explained that similar records for September, October, and November 2004 did not exist. Exhibit D (Affidavit of Special Agent Lisa Rudnicki). As such, the government failed to demonstrate any temporal proximity between evidence of heightened criminal activity and the date of the stop at issue.

In sum, the government's evidence that the area of Wright's arrest was a "high crime area" amounted to no more than "mere war stories." Montero-Camargo, 208 F.3d at 1138 n.32; Id. at 1143 ("Just as a man with a hammer sees every problem as a nail, so a man with a badge may see every corner of his beat as a high crime area ... But to rely on every cop's repertoire of war stories to determine what is a 'high crime area' - and on that basis to treat otherwise innocuous behavior as grounds for reasonable suspicion - strikes me as an invitation to trouble") (Kozinski, J., concurring). The character of a location may only be deemed a proper basis for reasonable suspicion where the police officers' knowledge of the history of that location somehow informs their interpretation of particular conduct. Since the testifying officers could not articulate any link between the character of 1220 Blue Hill Avenue and the nature of Wright's conduct in this case, the "high crime area" factor should not enter into the reasonable suspicion analysis.

**PROPOSED CONCLUSIONS OF LAW**

-13-

It is apodictic that merely running down the street, oblivious to police presence, does not give rise to reasonable suspicion for Fourth Amendment purposes, no matter the character of the neighborhood. Thus, if this Court finds insufficient evidence that Wright was aware of the police, his motion to suppress must be granted. If the Court does find sufficient evidence that Wright knowingly "fled" from police, the following legal analysis concerns the interplay of that factual finding and the evidence concerning the character of the neighborhood. For the reasons set forth below, this Court should rule that Wright's flight – viewed alone or in conjunction with evidence concerning the character of the location – did not engender reasonable suspicion to detain him.

**A.    Summary of Applicable Legal Principles**

Under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, an officer may conduct a brief, investigatory stop when that officer has "a reasonable, articulable suspicion that criminal activity is afoot." No matter how valid the need to assert police presence in a given neighborhood, police cannot detain a pedestrian without a specific basis for believing he is involved in criminal activity. Brown v. Texas, 443 U.S. 47, 52 (1979).

Ever since the advent of the Terry stop, trial courts have endeavored to measure the degree of suspicion attaching to a person's flight from police. See Charles L. Hobson, Flight and Terry: Providing the Necessary Bright Line, 3 Md. J. Contemp. Legal Issues 119, 131-140 (1992) (collecting and discussing cases). Since January 12, 2000, the touchstone for the analysis has been the Supreme Court's decision in Illinois v. Wardlow, 528 U.S. 119 (2000). The Wardlow Court had been invited by the litigants to draw a "bright-line rule" on the subject. Wardlow, 528 U.S. at 126 (Stevens, J. dissenting). The State of Illinois asked for a rule authorizing the temporary detention of anyone who flees at the mere sight of a police officer. Id. The defendant espoused the opposite

*per se* rule – that the fact that a person flees upon seeing the police can never, by itself, be sufficient to justify a <u>Terry</u> stop.  <u>Id</u>.  The Court declined to endorse either rule.  Instead, the court held that the <u>Wardlow</u> defendant's "unprovoked flight upon noticing the police," coupled with his "presence in an area of expected criminal activity," together justified the police in stopping him to investigate further.  <u>Wardlow</u>, 528 U.S. at 124-25.

The <u>Wardlow</u> holding has come to be known in many jurisdictions as the "flight 'plus'" rule – flight alone is not enough to justify a police stop, but "flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion." <u>United States v. Bonner</u>, 363 F.3d 213, 217-18 (3rd Cir. 2004).  <u>See also</u> Kevin Jay Kercher, <u>The Investigative Stop: What Happens When We Run?  Illinois V. Wardlow, 528 U.S. 119 (2000)</u>, 77 N.D. L. Rev. 123, 142 & n.216 (2001) (discussing lower courts' responses to <u>Wardlow</u>).  The circuit court has articulated the <u>Wardlow</u> rule as follows: "An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under <u>Terry</u>." <u>United States v. Scott</u>, 270 F.3d 30, 41 (1st Cir. 2001).  <u>See also</u> <u>Aitoro</u>, 446 F.3d. at 252 ("<u>Wardlow</u> turned primarily on two factors: the defendant's presence in an area known for heavy narcotics trafficking and the defendant's 'headlong flight' the moment he noticed the police").

Since <u>Wardlow</u>, few federal courts have directly addressed in a reported decision the question whether flight from police, by itself, can justify a stop.[4]  Those that have generally conclude that flight alone is not enough.  <u>E.g.</u>, <u>Bonner</u>, 363 F.3d at 215; <u>United States v. Gordon</u>, 231 F.3d 750, 756 (11th Cir. 2000) (while flight may be "perfectly innocent," defendant's flight coupled with

---

[4]    The vast majority of state courts (cited in the briefing in the court of appeals) considering the question have concluded that flight alone cannot justify a <u>Terry</u> stop.

officers' knowledge of frequent violent crime and drug trafficking in defendant's location, together

justified <u>Terry</u> stop); <u>United States v. Baker</u>, 2006 WL 1116433, *1 (D. Minn. 2006) (Slip Copy)

(absent any objective evidence that defendant was in a high crime area, defendant's flight alone did

not justify stop).  <u>See also United States v. Ramires</u>, 172 F.Supp.2d 1208, 1217 (D. Neb. 2001)

("Running from the police would probably not be sufficient to detain a person for investigation

absent other circumstances"), <u>aff'd</u>, 307 F.3d 713 (8th Cir. 2002).  At least one court has speculated

in *dicta* that flight alone may justify a <u>Terry</u> stop, but it does not appear that any reported decision

has upheld a stop based solely on a defendant's flight.  <u>See United States v. McGrath</u>, 89 F.Supp.2d

569, 576 (E.D. Pa. 2000) (citing <u>Wardlow</u> for observation that "attempted flight from police, without

more, could provide a lawful basis for reasonable suspicion under certain circumstances").

      Much has been written since <u>Wardlow</u> on the dangers of authorizing the temporary detention

of anyone who flees at the mere sight of police, most of which stem from the profoundly ambiguous

nature of such flight.  <u>See generally Wong Sun v. United States</u>, 371 U.S. 471, 482-83 (1963)

(discussing ambiguity involved with flight from police).   Justice Stevens, in his oft-cited

<u>Wardlow</u> dissent, observed:

> Among some citizens, particularly minorities and those residing in high crime areas, there
> is also the possibility that the fleeing person is entirely innocent, but, with or without
> justification, believes that contact with the police can itself be dangerous, apart from any
> criminal activity associated with the officer's sudden presence. ... [T]he evidence supporting
> the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and
> too persuasive to be disparaged as inconclusive or insufficient.

<u>Wardlow</u>, 528 U.S. at 132-35 (Stevens J., dissenting) (footnotes and citations omitted).  One author

describes the mind-set of the segment of the population referred to by Justice Stevens – the victims

of well-documented police practices of harassment and brutality – as follows:

> Because minorities and residents of high crime areas are popular targets of police abuse, they are also the ones most prone to run at the mere sight of police. In fact, as Professor Paul Butler suggests, such flight is a component of black culture. Some black parents educate their children at an early age about the dangers of police officers and how survival depends on staying away from them. Butler, for instance, shared an anecdote from his own childhood in which his mother punished him for merely conversing with a police officer. There are numerous black citizens who admit to taking extreme measures in their daily lives in order to escape police attention. Such efforts to evade police are not evidence of guilt, but rather are reasonable (and perhaps reflex) reactions by a culture with a history of being victimized by the law enforcement regime.

Amy D. Ronner, Fleeing While Black: The Fourth Amendment Apartheid, 32 Colum. Hum. Rts. L. Rev. 383, 395 (Spring 2001), citing Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 Yale L.J. 677, 700 (1992). These authorities, and many others, have marshaled abundant evidence regarding police practices in minority communities to craft a forceful rebuttal to the notion that flight from police is inherently indicative of wrongdoing. See California v. Hodari D., 499 U.S. 621, 624 n.1 (1991) (suggesting that it might be reasonable to stop "young men who scatter in panic upon the mere sighting of police" since Proverbs 28:1 counsels that "The wicked flee when no man pursueth"), and compare, e.g., Stanley A. Goldman, Running from Rampart, 34 Loy. L.A. L. Rev. 777 (2001) ("the Rampart scandal provides us with an unfortunate yet excellent illustration of why ... many a reasonable and innocent person might well find it prudent to run upon the arrival of police").

The particularly ambiguous nature of flight in many urban communities must be taken into account in any judicial analysis of reasonable-suspicion where police detained someone simply because he ran when he spotted them. Judge Woodlock explained the courts' function in this regard in United States v. McKoy, 402 F.Supp.2d 311 (D. Mass. 2004), aff'd, 428 F.3d 38 (1st Cir. 2005):

> [T]he heart of the reasonableness analysis in such cases, it must be remembered, is a balancing of interests – the police in their physical safety and citizens in their liberty. For

this to be carried out on something other than an uncalibrated scale, the real costs to be borne on both sides must be acknowledged.

McKoy, 402 F.Supp.2d at 316. Judge Woodlock also observed that the task of defining the overarching limits on police conduct during investigatory stops falls nearly exclusively to the courts in the context of reviewing motions to suppress. Id. at 314-15. He noted that courts are almost entirely free from addressing searches that result in no contraband being found, although such searches "are events of real constitutional and cultural significance." Id. He further noted that the civil enforcement of constitutional remedies "is by and large not a productive – and consequently ... an infrequently used – manner of invoking judicial scrutiny in this setting." Id. at 315 n.5. For these reasons, Judge Woodlock emphasized, it is the exclusionary rule that is the primary mechanism of enforcing the constitutional boundaries of permissible police practices. Id. at 315-16.

**B.    Application of Law to Facts.**

Even if the facts found by this Court would warrant a reasonable belief that Wright's conduct was a response to police presence, that alone would not entitle the police to detain him. As this Court observed after the original hearing, police were converging on the mini-mart area to engage in their "aggressive policing tactics" – they planned to "confront" the citizenry, to "show their presence," and to "make inquiry" of the numerous people coming and going there. Tr.I/37; Tr.IV/23, 37. The citizens in the area, including Wright, were constitutionally entitled to avoid the impending confrontation, and the police would not be permitted to chase down all those who scattered as they descended. Instead, police would need some additional articulable reason to suspect a person of criminal wrongdoing in order to justify an incursion of his liberty. Aitoro, 446 F.3d. at 252; Scott, 270 F.3d at 41.

In Wright's case, there were simply no "other indicia of wrongdoing" beside Wright's flight itself that might color that lawful conduct. <u>Bonner</u>, 363 F.3d at 215. Notably, although the police testified to seeing Wright grab his pocket, they did not testify that this movement fueled their suspicion in any way. <u>Cf</u>. <u>United States v. Lott</u>, 870 F.2d 778, 784 (1st Cir. 1989) ("An officer cannot have a **reasonable** suspicion that a person is armed and dangerous when he in fact has **no** such suspicion") (emphasis in original), <u>citing</u> <u>Sibron v. New York</u>, 392 U.S. 40, 46, 64 (1968) (finding <u>Terry</u> frisk invalid where officer never suggested that he feared suspect was armed). Nor did the officers articulate any nexus between the incidence or nature of the criminal activity in the location of the stop and Wright's particular conduct. Law enforcement officers are, of course, permitted to draw "inferences and deductions that might well elude an untrained person," but the Fourth Amendment requires an officer "to explain **why** the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." <u>United States v. Johnson</u>, 171 F.3d 601, 604 (8th Cir. 1999) (emphasis in original), <u>citing</u> <u>United States v. Cortez</u>, 449 U.S. 411, 417-22 (1981). In this case, the officers did not describe a single suspicious inference drawn from Wright's apparently innocent conduct. <u>Contrast</u> <u>Moore</u>, 235 F.3d at 702 & n.1 (officer testified to observations indicating that suspect was concealing contraband or a weapon in his hand, including evidence that drugs were being distributed out of the building in which police encountered the suspect).

This case is easily distinguishable from <u>United States v. Aitoro</u>, for example, where the defendants flight at the sight of police in a high crime area did give rise to reasonable suspicion. <u>Aitoro</u>, 446 F.3d. at 252. Judge Stahl wrote: "This case would be closer to the outer bounds of <u>Wardlow</u> had the surveilling officer not heard one of the two fleeing men cry 'Oh, shit' before

-19-

turning to run." Id. Further, the fleeing men were seen "looking warily over their shoulders" as they "sprinted" away. Id. These observations contributed substantial heft to the police perception that the men were running to evade apprehension for some wrongdoing, rather than running for some innocent purpose. Id. at 252-53. None of the factors keeping Aitoro clear of Wardlow's outer bounds was present in this case.

Since Wright's behavior was just as consistent with innocent travel as with furtive conduct, this case stands on equal footing with United States v. McKoy, 428 F.3d 38 (1st Cir. 2005), upholding the district court's allowance of a motion to suppress. In that case, two Boston police officers approached the defendant's vehicle with probable cause to believe he had committed two traffic violations. McKoy, 428 F.3d at 40. The officers made eye contact with the defendant, and then saw him twice lean and move his arm toward the center console area. Id. at 39. Suspecting that the defendant might have been reaching for a weapon, police ordered him out of the car and conducted a pat-frisk which revealed cocaine and marijuana. Id.

The government advanced similar justifications for that Terry encounter to those advanced in this case: first, that the defendant was in a high crime area, and, second, that the defendant's nervousness and movements could have indicated that he was reaching for a weapon. The First Circuit held that prior criminal incidents in the neighborhood were not of a kind or degree that would reasonably contribute to the perception that this particular defendant was armed. McKoy, 428 F.3d at 40. Regarding the defendant's nervousness and movements, Judge Stahl wrote a nervous manner is easily explained when one is approached by police. He articulated three critical points, equally applicable to Wright's case: (a) it is common and natural to be made nervous by police presence; (b) perfectly lawful actions do not give rise to reasonable suspicion simply because those actions could

-20-

also possibly be consistent with criminal conduct; and (c) the characterization of a location as a "high crime area" does not itself afford unfettered latitude to law enforcement in questioning its citizenry.

Since there was nothing particularly suspicious in the manner or location of Wright's flight, his flight alone did not give police authority to stop him against his will.  Compare United States v. Davis, 94 F.3d 1465, 1468-69 (10th Cir. 1996) (since the conduct of one of four passengers in a parked car – in exiting the car upon the arrival of police, looking at the officers, and then walking away with his hands in his pockets – did not warrant a Terry stop, he was entitled to go on his way). Wright had every right to flee the impending confrontation with police.  See Florida v. Royer, 460 U.S. 491 (1983) (holding that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business).

## CONCLUSION

Based on the findings of fact and rulings of law set forth herein, the defendant's motion to suppress should be ALLOWED.

<div style="margin-left:50%">

Respectfully submitted,
**GREGORY R. WRIGHT**
By his attorneys,

/s/ Charles W. Rankin
_____
Charles W. Rankin, BBO #411780
Michelle Menken, BBO #644537
Rankin & Sultan
One Commercial Wharf North
Boston, MA 02110
(617) 720-0011

</div>

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non participants on September 27, 2007.

/s/ Charles W. Rankin
_____
Charles W. Rankin

Westlaw.
485 F.3d 45                                                              Page 1
485 F.3d 45
(Cite as: 485 F.3d 45)

C

U.S. v. Wright

C.A.1 (Mass.),2007.

United States Court of Appeals,First Circuit.
UNITEDSTATES of America, Appellee,
v.
Gregory WRIGHT, Defendant, Appellant.
No. 06-1351.

Heard Dec. 4, 2006.
Decided May 4, 2007.

**Background:** Defendant was convicted on conditional guilty plea in the United States District Court for the District of Massachusetts, William G. Young, J., of being felon in possession of firearm, and he appealed District Court's denial of motion to suppress evidence.

**Holding:** The Court of Appeals, Lipez, Circuit Judge, held that fact that weapon was ultimately recovered when police stopped and frisked defendant could not be used as factor in determining presence of reasonable suspicion for *Terry* stop.

Vacated and remanded.
West Headnotes
**[1] Arrest 35 ☞63.5(5)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop- And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(5) k. Particular Cases. Most Cited Cases
Fact that weapon was ultimately recovered when police stopped and frisked individual who had exited back seat of automobile at time unmarked police cars approached, and had then run down street while reportedly grabbing at one side of his sweatshirt, could not be used as factor in determining presence of reasonable suspicion for *Terry* stop; consideration of weapon to find motive, and in turn flight, constituted "backwards" reasoning by trial court that went beyond objectively reasonable appraisal of facts available to officers at time of stop. U.S.C.A. Const.Amend. 4.

**[2] Criminal Law 110 ☞1158(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(O) Questions of Fact and Findings
            110k1158 In General
                110k1158(1) k. In General. Most Cited Cases
Court of Appeals typically reviews federal district court's factual findings for clear error.

**[3] Searches and Seizures 349 ☞36.1**

349 Searches and Seizures
    349I In General
        349k36 Circumstances Affecting Validity of Warrantless Search, in General
            349k36.1 k. In General. Most Cited Cases
Fruits of search cannot be used to establish that same search's validity under Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[4] Arrest 35 ☞63.5(4)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop- And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases
*Terry* stop is valid if objectively reasonable appraisal of facts available to police officers supports their suspicion of defendant. U.S.C.A. Const.Amend. 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit A**

485 F.3d 45
485 F.3d 45
**(Cite as: 485 F.3d 45)**

**[5] Arrest 35 ☜63.5(4)**

35 Arrest
  35II On Criminal Charges
    35k63.5 Investigatory Stop or Stop- And-Frisk
      35k63.5(3)   Grounds   for   Stop   or
Investigation
        35k63.5(4)     k.     Reasonableness;
Reasonable or Founded Suspicion, Etc. Most Cited
Cases
Character of location where *Terry* stop is made, i.e.
whether location is "high-crime area," thereby
supporting finding of reasonable suspicion, is issue
of fact. U.S.C.A. Const.Amend. 4.

**[6] Arrest 35 ☜63.5(4)**

35 Arrest
  35II On Criminal Charges
    35k63.5 Investigatory Stop or Stop- And-Frisk
      35k63.5(3)   Grounds   for   Stop   or
Investigation
        35k63.5(4)     k.     Reasonableness;
Reasonable or Founded Suspicion, Etc. Most Cited
Cases
Factors in whether location where *Terry* stop is
made is "high-crime area," thereby supporting
finding of reasonable suspicion, include: (1) nexus
between type of crime most prevalent or common
in area and type of crime suspected in instant case;
(2) limited geographic boundaries of "area" or
"neighborhood" being evaluated; and (3) temporal
proximity between evidence of heightened criminal
activity and date of stop or search at issue.
U.S.C.A. Const.Amend. 4.

**\*46** Charles W. Rankin, with whom Michelle
Menken and Rankin & Sultan were on brief, for
appellant.
Randall E. Kromm, Assistant United States
Attorney, with whom Michael J. Sullivan, United
States Attorney, was on brief, for appellee.

Before TORRUELLA, Circuit Judge, STAHL,
Senior Circuit Judge, and LIPEZ, Circuit Judge.
LIPEZ, Circuit Judge.

After several Boston police officers approached the
car in which appellant Gregory Wright was sitting,
the officers saw Wright run from the car and grab
the right side of his sweatshirt. Wright then refused
to stop when ordered to do so. Apprehended almost
immediately and found to be carrying a gun, he was
arrested for being a felon in possession of a firearm.
Wright unsuccessfully moved to **\*47** suppress the
gun, arguing that the stop was illegal. He then
entered a conditional guilty plea. Because a legal
error in the district court's analysis affected its
factual findings underlying the issue of reasonable
suspicion, we must vacate the judgment and remand
for further proceedings.

**A. Factual Background**

On the evening of November 8, 2004, a caravan of
four unmarked police cars was patrolling in
Dorchester, Massachusetts. The cars were Crown
Victorias, a model widely associated with police
departments. The plainclothes officers in the
caravan were members of the Boston Police
Department Youth Violence Task Force.

At about 7:45 p.m., the caravan was driving north
on Blue Hill Avenue and slowed down as the lead
car passed a vehicle that had just pulled over in
front of a mini-mart at 1216 Blue Hill Avenue. The
parked car was partially blocking one of two
driveway entrances to the mini-mart parking lot.
Officer Brown, who was sitting in the lead car's
front passenger seat, looked to his right as they
passed the parked vehicle and observed three
people, one of whom he recognized as Omar
Edwards, a neighborhood resident. He did not
recognize the driver or the passenger seated in the
back seat of the parked car. Immediately after
passing this parked vehicle, Officer Brown's car
pulled over to the right parking lane, in front of the
parked car. The rest of the caravan came to a stop
in the right travel lane to the rear of the parked car.
The front passenger of the second police car,
Officer Bordley, then observed the back seat
passenger of the parked car, later identified as
Gregory Wright, lean forward as though he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

looking at the Crown Victoria that had just pulled over in front of his car.[FN1] Wright then exited his car, on the passenger side, and began to run southward down Blue Hill Avenue. As he ran, Wright put one hand on the right side of his sweatshirt, grabbing or holding onto the sweatshirt pocket.

> FN1. There was some disagreement about the order in which the police cars were driving. Officers Brown and Bordley both testified that their cars were first and second, respectively, of the four cars. However, Officer Celester testified that his car was second and Officer Bordley's was third. The district court did not make any factual findings about the order of the vehicles. We assume, for ease and clarity, that Officer Bordley's car was second and Officer Celester was in the third car.

Officer Brown quickly exited his car, as did a number of the other officers in the caravan. The police ordered Wright to stop running, but he did not obey this directive. Within a matter of seconds, the officers caught up to Wright, who resisted the officers' attempts to frisk him. The police succeeded in patting Wright down and recovered a silver pistol from his sweatshirt pocket. Wright was arrested for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Wright moved to suppress the gun on the ground that the stop was unlawful. After a hearing, which included testimony by Officers Brown, Bordley, and Celester, the district court made a series of factual findings and concluded, based on those findings, that the officers had reasonable suspicion to stop Wright. Given their centrality to this appeal, we recount those findings in detail.

### B. The Court's Findings

#### 1. Wright's Conduct

The first, and most significant, factual issue at the suppression hearing was whether Wright had fled from the police. *48 Wright argued that he had not

"fled," but simply had arrived near his pre-designated destination, exited the car, and run to that destination. Given well-established precedent that a defendant's flight from the police contributes to reasonable suspicion, Wright argued that there was insufficient evidence that his running could properly be characterized as flight. In support of a finding of flight, the government argued that the police officers had seen Wright lean forward in his seat, enabling him to better observe the car that had pulled over in front of his vehicle, and that Wright ran when he recognized it as a police car. Two officers, Brown and Bordley, testified to seeing Wright lean forward.

The district court did not credit Officer Brown's testimony, finding it implausible that he had observed Wright's movement through a rearview mirror. Therefore, the pivotal testimony was that of Officer Bordley, who was in the second vehicle, behind Wright's car. Bordley testified that after the lead vehicle pulled over, he saw Wright "lean[ ] forward to observe the unmarked motor vehicle that had pulled over." He stated that after Wright leaned forward, Wright got out of the car, grabbed the right side of his sweatshirt, and ran down the street.

The court credited Officer Bordley's testimony,[FN2] and found that when Wright leaned forward in his seat, he was able to see the Crown Victoria and its occupants, thereby becoming aware that it was a police car which contained police officers. The court also found that Wright then promptly opened the rear passenger door and exited the car, in response to the police presence, and fled down Blue Hill Avenue to avoid interaction with those officers. The court summarized its reasoning as follows: "Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he was carrying a weapon and I do so reason."

> FN2. The district court stated that its finding was also based upon Officer Celester's testimony. Both parties agree, however, that Officer Celester testified that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

485 F.3d 45
485 F.3d 45
(Cite as: 485 F.3d 45)

he did not see anything that occurred inside of Wright's car, and only observed Wright's movements after he exited his car.

The court then proceeded to its second factual finding-that Wright "clutched" or grabbed at his sweatshirt while running. All three police officers who testified described Wright "grabbing" or "tugging at" the right side of his sweatshirt while he ran. Officer Brown described Wright's movement as follows: "Once he exited the vehicle he turned, turned to his right, grabbed onto his hooded sweatshirt pocket right about here and began to run up Blue Hill Avenue." Officer Celester testified that Wright was "tugging" at his clothes with his right hand, in his "waist area," and that he "appeared to be trying to pull something out of his waist area." Officer Bordley said that Wright "stepped out of the motor vehicle, grabbed the right side of his sweater and took off running up Blue Hill Avenue." These statements were the only evidence presented to the district court on this issue.

The court, however, found not simply that Wright had made a grabbing movement, but that he did so *because* he was carrying a gun. The court explained: "Because he was carrying the weapon in his sweatshirt and the weapon was heavy, naturally, he clutched it and his, he clutched it through the, through the sweatshirt and his clutching of the weapon, the better to run while carrying a heavy object, was observed by the police officers...."

### *49 2. High Crime Area

The district court also considered the character of the area in which the stop occurred, in response to the government's attempt to show that it was a "high crime area."

Officer Brown testified that "that area of Blue Hill Avenue, as well as that corridor, is a very high crime area consisting of firearm violence, drug activity, street robberies, breaking and enterings, all type of street crimes actually." He added that he had personally investigated crimes and responded to shootings and drug incidents "in that area."[FN3]

Officer Celester described the 1200 block of Blue Hill Avenue as a "trouble spot," and explained that "there's been shootings there, there's been a lot of crime there. It's a high crime area." He further testified more generally that he had previously made arrests "in that neighborhood" and had witnessed crimes being committed "in that area." Officer Bordley explained how he, and other members of the Youth Violence Task Force, determine whether a particular area is a high crime area: "There are weekly and biweekly reports that are done. They keep stats on what's happening in the city, and they have a meeting every two weeks and they report those stats in the meeting." He went on to explain that the "neighborhood around the 1200 block of Blue Hill Avenue" has a "level of criminal activity [that] would be considered high for that area. Numerous arrests for drug offenses, violent crimes, violent assaults, assaults and batteries, firearms arrests, things of that nature." Like the others, he had personally visited the neighborhood for previous criminal incidents.

> FN3. None of the officers offered boundaries or a definition of the "area" being described as a "high crime area."

After the government completed its presentation of the officers' testimony, Wright requested the Police Department reports mentioned by Officer Bordley. These reports provided the number of violent crimes that had occurred throughout the city during the preceding two weeks, broken down by police precinct. In addition, the reports identified certain "hot spots," or specific locations where crime had been particularly high. The district court permitted some additional limited discovery and the city produced incident reports for August 2004.[FN4] Wright then offered these reports into evidence and relied on them in his closing argument to the court. Wright cited the reports as evidence that the location of his arrest was not high in crime, according to the Boston Police Department's own definition, because it was not encompassed by any of the "hot spots" identified in the August incident reports.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. The court ordered the government to provide the two reports produced immediately before Wright's stop on November 8, 2004. Although Officer Bordley testified that these reports were typically generated for biweekly meetings, the government stated that the Police Department was altering the "format and procedures" for those meetings during the months of September and October in 2004. Therefore, no reports were available for the months immediately preceding Wright's stop and the August reports were the most recent.

The district court deemed most of the evidence presented on this issue-including the officers' testimony and the Boston Police Department incident reports-credible:

I find that the Boston Police Department has [a] mapping system and it maps criminal incidents. I find that the evidence that I have received as to where those incidents occurred and when is credible. I find that the internal operations of the Boston Police Department*50 quite properly results in periodic updates of these maps and based in part upon the maps and the officers' own law enforcement skills and intelligence information about what's going on on the street they deploy their resources accordingly and in good faith and not in a stereotyped or racially motivated or any improper basis. I find all that evidence credible.

However, the court acknowledged a concern about the relevant scope of a high crime area designation: "It may be crucial here to conclude that the specific mini mart area, this specific portion of Blue Hill Avenue and Morton Street is a high crime area." Describing the high crime finding first as "a mixed question of fact and law" and later as "a legal conclusion," the court concluded that it could not find that the relevant area, whatever it might be, was a high crime area. I reject the argument that because there were four police unmarked police cruisers coming up Blue Hill Avenue in this area, filled with a number of police officers, skilled and experienced police officers, that somehow by

definition because they're there it's a high crime area. And I do not conclude on this evidence that the area is a, quote, high crime area, close quote. Primarily because I'm not clear what that is. I mean, I have a common sense definition of it. And it's quite clear to me, I think I could take judicial notice that the incidence of crime in the Dorchester area of Boston is higher in an absolute sense than the surrounding suburbs. I am not insensitive, though I don't know that I could take judicial notice of the fact that as it is reported in the newspapers and as this Court has had some experience in other cases, gang violence is a phenomenon seen more often in certain residential sections of the City of Boston than in surrounding suburbs. Any common sense judgment would corroborate that.

But does that constitute a, quote, high crime area as the Supreme Court of the United States was referring to it in *Illinois v. Wardlow?*[FN5] I'm not clear that it does. Because in that case, though on the surface it seems so similar, the language of Chief Justice Rehnquist when he says they were converging on a specific area known for heavy narcotics traveling, and they expected to encounter drug customers and individuals acting as lookouts. That's different than this. This was aggressive patrolling where they intend, I infer, to get out of their cruiser, make inquiry of the Wright vehicle, if not of other people, lawfully but aggressively to find out where they were going and what they were doing.

FN5. In *Illinois v. Wardlow,* 528 U.S. 119, 124-26, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the Supreme Court held that officers had reasonable suspicion when they encountered a man who fled from them without provocation in a "high crime area." The Court explained that

[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

485 F.3d 45
485 F.3d 45
**(Cite as: 485 F.3d 45)**

whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis. *Id.* at 124, 120 S.Ct. 673.

### C. Reasonable Suspicion

Having made its factual findings regarding Wright's conduct, and having rejected the government's assertion that Wright *51 was arrested in a high crime area, the district court addressed the legal question of reasonable suspicion.

Mr. Wright got out [of the car] and started to run clutching the weapon in his sweatshirt. When he did that, I rule the officers had sufficient reasonable suspicion ... to compel him to stop for a brief interaction, a *Terry* interaction. And since that's so, everything that happened thereafter was appropriate police conduct and the motion to suppress is denied. I make this ruling on the specific facts of this case, and the specifics of this particular case without drawing what I think is a legal conclusion that this was a high crime area but finding, really without equivocation, that he did lean forward, he knew that was a police car that had stopped in front of him, that's why he got out of the car and that's why he ran.

With the motion to suppress denied, the gun that was recovered when the officers frisked Wright became admissible evidence.

Wright entered a conditional guilty plea, while reserving his right to appeal the district court's suppression ruling. He was sentenced to 70 months' imprisonment and filed this appeal. He now argues that some of the district court's factual findings underlying its conclusion of reasonable suspicion of criminal activity were clearly erroneous.

Wright raises two questions on appeal. He asserts that the district court's factual finding of flight was erroneous, and, alternatively, requests that we reverse the legal finding of reasonable suspicion. We do not address the court's reasonable suspicion analysis because we find an impermissible error in its antecedent factual findings. Thus, we express no opinion as to whether the facts of this case, had they been appropriately found, provided a sufficient basis for the officers to reasonably believe that Wright was engaged in criminal activity.

### A. Wright's Conduct

[1][2][3] On appeal, Wright first challenges as unsupported the district court's factual finding of flight-specifically, that Wright leaned forward to see the Crown Victoria's occupants, recognized them as police officers, and ran because of their presence. We typically review a district court's factual findings for clear error. *United States v. Coplin,* 463 F.3d 96, 100 (1st Cir.2006). This case, however, presents an unusual complication. Throughout its oral ruling, the district court relied on the later-acquired knowledge that Wright possessed a gun to evaluate the evidence about his conduct. Indeed, the court candidly acknowledged its backwards reasoning: "Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he was carrying a weapon and I do so reason." It is a central tenet of Fourth Amendment jurisprudence that the fruits of a search cannot be used to establish that same search's validity. "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light...."*Byars v. United States,* 273 U.S. 28, 29-30, 47 S.Ct. 248, 71 L.Ed. 520 (1927). Similarly, a court evaluating the validity of a stop must determine whether the officer, at the time he began the stop, had reasonable suspicion of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 19-20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Use of the results of the stop to determine whether the objective facts available to the officer justified the stop is a legal error. *See *52 United States v. Ubiles,* 224 F.3d 213, 218-19 (3d Cir.2000) ("The District Court's rationale for not suppressing the firearm in this case is troubling, therefore, insofar as it seems to endorse the stop based on the fruits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obtained as result of the subsequent search. This post-hoc justification for stops and searches has been repeatedly rejected.").

[4] Wright claims that the district court's finding on flight should be rejected because it was infected with self-described "backwards" reasoning. Although the government concedes that the reasoning was erroneous, it contends that the factual finding on flight may still be affirmed because the error was harmless. The government claims that the district court's reliance on the eventual recovery of a gun was limited to its comments regarding Wright's motives for running, and motive is irrelevant to the reasonable suspicion analysis. Noting that a stop is valid if an "objectively reasonable" appraisal of the facts available to the officers support their suspicion of the defendant, *Coplin*, 463 F.3d at 100, the government argues that the court's finding about Wright's flight from the police officers was not affected by its "backwards" reasoning.

We disagree. The court explained that it found Wright had fled not simply because it credited Officer Bordley's testimony about his observations and the inferences he drew from them, but also because that testimony was corroborated by the logical notion that Wright was running from the police *because* he had a gun.

I also, I want complete candor here, but of course I, I find that Mr. Wright was carrying a weapon. There's been no evidence he was licensed or not. But given the nature of these charges, I infer that Mr. Wright knew that at least there was some question about his carrying that weapon and he didn't want to confront the police. And so I infer that it made perfect sense for him, seated in the back seat of a car, to lean forward to assure himself that the vehicle that had pulled out of the traveled way and come to a stop in front of the car in which he was riding was in fact a police vehicle.

Can I reason backwards from the fact that what happened next was that the police officers discovered the weapon on Mr. Wright? I think it is undisputed he was carrying a weapon and I do so reason.

We find it impossible to discern whether the court would have concluded that Wright knowingly fled from the police if it had not considered the eventual recovery of the gun. At the hearing, Wright argued that Officer Bordley's testimony, alone, was insufficient to support a finding of flight because Bordley was behind Wright's car and could not see what Wright did while leaning forward (i.e., whether Wright leaned forward to look at the car in front of him, or to talk to the front seat passengers, or for some other reason altogether). The district court appears to have responded to this argument by citing the fact of the gun as corroboration that Wright's running was specifically a response to the police presence. Given that explanation, we cannot determine how much weight the court gave to the gun and how much it gave to Officer Bordley's testimony describing what he saw before Wright ran. Moreover, we are unable to say that the error was confined to irrelevant comments on Wright's motives for running. The court's oral ruling suggests that the court used the gun to illuminate a likely motive, and, more importantly, further relied on that motive for its finding of flight. The legal error committed by the district court is thus significant and, we conclude, incurable. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice*53 & Procedure: Civil* § 2585 (2d ed. 1995) ("Insofar as a finding [of fact] is derived from the application of an improper legal standard to the facts, it cannot be allowed to stand.").

The same type of "backwards" reasoning affected the court's analysis of the testimony by the officers that Wright was "clutching" or "grabbing" at his sweatshirt as he fled. None of the police officers testified that Wright's grabbing motion suggested to them that he was carrying a gun. None of them testified that they believed, at the time they initiated the stop, that he was carrying a heavy object. The district court, however, explained that it credited their testimony about the grabbing movement because Wright did, in fact, have a gun and it would be sensible for him to clutch it while running:

Because he was carrying the weapon in his sweatshirt and the weapon was heavy, naturally, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

485 F.3d 45
485 F.3d 45
(Cite as: 485 F.3d 45)

clutched it and his, he clutched it through the, through the sweatshirt and his clutching of the weapon, the better to run while carrying a heavy object, was observed by the police officers following and indeed by Officer Brown who by now had turned around.

Again, the court appears to have made a factual finding in erroneous reliance on the eventual fruits of the search. Here, though, the court used the evidence recovered through the search not only to validate the officers' testimony, but to expand upon it. Using the existence of the gun, and the court's commonsense assumption that the gun was heavy, the court made a factual finding that Wright grabbed his sweatshirt because he was carrying a heavy gun. As with the finding of flight, we conclude that this factual finding about Wright grabbing his sweatshirt was tainted with a significant legal error and cannot be allowed to stand.

### B. High Crime Area

The district court discussed, at some length, the character of the area where Wright was stopped. It stated that it "d[id] not conclude on this evidence that the area is a 'high crime area.' Primarily because I'm not clear what that is." The court also expressed its doubts about whether the character of the area was a legal question or a mixed question of fact and law.

The parties dispute whether the court made a high crime area finding or declined to do so. Wright insists that the court explicitly found that the area of his arrest was not a high crime area. The government insists that the court's uncertainty about the nature of a high crime area means that the court did not actually make a high crime area finding. We need not resolve this dispute. Instead, in light of the remand we must order, we respond to the court's acknowledged uncertainty about the nature of the high crime area determination and the factors relevant to that determination.

[5] We see no reason to treat the character of the stop's location as other than a factual issue. *See,*

*e.g., United States v. Bonner,* 363 F.3d 213, 216 (3d Cir.2004) (applying the clearly erroneous standard to the factual finding that area was not high in crime); *United States v. Diaz-Juarez,* 299 F.3d 1138, 1142 n. 2 (9th Cir.2002) (applying clearly erroneous standard to factual finding that area was high in crime); *United States v. Trullo,* 809 F.2d 108, 111 (1st Cir.1987) (collecting cases showing that the character of an area is an "articulable fact" that may be considered in the reasonable suspicion analysis).

[6] In most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most **\*54** prevalent or common in the area and the type of crime suspected in the instant case, *e.g., Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 (noting that the area was not simply generally crime-ridden, but was particularly "known for heavy narcotics trafficking," where the defendant was suspected of drug activity); *United States v. Edmonds,* 240 F.3d 55, 60 (D.C.Cir.2001) (noting that the finding of a high crime area was supported by the similarity between the type of crime commonly found at that location and the type of crime for which the police suspected this defendant); (2) limited geographic boundaries of the "area" or "neighborhood" being evaluated, *e.g., United States v. Caruthers,* 458 F.3d 459, 468 (6th Cir.2006) (affirming a district court's finding of a high crime area, in part, because the evidence of frequent crime was specific to the exact intersection where the stop occurred); *United States v. Montero-Camargo,* 208 F.3d 1122, 1138 (9th Cir.2000) (en banc) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity."); and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue, *e.g., United States v. Bailey,* 417 F.3d 873, 874-75, 877 (8th Cir.2005) (affirming high crime area finding, in part, because of criminal activity during

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

485 F.3d 45
485 F.3d 45
**(Cite as: 485 F.3d 45)**

week prior to the stop at issue, occurring in same location as the stop). Evidence on these issues could include a mix of objective data and the testimony of police officers, describing their experiences in the area.

Given the significance of location in evaluating the totality of the circumstances, *see, e.g., United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."), and in light of the considerations set forth herein, the district court, upon remand, may wish to reevaluate the high crime area issue. However, we wish to be clear that we are not directing the district court to reconsider its high crime area finding, and we are not suggesting what that finding should be, if it chooses to revisit the issue.

Because of the legal error that impermissibly tainted the district court's factual findings on Wright's conduct, we vacate the judgment below and remand this case for further proceedings consistent with this opinion.

*So ordered.*

C.A.1 (Mass.),2007.
U.S. v. Wright
485 F.3d 45

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Criminal No.
05-10001-WGY

* * * * * * * * * * * * * * * *
                               *
                               *
UNITED STATES OF AMERICA        *
                               *    **MOTION TO SUPPRESS**
v.                              *      (Volume 4)
                               *
GREGORY WRIGHT                  *
                               *
* * * * * * * * * * * * * * * *


BEFORE:  The Honorable William G. Young,
                   District Judge


APPEARANCES:

        NADINE PELLEGRINI and S. WAQAR HASIB,
Assistant United States Attorneys, 1 Courthouse
Way, Suite 9200, Boston, Massachusetts 02210, on
behalf of the Government

        RANKIN & SULTAN (By Charles W. Rankin, Esq.
and Michelle Menken, Esq.), 1 Commercial Wharf
North, Boston, Massachusetts 02110, on behalf of
the Defendant


**Exhibit B**


1 Courthouse Way
Boston, Massachusetts

July 29, 2005

1    answer right before where the Court just read.

2        THE COURT:  Which is:  Did you see what happened?

3    Yes is the answer.  And then up above that it says -- oh,

4    you're absolutely right.  Leaned forward to observe the

5    unmarked motor vehicle that had pulled over.

6        Thank you.  I'm sorry.

7        MS. PELLEGRINI:  I'm sorry, I didn't have it in

8    front of me and I got lost.

9        THE COURT:  That's all right.  I looked at the

10   wrong highlighting.  I see it.  Thank you.  All right, thank

11   you very much.

12       MS. PELLEGRINI:  Thank you, your Honor.

13       THE COURT:  In resolving this motion to suppress

14   there are really three separate areas I want to comment on

15   and I will, actually four, and I'll reserve my right should

16   there be further proceedings to amplify on this and put it

17   in a more orderly fashion in a written decision.

18           The first is a matter of, and is an institutional

19   matter, a discovery matter.  Having reflected on the

20   interaction of the Massachusetts Freedom of Information Act

21   and the Federal Rules of Criminal Procedure it appears to

22   the Court that the two do not interact in the sense that the

23   Massachusetts act does not expand discovery permissible as

24   of right under the Federal Rules of Criminal Procedure, and

25   the indigency of a defendant does not alter the operation of

  1    those rules.  Those rules apply equally to all litigants on

  2    the criminal side of the Court.

  3         What is interesting to this Court is that the

  4    Massachusetts Supreme Judicial Court has in recent years

  5    read its own Freedom of Information Act to make access to

  6    internal personnel and, I shouldn't say personnel, to

  7    Internal Affairs reports of police departments more

  8    accessible than I had thought was the case.  That's due to

  9    inattention on my part, not any question about the propriety

 10    of that state high court making its judgments about its own

 11    statutes.  I honor that and respect it.  This had been a

 12    phenomenon that I had not known about.

 13         I do note that the desirability of making such

 14    inquiry under the Massachusetts Freedom of Information Act

 15    is of little moment in the Massachusetts courts because of

 16    their restrictive view of other bad act evidence, even other

 17    bad act evidence that goes to a character for truthfulness

 18    or untruthfulness.  One can -- and when you compare that

 19    with the federal evidentiary rules those rules are somewhat,

 20    one might even say considerably broader.

 21         This can easily be seen by comparing, if you look

 22    at Young, Pollets and Poreda Massachusetts Evidentiary

 23    Standards, Standard 608(b) with the cognate Federal Rule of

 24    Evidence 608(b), it's easy to see that the Federal Rule of

 25    Evidence is broader than the state rule.  And as one who has

1    thought carefully about codifying the Massachusetts Rules of

2    Evidence in this text, I think the Massachusetts evidentiary

3    standard is accurate.

4        All of which leads, leads to a conclusion that

5    competent defense counsel in federal court ought routinely,

6    when they're facing police testimony, as they so often are,

7    seek to find out what they can from the local police forces

8    in an effort to cross-examine the police witnesses who will

9    testify in federal court.

10        It appears to this Court that operating under

11    regulations properly designed to protect uninvolved parties,

12    since this is all collateral evidence to matters directly in

13    federal court, that this is a slow, cumbersome process,

14    costly for the cities and towns of the Commonwealth, and

15    they have no particular incentive to move speedily.

16        And all of this is something of an aside in this

17    case, though I have followed the in camera procedure that I

18    thought was fair simply to get my thoughts on the record so

19    that I may go back and refer to them further in other cases.

20        The following seems to me -- the following is

21    suggested.  One, competent defense counsel ought make these

22    Freedom of Information Act requests.  Two, they do not

23    expand discovery under the Federal Rules of Criminal

24    Procedure and do not implicate any special rights for an

25    indigent defendant.  The rub comes when because of the

1    slowness of the state procedures, given the realities of

2    their financing, their disinterest institutionally, and

3    their proper need to protect those who are uninvolved, they

4    move at a snail's pace compared to a federal criminal case.

5    All of which leads me to believe that we will again face,

6    one, motions to continue in federal court so that the state

7    discovery can play out, even though it's of matters entirely

8    collateral, and two, motions for orders to state actors to

9    either speed things up or take particular actions or the

10   like.

11        On reflection, I'm not sure that I was wise in

12   engaging in the in camera proceeding that I adopted in this

13   case.  It seemed fair.  But I don't suggest I'll be doing

14   that in every case.  Because I'm going to be asked in every

15   case it seems to me.

16        Nevertheless, that's the first point and those are

17   just ruminations.

18        The second point I want to make, blocking out the

19   findings and rulings in this case, is a general credibility

20   determination.  And I say this.  The evidence in this case

21   is largely, though not entirely, undisputed.  Defense

22   counsel has, appropriately, thoroughly examined the

23   witnesses and has been afforded the opportunity to do so.

24   But largely the events of this incident are undisputed.

25   There are some disputes and I will try to be clear in

1    resolving the evidentiary, the factual findings when I

2    resolve those disputes.

3         Now, the third thing that I must do is find the

4    facts and then draw the legal conclusions from those facts.

5    And I proceed to do that now.

6         On November 8th, 2004, police officers of the

7    Boston Police Department Youth Violence Task Force were

8    engaged in aggressive patrolling in the area of Blue Hill

9    Avenue and Morton Street in Dorchester, Massachusetts.  They

10    were in unmarked police vehicles, specifically Crown

11    Victorias, and the first car was occupied by Officers Brown,

12    Jones and Outerbridge.

13         As that car passed the vehicle occupied by Mr.

14    Wright, Mr. Wright seated in the back seat of his vehicle,

15    Officer Brown looked to his right and saw in the front

16    passenger seat of the Wright vehicle an individual by the

17    name of Osmond Edwards.  Mr. Edwards was known to the police

18    having earlier been a victim of a shooting and having been

19    severely injured in that shooting.

20         The three officers in the first car pulled to the

21    right and out of the traveled lane and brought the first

22    unmarked police car to a stop somewhat in front of, not

23    bumper to bumper, but in front of and in a reasonable

24    proximity to the car in which Mr. Wright was seated.  The

25    other police cars, in caravan behind, but in the traveled

1    way, seeing the car in which Mr. Brown was traveling, pulled

2    to the right, stopped in the traveled way.

3         Now what is clearly a significant factual finding

4    and I'll both make it and state my basis for it.

5         Mr. Wright leaned forward in his position in the

6    back seat and I infer identified the vehicle that had pulled

7    out of the traveled way as a police vehicle.

8         Why do I make that finding? I do not, having

9    considered all the evidence, credit Officer Brown seeing him

10   lean forward through his rear-view mirror. There would be

11   no reason for Officer Brown to apprehend for his safety at

12   that point or to keep the occupants of the vehicle in

13   immediate view because I infer these officers intended to

14   stop, get out, and indeed make inquiry of the citizenry in

15   that area. They were doing aggressive patrolling. So I

16   don't believe that. However, I do believe Officers Bordley

17   and Celester who testified that they saw Mr. Wright's

18   movement.

19        I also, I want complete candor here, but of course

20   I, I find that Mr. Wright was carrying a weapon. There's

21   been no evidence he was licensed or not. But given the

22   nature of these charges, I infer that Mr. Wright knew that

23   at least there was some question about his carrying that

24   weapon and he didn't want to confront the police. And so I

25   infer that it made perfect sense for him, seated in the back

1    seat of a car, to lean forward to assure himself that the

2    vehicle that had pulled out of the traveled way and come to

3    a stop in front of the car in which he was riding was in

4    fact a police vehicle.

5         Can I reason backwards from the fact that what

6    happened next was that the police officers discovered the

7    weapon on Mr. Wright?  I think it is undisputed he was

8    carrying a weapon and I do so reason.

9         What happened next is -- that's the crucially

10   disputed factual finding.  Well, no, there's a second one.

11   But on that I believe he leaned forward, he saw that it was

12   an unmarked police officer, he knowledgeably recognized it

13   as such.  It's undisputed then he got out of the vehicle in

14   which he was riding and he ran away from the police vehicle

15   back up the street.  Because he was carrying the weapon in

16   his sweatshirt and the weapon was heavy, naturally, he

17   clutched it and his, he clutched it through the, through the

18   sweatshirt and his clutching of the weapon, the better to

19   run while carrying a heavy object, was observed by the

20   police officers following and indeed by Officer Brown who by

21   now had turned around.

22        The officers called upon Mr. Wright to stop.  He

23   did not.  He was in short order run down and after a

24   struggle the weapon was discovered.

25        The other factual issue -- it actually is not --

1    it's a mixed question of fact and law.  It's a question

2    which should there be further proceedings the Court of

3    Appeals will derive its own conclusion on.  And as to that I

4    make the following findings.

5         I find that as to each of the matters that the

6    witnesses testified, save for their conclusions, they are

7    credited.  That is to say, I find that the Boston Police

8    Department has this mapping system and it maps criminal

9    incidents.  I find that the evidence that I have received as

10   to where those incidents occurred and when is credible.  I

11   find that the internal operations of the Boston Police

12   Department quite properly results in periodic updates of

13   these maps and based in part upon the maps and the officers

14   own law enforcement skills and intelligence information

15   about what's going on on the street they deploy their

16   resources accordingly and in good faith and not in a

17   stereotypical or racially motivated or any improper basis.

18   I find all that evidence credible.

19        Now, having said that, it may be crucial here to

20   conclude that the specific mini mart area, this specific

21   portion of Blue Hill Avenue and Morton Street is a high

22   crime area.  The language, that language is used in the

23   seminal case of Wardlow v. Illinois, Chief Justice Rehnquist

24   as he begins his opinion on Page 119 refers to an area known

25   for heavy narcotics traveling.  And then later at Page 124

1    talks about the police officers there, Nolan and Harvey were

2    among eight officers in a four-car caravan that was

3    converging on an area known for heavy narcotics traveling

4    and the officers anticipated encountering a large number of

5    people in the area, including drug customers and individuals

6    serving as lookouts.

7         Now, that was the record before the Supreme Court

8    of the United States in Wardlow v. Illinois.  Reference is

9    made in the Court's opinion and the dissent quotes the

10    phrase "high crime area."

11         With all the respect, I am struck by the incisive

12    and I'll say brilliant decision of my colleague Judge

13    Woodlock in United States v. McKoy.  I had not ever been

14    directed to that decision though it was decided late last

15    year.  And I especially want to make reference to his

16    discussion under B, star 19, High Crime Locale, but, but

17    then I want to quote this observation which appears at star

18    9, a quote which, which draws on Justice Stevens'

19    concurrence and dissent, and I want to insert it here:

20         Courts have developed factors, and have called for

21    the police to identify articulable facts, warranting frisks

22    in an attempt to place real limits on police conduct during

23    investigatory stops.  But these boundaries have been

24    subjected to constant pressure in the case law.  This should

25    come as no surprise considering the posture in which most of

1    these cases appear before judges.  Searches that result in

2    no weapons or contraband being found do not -- as a

3    practical matter -- make it to the courthouse door.  Yet,

4    they are events of real constitutional and cultural

5    significance that courts are almost entirely free from

6    addressing.  See Illinois v. Wardlow, 528 U.S. 119, 133,

7    Note 7, 2000, Stevens, J., concurring in part and dissenting

8    in part, citing New York Daily News article regarding an,

9    quote, informal survey of a hundred young black and Hispanic

10   men living in New York city; 81 reported having been stopped

11   and frisked by police at least once; none of the 81 stops

12   resulted in arrests, close quote.  The exclusionary rule

13   operates in an environment in which it is only those cases

14   where weapons or contraband -- such as the drugs in this

15   case -- are found that receive consistent judicial scrutiny

16   and then in the context of motions to suppress evidence.

17          And now going over, omitting a footnote and going

18   over to star 11, the following:  Courts are left, as a

19   consequence, to define the overarching boundaries within

20   which police must work in the context of discrete cases

21   where officers make compelling, and often quite reasonable

22   claims, as a practical if not a legal matter.  Courts defer

23   to the officer's judgment and evidence is admitted in cases

24   where the predictions and concerns of the officers have by

25   definition been substantiated.  Although the evidence itself

1    is ordinarily not identified as part of the formal legal

2    analysis, it is difficult to conclude it was objectively

3    unreasonable for the officers to believe a suspect was armed

4    when in fact he was.

5         My colleague's comments I truly think say it

6    brilliantly.  And I share them.

7         I reject the argument that because there were four

8    police unmarked police cruisers coming up Blue Hill Avenue

9    in this area, filled with a number of police officers,

10   skilled and experienced police officers, that somehow by

11   definition because they're there it's a high crime area.

12   And I do not conclude on this evidence that the area is

13   quote, high crime area, close quote.  Primarily because

14   not clear what that is.  I mean, I have a common sense

15   definition of it.  And it's quite clear to me, I think

16   could take judicial notice that the incidence of crime

17   the Dorchester area of Boston is higher in an absolute sense

18   than the surrounding suburbs.  I am not insensitive, though

19   I don't know that I could take judicial notice of the fact

20   that as it is reported in the newspapers and as this Court

21   has had some experience in other cases, gang violence is a

22   phenomenon seen more often in certain residential sections

23   of the City of Boston than in the surrounding suburbs.  Any

24   common sense judgment would corroborate that.

25         But does that constitute a, quote, high crime area

as the Supreme Court of the United States was referring to
it in Illinois v. Wardlow?  I'm not clear that it does.
Because in that case, though on the surface it seems so
similar, the language of Chief Justice Rehnquist when he
says they were converging on a specific area known for heavy
narcotics traveling, and they expected to encounter drug
customers and individuals acting as lookouts.  That's
different than this.  This was aggressive patrolling where
they intended, I infer, to get out of their cruiser, make
inquiry of the Wright vehicle, if not of other people,
lawfully but aggressively to find out where they were going
and what they were doing.

Now, having said all that, and I stick by it, in
this case the officers in no way provoked Mr. Wright.  None
of their conduct provoked him into flight.  And none of
their conduct, because I credit the uniform testimony that
there had been no interaction between the police and anybody
in the Wright vehicle prior to the time that Mr. Wright got
out and started to run.

Now, Mr. Wright got out and started to run
clutching the weapon in his sweatshirt.  When he did that, I
rule the officers had sufficient reasonable suspicion,
notwithstanding Wardlow, to compel him to stop for a brief
interaction, a Terry interaction.  And since that's so,
everything that happened thereafter was appropriate police

1    conduct and the motion to suppress is denied.

2          I make this ruling on the specific facts of this

3    case, the specifics of this particular case without drawing

4    what I think is a legal conclusion that this was a high

5    crime area but finding, really without equivocation, that he

6    did lean forward, he knew that was a police car that had

7    stopped in front of him, that's why he got out of the car

8    and that's why he ran.

9          Those are my findings and rulings.

10          Now, how shall we proceed?  Have I set a trial date

11    in this case?

12          MR. RANKIN:  There's no trial date, your Honor.

13          THE COURT:  Because you're --

14          MR. RANKIN:  We were just engaged in this process

15    of sorting through this.

16          THE COURT:  That's what you told me before.

17          MR. RANKIN:  Yes.

18          THE COURT:  Well, shall I set a status date then

19    where -- have you -- again, is it going to be a conditional

20    plea or is going to be a plea where you test me on the

21    motion to suppress?

22          MR. RANKIN:  My thinking as I stand here without

23    having had a chance to speak with Mr. Wright after your

24    Honor's ruling is that we probably will want to do a

25    conditional plea.  I don't feel comfortable making that

police department that comes before the Court frequently,

wants to see if ever there's an instance of untruthfulness.

I'm not clear. But I, but I thank you. We'll look

at it again.

All right. We'll recess.

**MS. PELLEGRINI:** Thank you, your Honor.

**THE CLERK:** All rise.

(Adjournment.)

## C E R T I F I C A T E

I, Donald E. Womack, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.

DONALD E. WOMACK
Official Court Reporter
P.O. Box 51062
Boston, Massachusetts 02205-1062
womack@megatran.com

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

CRIMINAL NO. 05-10001-WGY

---

UNITED STATES

v.

GREGORY R. WRIGHT

---

**AFFIDAVIT OF CHARLES W. RANKIN**

Being duly sworn, Charles W. Rankin states:

1.      In March 2005, the defendant made a discovery request of the government that it provide:

Incident reports, statistical compilations, and/or other documentation reflecting the
number of arrests by local, state, and federal authorities for firearms or drug offenses
in the area of 1216 Blue Hill Avenue, Dorchester, Massachusetts, and reflecting
whether or not those arrests resulted in criminal convictions;

In response, we were given: (1) a map purporting to reflect the number and type of "incidents with

a firearm" occurring within 1000' feet of the spot where Greg Wright was arrested between 6/9/04

and 11/8/04 (the date of the arrest); and (2) a list of police incident reports pertaining to "violent

crime involving a firearm" occurring within 1000' feet of the spot where Greg Wright was arrested

between 6/9/04 and 11/8/04.  This office then obtained the actual incident reports cited on that list

for the months of October, and November 2004.[1]

---

[1]      The government also furnished the defense with a similar map and chart for the
time period November 9, 2004 until April 9, 2005.  Those incidents have not been analyzed
because they occurred after the defendant's arrest on November 8, 2004.

**Exhibit C, part 1**

An analysis of these materials yielded the following results:

The incidents for October and the first week of November (not including Greg Wright's arrest), ascending by date, are:

October

| 10/09/04 | 765 Morton Street | FCOM | 40546087 | (report unavailable) |
| 10/09/04 | BHA & Morton | FCOM | 40545909 | |
| 10/12/04 | 34 Woolson | | 40553606 | |
| 10/19/04 | 0 Ormond Street | | 40567475 | |
| 10/23/04 | 22 Woolson | FCOM | 40575436 | |
| 10/25/04 | 1210 Blue Hill Ave | FCOM | 40578605 | (report unavailable) |
| 10/26/04 | 67 Goodale Road | FARR | 40604691 | (report unavailable) |
| | | | | (We do have 40580797, 40581326, 40581399, 40581535, 40580913) |
| 10/28/04 | 749 Morton Street | PERGUN | 40586144 | (report unavailable) |
| | | | | (We do have 40586215) |
| 10/30/04 | 10 Deering Road | FCOM | 405588692 | |
| 10/30/04 | 1220 Blue Hill Ave | FARR | 30170948 | |

November

| 11/03/04 | 10 Sutton Street | FCOM/FARR/FREC | 40597447 | |
| 11/05/04 | 20 Outlook Road | FCOM | 40601611 | |
| 11/08/04 | 1187 Blue Hill Ave | FCOM | 40608099 | |

The incident reports are discussed below. In sum, of the 11 incident reports that we have, only two incidents (numbers 2 and 3 below) justifiably contribute to the police officers' claimed perceptions of the area. Eight incidents do not contribute to the officers' perception of a high crime area. Incident number 7, characterized as an unarmed robbery, could be classified either way.

1.    040545909
      10/09/04
      BHA & Morton
      Domestic Violence, 209A, verbal dispute

This was a radio call to police that the complainant's ex boyfriend had been following her and her male companion, and "gestured like he had a weapon" before leaving the area. This was properly characterized as a "verbal dispute." This was domestic, there was no actual firearm, and this alleged crime would not lead to conclusion that this was a high firearm crime area.

2. 040553606
   10/12/04
   34 Woolson Street
   Armed Robbery

   The complainant appeared at the police station reporting that at the above location, two unknown black males came up behind him, put a gun to his head, and took his wallet and his jewelry.

3. 040567457
   10/19/04
   Ormond Street/Evelyn & BHA
   Armed Robbery
   1 original & 1 supplementary report

   Complainant reported that as he was exiting an ice cream store at BHA & Evelyn St, a group of approx. 6 males asked him for a dollar. When he refused, they followed him, jumped him, pointed a silver revolver at him, and took his money out of his pockets.

4. 040575436
   10/23/04
   Astoria St/Norfolk St.
   ABDW
   1 original &1 supplementary report

   This report regarded a person who was shot in Walker Playground near Astoria Street. The actual events occurred approximately one mile away from 1222 BHA (beyond the 1000' radius). The incident appears on our incident map as a "firearm complaint" because the complainant was found on the steps at 22 Woolson St.

5. 40580797 (40581326, 40581399, 40581535, 40580913 = officer injuries)
   10/26/04
   67 Goodale
   ABDW

   Police responded to a complaint that a man had followed a woman from the bus and

-3-

wouldn't leave her alone, even when her boyfriend intervened. Police asked him to leave the property where the woman and her boyfriend were (a multi-unit house at 67 Goodale), and he did not respond. When police tried to physically escort him off the property, he became physically combative. A massive struggle ensued, which ended up involving and injuring a number of officers. During the course of the struggle, the suspect attempted to take one of the officer's firearms but was unsuccessful. This appears to be the only reason his arrest is listed as a "firearms arrest." According to the report we have, the suspect was charged with: ABPO, resisting, trespassing, ABDW (shod foot), attempted larceny of a firearm, and larceny of an officer's badge.

6.    40586215
      10/28/04
      749 Morton St
      Warrant Arrest

      The suspect here was arrested on a warrant. The report is extremely confusing, but it does not appear that this suspect was ever alleged to have a gun. Instead, police found this agitated person while responding to a call to the same address for a person with a gun. The report references cc no. 40586144, which we do not have. The list of incident reports lists cc no. 40586144 as an assault with a dangerous weapon. This incident report (40586215) is not on that list or on the map, because no firearm was involved.

7.    040588692
      10/30/04
      10 Deering Road
      Juvenile, Unarmed Robbery

      This incident was  classified as "unarmed" robbery.  A group of youths (some juveniles, some adults) allegedly appeared at the complainant's home (?) and took his/her cell phone by force. One of the alleged perpetrators gestured as if he had a gun. No gun was actually observed.

8.    030170948
      10/30/04
      1220 BHA
      Warrant Arrest

      Police arrested the suspect on an outstanding warrant relating to an April 2003 incident at Wellington Hill & Deering Rd.  The suspect had been confronted by

-4-

police for being a junkie on the street at night, and a single live shotgun shell was found in a jacket pocket as a result of a pat frisk.

9.    40597447
      11/03/04
      10 Sutton Street
      A D/W

    This was some kind of a co-worker dispute. Apparently, one employee of Home Depot in Natick drove a number of other employees home on this date. More than one of them lived at 10 Sutton. At some point during the transport, after the Sutton St. residents had been dropped off, the suspect began threatening a bunch of his co-workers with a gun. At some point, the suspect went to Sutton St. and threatened the Home Depot employees who were there with a gun. He was soon apprehended and the firearm recovered.

    The fact that this incident occurred within 1000' of 1222 BHA has less to do with the character of the area, and more to do with employee relations at Home Depot in Natick.

10.   040601611
      11/05/04
      1475 Dorchester Ave.
      A D/W

    This is a report of a firearm incident that occurred at the Fields Corner T Station at 1475 Dorchester Ave, approximately 2 miles away from 1222 BHA. It shows on our incident map as a "firearm complaint" because the complainant reported the incident once he arrived at school. The school was the Lewenberg School at 20 Outlook Road, which is very close to 1222 BHA.

11.   040608099
      11/08/04
      1187 BHA
      Domestic Violence, 209A, ADW

    This was a report of a domestic assault with a gun. Police apprehended the suspect some distance away. He said he didn't have a gun, and police make no note of him actually having one.

    This domestic incident does not contribute to the notion that people are walking the

streets in this neighborhood with guns.

A copy of the material received from the government in response to the discovery request is attached as Exhibit A.  Copies of the incident reports for the incidents occurring in October and November 2004 are attached as Exhibit B.

Signed under the penalty of perjury on July 18, 2005

_____
Charles W. Rankin



Incidents with a Firearm within 1000 Feet of 1222 Blue Hill Ave

Time Period 6/8/04 - 11/8/04

1222 Blue Hill Ave

Map Legend
+ Homicide (0)
◎ Robbery (4)
▲ Agg. Assault (6)
◒ Firearm Arrest (11)
⊟ Firearm Complaint (23)
🔫 Recovered Firearm (4)

EXHIBIT A

## Violent Crime Involving a Firearm Within 1000 Feet of 1222 Blue Hill Ave June 8, 2004 through November 8, 2004

| Date | Location | Type | Weapon | Crime Code | Nature Code | CC# |
|---|---|---|---|---|---|---|
| 8/9/2004 | 1165 Blue Hill Ave | Unlawful Possession of Firearm | | FARR | ROBRPT | 40597575 |
| 10/19/2004 | 0 ORMOND ST | ROB,STREET,ALLEY, ARMED | | 03xx | IVPER | 40674725 |
| 10/12/2004 | 34 WOOLSON ST | ROB,STREET,ALLEY, ARMED | | 03xx | IVPER | 40553606 |
| 6/13/2004 | LESTON ST & MORTON ST | ROB,ST,ALLEY ATT,ARMED | Firearm | 03xx | IVPER | 40304519 |
| 7/24/2004 | 1262 BLUE HILL AV | ROB- VAR,ST,ETC.,ATT,ARMED | Firearm | 03xx | ARMROB | 40387841 |
| 8/28/2004 | WILDWOOD ST & WOOLSON ST | A&B DANG.WPN - GUN | Firearm | 04xx | SHOT | 40457567 |
| 9/25/2004 | 1150 BLUE HILL AV | A&B DANG.WPN - GUN | Firearm | 04xx | SHOT | 40517800 |
| 7/9/2004 | 17 EVELYN ST | ASSAULT DANG.WPN - GUN | Firearm | 04xx | PERGUN | 40358076 |
| 10/28/2004 | 749 MORTON ST | ASSAULT DANG.WPN - GUN | Firearm | 04xx | PERGUN | 40586144 |
| 6/12/2004 | 6 DEERING RD | ASSAULT DANG.WPN - GUN | Firearm | 04xx | ARREST | 40303174 |
| 11/8/2004 | 1187 BLUE HILL AV | ASSAULT DANG.WPN - GUN | Firearm | 04xx | PERGUN | 40608099 |
| 9/21/2004 | MORTON ST | CARRYING OR POSSESSION | Firearm | 04xx | PERGUN | 40508904 |
| 6/10/2004 | 46 WILDWOOD ST | CARRYING OR POSSESSION | | FREC | PERGUN | 40299657 |
| 6/12/2004 | 6 Deering Rd | Assault Dangerous Weapon - Gun | | FARR | | 40303246 |
| 6/13/2004 | BLUE HILL AV & LESTON | POLICE SERVICES-TRAFF ETC | | FARR | | 40304453 |
| 8/11/2004 | LUCERNE ST & WINSTON RD | POLICE SERVICES-TRAFF ETC | | FCOM | SHOTS | 40424100 |
| 8/22/2004 | 41 Woolson | Unlawful Possession of Firearm | | FARR | SHOTS | 30344095 |
| 8/21/2004 | 22 WOOLSON ST | INVEST PREMISES, OBJECTS | | FCOM | SHOTS | 40444673 |
| 8/28/2004 | 22 WOOLSON ST | INVESTIGATE PERSON ROUTINE | | FCOM | SHOT | 40457567 |
| 9/11/2004 | 760 MORTON ST | INVESTIGATE PERSON ROUTINE | | FCOM | PSHOT | 40488126 |
| 10/26/2004 | 67 Goodale Rd | Assault Dangerous Weapon - Gun | | FARR | | 40064691 |
| 10/30/2004 | 1220 Blue Hill Ave | Unlawful Possession of Firearm | | FARR | PSHOT | 30170948 |
| 10/23/2004 | 22 WOOLSON ST | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40575436 |
| 10/28/2004 | 749 MORTON ST | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40586144 |
| 10/30/2004 | 10 DEERING RD | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40588692 |
| 10/9/2004 | 765 MORTON ST | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40546087 |
| 10/25/2004 | 1210 BLUE HILL AV | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40578605 |
| 10/9/2004 | BLUE HILL AV & MORTON ST | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40545909 |
| 11/3/2004 | 10 Sutton St | Unlawful Possession of Firearm | | FARR | PERGUN | 40597447 |
| 11/8/2004 | 1222 Blue Hill Ave | Unlawful Possession of Firearm | | FARR | | 40608531 |
| 11/3/2004 | 10 Sutton St | Unlawful Possession of Firearm | | FARR | PERGUN | 40597447 |
| 11/8/2004 | 1187 Blue Hill Ave | Unlawful Possession of Firearm | | FARR | | 40608099 |
| 11/8/2004 | 10 Sutton St | Unlawful Possession of Firearm | | FCOM | SHOTS | 40601611 |
| 11/3/2004 | 1187 BLUE HILL AV | | | FARR | PERGUN | 40597447 |
| 11/5/2004 | 20 OUTLOOK RD | | | FCOM | | 40608099 |
| 11/8/2004 | 1187 BLUE HILL AV | | | FCOM | SHOTS | 40601611 |
| 11/5/2004 | 10 SUTTON ST | CARRYING OR POSSESSION | | FCOM | PERGUN | 40597447 |
| 11/3/2004 | 10 SUTTON ST | CARRYING OR POSSESSION | | FREC | PERGUN | 40597447 |
| 11/8/2004 | 1222 blue hill ave | CARRYING OR POSSESSION | | FREC | | 40608531 |

Violent Crime Involving a Firearm
Within 1000 Feet of 1222 Blue Hill Ave
June 8, 2004 through November 8, 2004

| Date | Location | Type | Weapon | Crime Code | Nature Code | CC# |
|---|---|---|---|---|---|---|
| 8/22/2004 | 41 HOSMER | CARRYING OR POSSESSION | | FREC | | 30344095 |
| 6/18/2004 | 761 MORTON ST | INVESTIGATE PERSON ROUTINE | | FCOM | SHOT | 40316149 |
| 7/9/2004 | 1165 Blue Hill Ave | Possession, Firearm, Altered Serial Numbers | | FARR | | 40356983 |
| 7/9/2004 | 1165 Blue Hill Ave | Unlawful Possession of Firearm | | FARR | | 40356983 |
| 7/9/2004 | 17 EVELYN ST | ASSAULT DANG.WPN - GUN | | FCOM | PERGUN | 40358076 |
| 7/10/2004 | 20 HOSMER ST | | | FCOM | SHOTS | 40359386 |
| 7/10/2004 | BLUE HILL AV & MORTON ST | | | FCOM | SHOT | 40360813 |
| 8/2/2004 | LUCERNE ST & WINSTON RD | | | FCOM | SHOTS | 40404606 |
| 7/9/2004 | 20 HOSMER ST | INVEST PREMISES, OBJECTS | | FCOM | SHOTS | 40358782 |
| 7/27/2004 | 14 HOSMER ST | INVESTIGATE PERSON ROUTINE | | FCOM | PERGUN | 40393773 |
| 8/1/2004 | MORTON ST & WILDWOOD ST | INVESTIGATE PERSON ROUTINE | | FCOM | SHOTS | 40401662 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS DOMESTIC VIOLENCE | | COMPLAINT NO 040545909 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT 209A, VERBAL DISPUTE | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/09/04 | B |
| LOCATION OF OCCUR. BLUE HILL AV , MORTON ST | APT. | DISPATCH TIME 12:13 AM | TIME OF OCCUR. A.12:13 AM | B |

| | APT. | OCCUPATION | | | RACE | | MARITAL STATUS |
|---|---|---|---|---|---|---|---|

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | | | AGE 0 | D.O.B |
|---|---|---|---|---|---|

| PERSON REPORTING SAME | ADDRESS | APT. | PHONE |
|---|---|---|---|

| WAS THERE A WITNESS TO THE CRIME | | | | | | | A | ☐ ☒ |
|---|---|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | RES | YES NO |
| | | | | | | | BUS | |

NUMBER OF PERPETRATORS : 1 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME

| P E R S O N S | STATUS SUSPECT | | | | | ID NO. | BOOKING NO. | PHOTO NO. | ALIAS | B | ☒ ☐ YES NO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | WARRANT NO | ADDR | | | SEX | | | EYES | | | |
| | SPECIAL CHARACTERISTICS (INCLUDING CLOTHING) | | | | | | | | | | |

| CAN SUSPECT VEHICLE BE DESCRIBED | | | | | | | C | ☐ ☒ |
|---|---|---|---|---|---|---|---|---|
| V E | STATUS SUSPECT VEHICLE | REG. STATE | REG NO | | | | | YES NO |
| | VEHICLE MAKE | | | | | | | |
| S | NO NAME | | OWNER'S'S ADDRESS | | | | | |

| CAN PROPERTY BE IDENTIFIED | | | | | | | D | ☐ ☒ |
|---|---|---|---|---|---|---|---|---|
| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | YES NO |

| IS THERE A SIGNIFICANT M.O. | | | | | E | ☐ ☒ |
|---|---|---|---|---|---|---|
| M O | TYPE OF WEAPON-TOOL UNKNOWN | NEIGHBORHOOD COMMERCIAL & RESIDENTIAL | TYPE OF BUILDING N/A | PLACE OF ENTRY N/A | | YES NO |
| | WEATHER CLEAR | LIGHTING STREET LIGHTS | TRANSPORTATION OF SUSPECT CAR | VICTIM'S ACTIVITY DRIVING | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM FATHER OF CHILD | | |

| IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) | F | ☐ ☒ YES NO |
|---|---|---|

| IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) | G | ☐ ☒ YES NO |
|---|---|---|

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 12:13AM ON 10/09/04 OFFICERS COOPER / HICKS IN THE C101A UNIT RESPONDED TO A R/C FOR A PERSON WITH A GUN AT BLUE HILL AVE / MORTON ST  UPON ARRIVAL OFFICERS SPOKE WITH THE CALLER, ▇▇▇▇ WHO STATED THAT HE ALONG WITH HIS ACQUAINTANCE ▇▇▇▇▇ WHERE BEING FOLLOWED BY ▇▇▇▇▇ VICTIM STATED THAT THE SUSPECT WALKED UP TO THEIR M/V AND ASKED THE VICTIM (▇▇▇▇▇ TO OPEN THE DOOR. WHEN THE VICTIM REFUSED TO OPEN THE DOOR, THE SUSPECT STATED THAT HE WOULD OPEN IT HIMSELF. THE SUSPECT THEN WENT TO HIS M/V, WHITE ACURA LEGEND PLATE UNK, AND REMOVED AN UNKNOWN OBJECT. ▇▇▇▇▇ STATED THAT HE DID NOT SEE A GUN, BUT THAT THE SUSPECT GESTURED LIKE HE HAD A WEAPON. SUSPECT THEN FLED THE AREA IN AN UNKNOWN DIRECTION. SEARCH OF THE AREA WAS CONDUCTED FOR THE SUSPECT TO NO AVAIL. A BROADCAST OF THE SUSPECT'S M/V GIVEN OVER CH3.

| UNIT ASSIGNED C101A | TOUR OF DUTY 1 | REPORTING OFFICER'S NAME KEVIN R. COOPER | REPORTING OFFICER'S ID 11807 | PARTNER'S ID 11824 | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/09/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| TIME COMPLETED 01:12 AM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME DAVID D KILEY | | DUTY. SUP. ID 11705 |

**Exhibit C, part 2**

CompNos=▇

EXHIBIT    B

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒  SUPPLEMENTARY ☐

| KEY SITUATIONS OTHERS | | COMPLAINT NO 040553606 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT ROBBERY, ARMED PERSON | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/12/04 | B. 10/12/04 |
| LOCATION OF INCIDENT 34 WOOLSON ST | APT. | DISPATCH TIME | TIME OF OCCUR A.11:00 PM | B.11:15 PM |

| VICTIM | SEX | RACE | |

| ADDRESS | APT. | | |

| PERSON REPORTING SAME | ADDRESS SAME SAME,MA, | APT. | PHONE |

**WAS THERE A WITNESS TO THE CRIME**     A ☐ ☒ YES NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE RES BUS |
|---|---|---|---|---|---|---|

**NUMBER OF PERPETRATORS : 0 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME**     B ☐ ☒ YES NO

| | STATUS | NAME (LAST, FIRST, MI) | | S.S. NO | BOOKING NO. | PHOTO NO | ALIAS |
|---|---|---|---|---|---|---|---|
| P E R S O N S | WARRANT NO. | ADDRESS | | SEX | RACE | AGE | HEIGHT DOB |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | BUILD | HAIR | EYES | |

**CAN SUSPECT VEHICLE BE DESCRIBED**     C ☐ ☒ YES NO

| | STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| V E H I C L E S | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | LICENSE NO | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | OWNERS'S ADDRESS | | | |

**CAN PROPERTY BE IDENTIFIED**     D ☐ ☒ YES NO

| | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|
| P R O P E R T Y | STOLEN | WALLET | | | | | |

**IS THERE A SIGNIFICANT M.O.**     E ☒ ☐ YES NO

| | TYPE OF WEAPON-TOOL HANDGUN | NEIGHBORHOOD RESIDENCE/HOME | TYPE OF BUILDING N/A | PLACE OF ENTRY N/A |
|---|---|---|---|---|
| M O | WEATHER CLEAR | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY WALKING OUTSIDE |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR STAY STRAIGHT AND GIVE UP THE WALLET AND JEWELRY | | RELATIONSHIP TO VICTIM N/A | |

**IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)**     F ☒ ☐ YES NO

**IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)**     G ☒ ☐ YES NO

**BLOCK NARRATIVE AND ADDITIONAL INFORMATION**
NO   ON 10/12/04 AT ABOUT 2330 HRS, THE VICTIM CAME INTO THE AREA B-3 POLICE STATION TO REPORT A ROBBERY. MR. PREVOST STATED THAT TWO UNKNOWN BLACK MALES CAME UP BEHIND HIM AND PUT A GUN TO HIS HEAD. DURING THE INCIDENT, THE SUSPECTS TOOK THE VICTIM'S WALLET, $60.00 US CURRENCY, MASTERCARD, A DISCOVER CARD, GOLD DIAMOND RING, GOLD BRACELET AND CHAIN. THE VICTIM STATED THAT HE DID NOT SEE THE SUSPECTS THEREFORE COULD NOT GIVE A DESCRIPTION. AREA B-3 DETECTIVES TO BE NOTIFIED.

| UNIT ASSIGNED CD 96 | TOUR OF DUTY 3 | REPORTING OFFICER'S NAME ROBERT  NEWTON Jr. | REPORTING OFFICER'S ID 8319 | PARTNER'S ID | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/12/04 | SPECIAL UNITS NOTIFIED(REPORTING) AREA B-3 | | | | TELETYPE NO |
| TIME COMPLETED 11:37 PM | PATROL SUPERVISOR NAME | PAT  SUP  ID | DUTY SUP. NAME RICHARD J SEXTON | DUTY. SUP ID 10738 | |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO | REPORT DIST | CLEARANCE DIST |
|---|---|---|---|---|
| OTHERS | | 040567475 | B3 | |
| TYPE OF INCIDENT | CRIME CODE | STATUS | DATE OF OCCUR | B. 10/19/04 |
| ROBBERY, ARMED PERSON | 0 | | A.10/19/04 | |
| LOCATION OF INCIDENT | APT. | DISPATCH TIME | TIME OF OCCUR | B 05:45 PM |
| ORMOND ST | | 06:09 PM | A.05:45 PM | |

VICTIM COMP.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  MARITAL STATUS

ADDRESS  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

| PERSON REPORTING | ADDRESS | | APT. | PHONE |
|---|---|---|---|---|
| POWELL, IAN | 21 OUTLOOK RD,MATTAPAN,MA,00000-0000 | | 1 | (617)-298-3344 |

WAS THERE A WITNESS TO THE CRIME                                          RES YES ☐ NO ☒

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|

BUS

NUMBER OF PERPETRATORS : 2 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME                YES ☒ NO ☐

| STATUS | NAME (LAST, FIRST, MI) | S S NO | BOOKING NO | PHOTO NO | ALIAS |
|---|---|---|---|---|---|
| SUSPECT | UNK | | | | |
| WARRANT NO | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | MALE | BLACK NON-HISPANIC | 18 | 5-07 | |

| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | WEIGHT | BUILD | HAIR | EYES |
|---|---|---|---|---|
| BLK FLIGHT JACKET, SKULLY CAP, CHAMPION HOODY AND BLUE JEANS PTS | | | | |

CAN SUSPECT VEHICLE BE DESCRIBED                                          YES ☐ NO ☒

| STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | VEHICLE NO | | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | | LICENSE NO | STATE | OPERATOR'S ADDRESS |
| OWNERS'S NAME | | | OWNERS'S ADDRESS | | |

CAN PROPERTY BE IDENTIFIED                                               YES ☐ NO ☒

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.                                              YES ☒ NO ☐

| TYPE OF WEAPON-TOOL | NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|
| HANDGUN | COMMERCIAL & RESIDENTIAL | | |
| WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY |
| RAINING | ARTIFICIAL | FOOT | WALKING |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | RELATIONSHIP TO VICTIM | |
| | | ACQUAINTANCE | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)    YES ☐ NO ☒

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)                  YES ☐ NO ☒

BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 6:09PM PO JAMES ASSIGNED TO THE C431F RESPONDED TO 21 OUTLOOK RD FOR AN ARMED ROBBERY REPORT. ON ARRIVAL PO SPOKE TO VICTIM ▓▓▓▓▓▓▓ WHO STATED HE WENT TO THE P AND R ICE-CREAM STORE AT THE INTERSECTION OF BLUE HILL AV AND EVELYN ST TO BUY SOME FOOD. THE VICTIM STATED THAT WHEN HE LEFT THE STORE HE SAW A GROUP OF APPROX. 6 BLK MALES STANDING IN FRONT OF THE STORE. HE THEN STATED THAT ONE OF THE MALES WHO HE RECOGNIZED BUT DID NOT KNOW APPROACHED HIM AND ASKED HIM FOR 1 DOLLAR. THE VICTIM STATED THAT HE TOLD THE BLK MALE HE DID NOT HAVE ANY MONEY AND KEPT ON WALKING. HE THEN STATED THAT WHEN HE WAS WALKING ON ORMOND ST HE NOTICED THAT THEIR WERE TWO BLK MALES WALKING BEHIND HIM. HE THEN STATED THAT HE CROSSED THE STREET AND SAW THAT BOTH MALES THEN CROSSED THE STREET AS WELL. HE THEN STATED THAT ONE OF THE BLK MALES TOLD HIM THAT HE WANTED TO TALK TO HIM AND HE REFUSED. HE THEN STATED THAT HE STARTED TO WALK FASTER THAT WAS WHEN ONE OF THE MALES JUMPED ON HIS BACK AND THEY STARTED TO STRUGGLE. HE THEN STATED THAT WAS WHEN THE OTHER MALE CAME UP AND POINTED THE SILVER REVOLVER AT HIM. VICTIM THEN STATED THAT THIS WAS THE BLK MALE WHO ASKED HIM FOR THE DOLLAR. HE STATED THAT THE GUN WAS PLACED IN HIS RIGHT SIDE AND THE OTHER SUSPECT BEGAN TO GO THROUGH HIS POCKET AND TOOK OUT $13.00 US CURRENCY FROM HIS POCKET. THE VICTIM STATED THAT THE SUSPECT THEN LEFT HIM ALONE AFTER THEY GOT WHAT THEY WANTED FROM HIM. VICTIM DESCRIBE THEN SUSPECT THAT HE RECOGNIZED AS A BLK MALE 17 TO 18 YRS OLD MED BROWN SKINNED WEARING A BLK FLIGHT JACKET ,BLK SKULLY CAP, BLK CHAMPION HOODY AND BLUE JEANS PTS. VICTIM COULD DESCRIBE THE SECOND SUSPECT. AFTER LOOKING AT A PHOTO ARRAY THE VICTIM WAS ABLE TO IDENTIFY ONE OF THE BLK MALES WHO WAS IN THE GROUP IN FRONT OF THE STORE ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ HE ALSO THOUGHT THAT A SECOND PERSON IN THE ▓▓▓▓▓▓▓▓ MAY HAVE BEEN
THERE WAS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C431F | 3 | ALFRED A. JAMES | 10960 | | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
|---|---|---|---|---|---|
| 10/19/04 | | | | | |

| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | | DUTY. SUP. ID |
|---|---|---|---|---|---|
| 07:59 PM | | | BRIAN E RILEY | | 8773 |

Incident Search

# BOSTON POLICE
# INCIDENT REPORT

ORIGINAL ☐    SUPPLEMENTARY ☒

| KEY SITUATIONS | | COMPLAINT NO | REPORT DIST | CLEARANCE DIST |
|---|---|---|---|---|
| OTHERS | | 040567475 | B3 | |
| TYPE OF INCIDENT | CRIME CODE | STATUS | DATE OF OCCUR | B. 10/31/04 |
| ROBBERY, ARMED PERSON | 0 | | A.10/19/04 | |
| LOCATION OF INCIDENT | | APT | DISPATCH TIME | TIME OF OCCUR | B.11:15 AM |
| BLUE HILL AV , FESSENDEN ST | | | | A.06:09 PM | |

| VICTIM ~~(  MI)~~ | | | | | |
|---|---|---|---|---|---|
| ADDRESS | | ~~ATION~~ | | AGE | |

| PERSON REPORTING | ADDRESS | | APT | PHONE |
|---|---|---|---|---|
| P.O. GRIFFITHS | 1165 BLUE HILL AVE,MATTAPAN,MA,02124-0000 | | | (617)-343-4700 |

WAS THERE A WITNESS TO THE CRIME

| | PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | A | ☐ ☒ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | YES NO |
| | | | | | | | | RES | |
| | | | | | | | | BUS | |

NUMBER OF PERPETRATORS : 2 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | | | | PHOTO NO | ALIAS | ☒ ☐ |
|---|---|---|---|---|---|---|---|---|
| | ARRESTED | | | | | | | YES NO |
| | WARRANT NO | ~~ADDRESS~~ | | | | | ~~RIGHTIDOOR~~ | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | | | | |

| P E R S O N S | STATUS | NAME ~~ADDRESS, MI)~~ | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ARRESTED | | | | | | | |
| | WARRANT NO | ~~ADDRESS~~ | | SEX | RACE | | ~~HEIGHTIDOOR~~ | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | BUILD | | | EYES | |

CAN SUSPECT VEHICLE BE DESCRIBED

| V E H I C L E S | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL | ☐ ☒ |
|---|---|---|---|---|---|---|---|
| | | | | | | | YES NO |
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | | |
| | OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | | |
| | OWNERS'S NAME | | | OWNERS'S ADDRESS | | | |

CAN PROPERTY BE IDENTIFIED

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | D ☐ ☒ |
|---|---|---|---|---|---|---|---|---|
| | STOLEN | MONEY | | | | | | YES NO |

IS THERE A SIGNIFICANT M.O.

| M O | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | | PLACE OF ENTRY | E ☒ ☐ |
|---|---|---|---|---|---|---|---|
| | HANDGUN | COMMERCIAL & RESIDENTIAL | | PUBLIC BUILDING | | | YES NO |
| | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | | VICTIM'S ACTIVITY | | |
| | CLEAR | NATURAL | FOOT | | WALKING TO STORE | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | | RELATIONSHIP TO VICTIM | | |

| IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) | F ☐ ☒ |
|---|---|
| | YES NO |

| IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) | G ☒ ☐ |
|---|---|
| | YES NO |

BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 11:15AM ON SUNDAY 31 OCT 2004 P.O. GRIFFITHS ASSIGNED AS THE C415D AND P.O. BARRY ASSIGNED AS THE C660D WHILE ENROUTE TO FESSENDEN ST ON BLUE HILL AVE PO'S OVERHEARD A BROADCAST FROM CHARLIE BASE (P.O. BRADSHAW) WHO STATED THAT A VICTIM OF AN ARMED ROBBERY BY MEANS OF A FIREARM ON 10/19/2004 JUST OBSERVED THE TWO SUSPECTS ON BLUE HILL AVE IN FRONT OF P&R ICE CREAM STORE. PO'S OBSERVED TWO SUSPECTS FITTING THE DESCRIPTION AS GIVEN BY BASE 3, STANDING ON BLUE HILL AVE AND WILMORE ST. PO'S GRIFFITHS & BARRY EXITED MARKED DEPARTMENT M/V AND DUE TO THE NATURE OF THE CALL, THAT A FIREARM WAS USED IN THE ROBBERY PO'S ORDERED SUSPECTS TO GROUND BY GUNPOINT. THE C101D P.O. TAXTER & ROSSI TRANSPORTED VICTIM AND MOTHER TO AREA OF BLUE HILL AVE AND WILMORE AND FROM A VANTAGE POINT ACROSS BLUE HILL AVE FROM WHERE THE VICTIM POINTED OUT, STRONGLY AND POSITIVELY IDENTIFIED SUSPECT ~~████~~ AS THE ONE WHO PUT THE GUN IN VICTIMS FACE AND SUSPECT ~~████~~ AS THE ONE THAT REACHED INTO VICTIMS POCKET AND TOOK VICTIMS MONEY. B-3 DETECTIVES NOTIFIED AND WILL INVESTIGATE FURTHER.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| | | | | | |

Incident Search

| C415D | 2 | THOMAS G. GRIFFITHS | 10957 | | 91874 | NO |
|---|---|---|---|---|---|---|
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | | TELETYPE NO |
| 10/31/04 | GENERAL INVESTIGATIONS | | | ⚡ | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME | | DUTY. SUP. ID |
| 02:13 PM | | | | JOHN D MCDONOUGH | | 9030 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO 040575436 | REPORT DIST B3 | CLEARANCE DIST |
|---|---|---|---|---|

| TYPE OF INCIDENT ABDW | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/23/04 | B |
|---|---|---|---|---|

| LOCATION OF INCIDENT ASTORIA ST , NORFOLK ST | APT | DISPATCH TIME 02:36 PM | TIME OF OCCUR. A.02:36 PM | B |
|---|---|---|---|---|

| VICTIM-COMP ▓▓▓▓ | PHONE | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|
| ADDRESS ▓▓▓▓ | | OCCUPATION | | D.O.B. |
| 0000 | | | | |

| VICTIM-COMP (LAST, FIRST, MI) ▓▓▓ | | | MARITAL STATUS |
|---|---|---|---|
| ADDRESS ▓▓▓ | APT. | OCCUPATION ▓▓▓ | |

| VICTIM-COMP ▓▓▓ | | | MARITAL STATUS |
|---|---|---|---|
| ADDRESS ▓▓▓ | | OCCUPATION ▓▓▓ | D.O.B. |

| PERSON REPORTING P.O. SANDEFUR | ADDRESS 1165 BLUE HILL AVE,DOR,MA,02124-0000 | APT | PHONE (617)-343-4700 |
|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|
| | | | | | | RES |
| | | | | | | BUS |

☒ YES ☐ NO

NUMBER OF PERPETRATORS : 5 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME

**PERSONS**

| STATUS SUSPECT | NAME (LAST, FIRST, MI) UNKNOWN | | S.S. NO. 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 | BOOKING NO 000000000 | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| WARRANT NO. | ADDRESS UNKNOWN ,MA, | | SEX MALE | RACE BLACK NON-HISPANIC | AGE 18 | HEIGHT DOB |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) BLK HAT, BLK JACKET, SCAR ON FACE, MED COMPLEXION | | WEIGHT 160 | BUILD MEDIUM | HAIR | EYES | |

☒ YES ☐ NO

CAN SUSPECT VEHICLE BE DESCRIBED

**VEHICLES**

| STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | LICENSE NO | STATE | OPERATOR'S ADDRESS | |
| OWNERS'S NAME | | OWNERS'S ADDRESS | | | |

☒ YES ☐ NO

CAN PROPERTY BE IDENTIFIED

**PROPERTY**

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

☒ YES ☐ NO

IS THERE A SIGNIFICANT M.O.

**MO**

| TYPE OF WEAPON-TOOL | NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|
| WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | RELATIONSHIP TO VICTIM | |

☒ YES ☐ NO

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)

☒ YES ☐ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)

☒ YES ☐ NO

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 2:36PM P.O. SANDEFUR IN THE C421D UNIT RESPONDED TO A CALL FOR A PERSON SHOT IN FRONT OF 22 WOOLSON ST. MATT. UPON ARRIVAL P.O. OBSERVED VICTIM ▓▓▓ SITTING ON THE STAIRS OF 22 WOOLSON ST WITH BLOOD COMING FROM HIS NECK. HE WAS IN THE COMPANY OF ▓▓▓ AND ▓▓▓ VICTIM ALSO STATED THAT HE THOUGHT THAT ▓▓ WAS SHOT IN THE BACK AND UPON LIFTING HIS SHIRT THIS WAS ALSO CONFIRMED. H&H AMB A-11 (DIAZ & HINES), P-2 (SULLIVAN & MORLEY) AND D2E LT FOREST RESPONDED, STABILIZED VICTIM, AND TRANSPORTED ▓▓ TO BMC FOR FURTHER TREATMENT. VICTIM'S #2 & 3 STATED THAT THEY WERE WITH WALKING WITH THE OTHER VICTIM DOWN ELIZABETH ST. WHEN THEY WERE CONFRONTED BY 5 UNKNOWN BLK MALES, ONE ON A BIKE ▓▓▓ FURTHER STATED THAT THEY JUST IGNORED THE SUSPECTS AND KEPT WALKING. THEY TOOK THE RIGHT

ONTO ASTORIA AND WENT INTO THE PARK (WALKER PLAYGROUND). ONCE IN THE PARK THEY SAT DOWN MID-WAY IN, TO CONVERSE. THIS WAS WHEN THOSE SAME FIVE MALES RUSHED INTO THE PARK AND SURROUNDED THEM. ONE OF THE BLACK MALES TOLD THEM TO, "RUN YOUR SHIT" AND TWO OTHERS STARTED FEELING THEIR POCKETS ▓▓▓▓ ▓▓▓▓▓▓ FURTHER EXPLAINED THAT WHILE ▓▓ AND ▓▓▓▓▓▓▓ COOPERATED ▓▓▓▓▓▓▓▓▓▓▓▓ RESISTED PROMPTING THE UNKNOWN BLK MALE ON THE BIKE (DESCRIBED ABOVE) TO PULL A SILVER REVOLVER AND STATE, "THIS IS GOING TO HAVE TO GET PHYSICAL." WHEN VICTIM ▓▓▓▓▓▓▓ SAW THIS ▓▓ RAN TOWARD ASTORIA ST. WITH THE ARMED SUSPECT BEHIND ▓▓▓ FIRING SHOT. AFTER SHOT VICTIM ▓▓▓▓▓ FURTHER STATED THAT HE HEARD 5-6 SHOTS BUT THEY SOUNDED FAKE SO ▓ YELLED FOR HIS FRIEND TO COME BACK BELIEVING IT WAS A FAKE GUN. ALL OTHER SUSPECTS SCATTERED AND VICTIMS ▓▓▓▓▓▓▓▓▓▓▓ AND ▓▓▓▓▓▓▓ RAN TO TRY TO CATCH UP TO THEIR FRIEND AND BROTHER. THEY FINALLY CAUGHT UP WITH ▓▓▓ IN FRONT OF 22 WOOLSON ST AND THIS IS WHEN THEY REALIZED ▓▓ WAS ACTUALLY SHOT. SUSPECTS FLED IN AN UNKNOWN DIRECTION PRIOR TO POLICE ARRIVAL. AN AREA SEARCH FOR SUSPECT YIELDED NEGATIVE RESULTS AND THERE WAS NO APPARENT CRIME SCENE TO BE MAINTAINED. VICTIM ▓▓▓▓▓▓▓ CONDITION WAS NOT AVAILABLE AT THE TIME OF THE REPORT. OTHER UNITS THAT RESPONDED TO THE SCENE WERE C901 SGT. WEBB, C102D P.O. DOTTIN & YOUNGER, C101D P.O. MALONE & ROSSI, CT55D P.O. BROWN, CT56D P.O. HARRISON, CK01D P.O. GRIFFITHS & PUGLIA, C912 SGT LONG, T529 P.O. WILLIS, C435D P.O. HARLOW, AND C422D P.O. MITCHELL.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C421D | 2 | ROLAND D. SANDEFUR | 11360 | | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| 10/23/04 | | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | | DUTY. SUP. ID |
| 04:37 PM | | | JOHN H DANILECKI | | 8947 |

Incident Search

Page 1 of 2

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☒

| KEY SITUATIONS | | | COMPLAINT NO 040575436 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|---|
| TYPE OF INCIDENT ABDW | | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/23/04 | B. |
| LOCATION OF INCIDENT ASTORIA ST , NORFOLK ST | | | APT | DISPATCH TIME | TIME OF OCCUR. A.02:36 PM | B. |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION | | | D.O.B | |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION | | | D.O.B | |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE | | | MARITAL STATUS |
|---|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION | | | D.O.B | |

| PERSON REPORTING DETECTIVE BRIAN BLACK | ADDRESS B3 DETECTIVES ,MA, | | APT | PHONE |
|---|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME ... A [ ] YES ☒ NO

| PERSON INTERVIEWED SEE NARRATIVE | AGE 0 | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE RES BUS |
|---|---|---|---|---|---|---|

NUMBER OF PERPETRATORS : 0 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME   B [ ] YES ☒ NO

**PERSONS**

| STATUS ARRESTED | NAME | | BOOKING NO. | PHOTO NO. | ALIAS | [ ] YES ☒ NO |
|---|---|---|---|---|---|---|
| WARRANT NO | | SEX | RACE | AGE | HEIGHT | DOB |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | | HAIR | EYES | |

CAN SUSPECT VEHICLE BE DESCRIBED   C [ ] YES ☒ NO

**VEHICLES**

| STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| OWNERS'S NAME | | | OWNERS'S ADDRESS | | |

CAN PROPERTY BE IDENTIFIED   D [ ] YES ☒ NO

**PROPERTY**

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.   E [ ] YES ☒ NO

**MO**

| TYPE OF WEAPON-TOOL REVOLVER | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|---|
| WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY | |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR SEE NARRATIVES | | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)   F [ ] YES ☒ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)   G [ ] YES ☒ NO

| BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION |
|---|---|
| | ABOUT 6:20 AM, B3 DETECTIVES WILLIAM DOOGAN, GUS IRBY, STEPHEN O'BRIEN AND BRIAN BLACK ALONG WITH OFFICERS JOHN CONWAY, ELI BAEZ, EDWARD GRACIA, FRANK ST. PETER, TIMOTHY LAHAM AND SEAN FLYNN, UNDER THE DIRECTION OF SERGEANT DETECTIVE RANDALL HALSTEAD RESPONDED TO 40 MCLELLAN ST # 31 DORCHESTER, MA WHERE THEY KNOCKED ON THE DOOR AND WERE GREETED BY THEY ANNOUNCED THEIR OFFICE AND THEIR PURPOSE, THE EXECUTION OF DORCHESTER SEARCH WARRANT PEACEFUL ENTRY WAS GAINED AND THE ABOVE LISTED SUSPECT WAS LOCATED IN THE BEDROOM AT THE REAR OF THE APARTMENT. HE WAS PLACED UNDER ARREST AND ADVISED OF HIS RIGHTS UNDER MIRANDA. HE WAS THEN TRANSPORTED TO DISTRICT 3 FOR BOOKING. THIS SUSPECT WAS IDENTIFIED VIA DESCRIPTION AND BY A WITNESS KNOWN TO THE COMMONWEALTH AS THE PERSON WHO SHOT |

THE ABOVE VICTIM DURING THE COMMISSION OF AN ATTEMPT TO ROB THE VICTIM AND OTHERS IN THE WALKER PLAYGROUND (NORFOLK ST/ASTORIA ST AREA) ON 10-23-04. THE SEARCH WARRANT YIELDED SPECIFIC CLOTHING PREVIOUSLY DESCRIBED BY THE WITNESS. ABOUT 7:50 AM, THE DETECTIVES RETURNED TO DISTRICT 3, THE SUSPECT WAS AGAIN ADVISED OF HIS MIRANDA RIGHTS AND EXECUTED A SIGNED BOSTON POLICE MIRANDA WARNING FORM. HE THEN AGREED TO BE INTERVIEWED BUT REFUSED REQUESTS TO BE AUDIO TAPED. LATER, HE RECONSIDERED AND AGREED TO GIVE A TAPED STATEMENT. THE SUSPECT TO BE CHARGED WITH ARMED ASSAULT WITH INTENT TO ROB, ARMED ASSAULT WITH INTENT TO ROB ABDW: FIREARM, AND UNLAWFUL POSSESSION OF A FIREARM. IN THE APARTMENT AT THE TIME OF ARREST IN ADDITION TO HIS � ▇▇▇▇▇▇▇▇▇ THEY WERE IDENTIFIED AND RELEASED. THE APRTMENT LEFT IN THE CUSTODY OF ▇▇▇▇▇▇▇▇

| UNIT ASSIGNED C803 | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME BRIAN C BLACK | REPORTING OFFICER'S ID 10387 | PARTNER'S ID 9571 | FI NO |
| DATE OF REPORT 11/24/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| TIME COMPLETED 11:32 AM | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME CHARLES G. KELLY | DUTY SUP. ID 11327 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐



| KEY SITUATIONS | | | COMPLAINT NO 040580797 | | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|---|---|
| TYPE OF INCIDENT ABDW | | CRIME CODE 0 | STATUS | | DATE OF OCCUR. A.10/26/04 | B. |
| LOCATION OF INCIDENT 67 GOODALE RD | | APT. | DISPATCH TIME 12:34 PM | | TIME OF OCCUR. A.12:34 PM | B. |

NUMBER OF PERPETRATORS : 1 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME

PERSONS
- STATUS: ARRESTED SUSPECT
- WARRANT NO.
- SPECIAL CHARACT.

CAN SUSPECT VEHICLE BE DESCRIBED

VEHICLES

CAN PROPERTY BE IDENTIFIED

| | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | YES NO |
|---|---|---|---|---|---|---|---|---|
| PROPERTY | DESTROYED / DAMAGED / VANDALIZED | ELECTRONIC DEVICES | | MOTOROLA - POLICE RADIO | | 1600.00 | | |
| | STOLEN RECOVERED | POLICE BADGE | | - BOSTON POLICE | | | | |
| | STOLEN | CELLULAR PHONE | | | | | | |

| T Y | DESTROYED / DAMAGED / VANDALIZED / RECOVERED | | | | | | |
|---|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.    ☒ ☐ YES NO    E

| M O | TYPE OF WEAPON-TOOL HANDS/FEET/TEETH | NEIGHBORHOOD RESIDENCE/HOME | | TYPE OF BUILDING RESIDENTIAL HOUSE | | PLACE OF ENTRY FRONT DOOR | |
|---|---|---|---|---|---|---|---|
| | WEATHER CLEAR | LIGHTING NATURAL | TRANSPORTATION OF SUSPECT FOOT | | VICTIM'S ACTIVITY AT HOME | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)    ☒ ☐ YES NO    F

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)    ☒ ☐ YES NO    G

BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 1234 TUESDAY 10/26/2004 OFFICERS WRIGHT & HENRIQUEZ ASSIGNED TO THE C101D RESPONDED TO A RADIO CALL FOR A DISTURBANCE AT 67 GOODALE RD, MATTAPAN AT ABOUT 1244 OFFICER WRIGHT PUT OUT A BROADCAST, FOR ASSISTANCE AT 67 GOODALE RD. OFFICERS FROM B3 STARTED TO RESPOND. AT ABOUT 1245 OFFICER WRIGHT PUT OUT A BROADCAST, FOR ASSISTANCE WHICH WAS VERY DISTORTED AND SOUNDED AS IF OFFICERS WERE IN A STRUGGLE. OFFICER HARLOW RESPONDED TO 67 GOODALE RD, WITH THE C905 SGT. TROY. ON ARRIVAL OFFICER HARLOW OBSERVED APPROXIMATELY 5 TO 6 OFFICERS STRUGGLING WITH THE SUSPECT LATER IDENTIFIED AS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ OFFICER HARLOW OBSERVED THE SUSPECT KICKING OFFICER WHILE ATTEMPTING TO RESTRAIN THE SUSPECT AND MOVING HIS BODY BACK AND FORTH IN A VIOLENT MANNER. OFFICER HARLOW OBSERVED OFFICERS PLACE THE SUSPECT IN CUSTODY, AND SECURE THE SUSPECT IN THE DIST. 3 WAGON. OFFICER HARLOW OBSERVED OFFICER HENRIQUEZ WALK OUT FROM THE FRONT WALK WAY AREA AND BEGAN TO BECOME WEAK IN THE LEGS AND SLOWLY DROP TO THE GROUND, ASSISTED BY OFFICER HARLOW AND DOT TIN-JORDAN. OFFICER HARLOW OBSERVE OFFICER HENRIQUEZ TO HAVE A LARGE ABRASION TO THE FOREHEAD JUST ABOVE HIS RIGHT EYE, AND BLOOD COMING FROM HIS NOSE, AND MOUTH AREA AS A RESULT OF ATTEMPTING TO RESTRAIN THE SUSPECT. OFFICER HENRIQUEZ WAS TRANSPORTED TO BOSTON MEDICAL CENTER BY A11 EMT'S (MCCAY & CRISPIN). OFFICER HARLOW ALSO OBSERVED OFFICER WRIGHT COMPLAINING OF, INJURIES AS A RESULT OF STRUGGLING WITH THE SUSPECT. OFFICER WRIGHT STATED THE SUSPECT WAS PUSHING BOTH HIM AND OFFICER HENRIQUEZ AROUND AND THAT'S HOW HE OBTAINED IS INJURIES. OFFICER WRIGHT ALSO REQUESTED AN AMBULANCE. OFFICER WRIGHT WAS TRANSPORTED TO BOSTON MEDICAL CENTER BY P03 PARAMEDICS (AHERN & HUGHES). OFFICER PUGLIA ALSO REQUESTED AN AMBULANCE, DUE TO INJURIES TO IS BACK OBTAINED AS A RESULT OF THE STRUGGLE WITH THE SUSPECT. OFFICER PUGLIA WAS TRANSPORTED TO BOSTON MEDICAL CENTER BY P03 PARAMEDICS (AHERN & HUGHES). OFFICER YOUNGER ALSO REQUESTED AN AMBULANCE, DUE TO INJURIES OBTAINED AS A RESULT OF THE STRUGGLE WITH THE SUSPECT. OFFICER YOUNGER, WAS TRANSPORTED TO CARNEY BY BOSTON EMS. SUSPECT WAS TRANSPORTED TO AREA B3 FOR BOOKING BY C202D OFFICER HARLOW SPOKE WITH VICTIM #2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ WHO STATED SHE WAS ON MBTA BUS # 28 FROM RUGGLES, WHEN THE SUSPECT APPROACHED HER AND STARTED TO TALK WITH HER. VICTIM #2 STATED SHE TOLD THE SUSPECT THAT SHE HAS A BOYFRIEND, AND WANTS TO BE LEFT ALONE. VICTIM #2 STATED THE SUSPECT WOULD NOT LEAVE HER ALONE ON THE BUS, AND WHEN SHE GOT OFF THE BUS THE SUSPECT GOT OFF AS WELL AND FOLLOWED HER FROM BLUE HILL AV, UP GOODALE ST. TO #67 GOODALE. THE VICTIM #2 STATED SHE CALLED HER BOYFRIEND VICTIM # 3 ▓▓▓▓▓▓▓▓▓▓▓▓ TO HAVE HIM MEET HER OUTSIDE AT # 67 GOODALE ST. VICTIM # 2 STATED WHEN SHE ARRIVED AT 67 GOODALE ST THE SUSPECT FOLLOWED HER THROUGH THE FRONT GATE INTO THE FRONT YARD, WERE SHE MET WITH VICTIM # 3. VICTIM # 3 STATED THAT HE TOLD THE SUSPECT TO STOP TALKING TO HIS GIRL AND LEAVE. VICTIM # 3 STATED THAT THE SUSPECT STATED "WHAT ANOTHER MAN CAN'T TALK TO YOUR GIRL." VICTIM # 3 STATED HE THEN SLAMMED THE DOOR, AND WENT INTO HIS APARTMENT. VICTIM # 1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ WAS INTERVIEWED BY DET. DAMBERVILLE C804. WITNESS # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ WAS INTERVIEWED BY DET. DAMBERVILLE C804. WITNESS # ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ WAS INTERVIEWED BY DET. WILLIAMS C815. OFFICER HARLOW THEN RESPONDED TO BOSTON MEDICAL CENTER TO SPEAK WITH OFFICERS WRIGHT, HENRIQUEZ, AND PUGLIA. ON ARRIVAL AT BOSTON MEDICAL CENTER OFFICER HARLOW SPOKE WITH OFFICER WRIGHT WHO STATED WHEN HE ARRIVED ON-SCENE HE OBSERVED THE SUSPECT, ALONG WITH VICTIM #1, WITNESS # 1 AND WITNESS # 2 ON-SCENE. OFFICER HARLOW SPOKE WITH OFFICER HENRIQUEZ WHO STATED WHEN HE ARRIVED ON-SCENE HE OBSERVED THE SUSPECT STANDING ON THE STAIRWAY IN SIDE THE GATED YARD, AND THE GATE WAS CLOSED. OFFICER HENRIQUEZ STATED HE ASKED VICTIM #1 IF SHE KNOWS THE SUSPECT. OFFICER HENRIQUEZ STATED THAT VICTIM # 1 STATED "HE (BEING THE SUSPECT) DOESN'T BELONG HERE, I OWN THE HOUSE, I WANT HIM OUT." OFFICER HENRIQUEZ STATED THAT ASKED THE SUSPECT IF HE LIVED AT 67 GOODALE ST. OFFICER HENRIQUEZ STATED THE SUSPECT STATED "YA I LIVE HERE", WITH A SMIRK ON HIS FACE. OFFICER HENRIQUEZ STATED THAT HE REQUESTED TO KNOW WHAT APARTMENT HE LIVED AT. OFFICER HENRIQUEZ STATED THE SUSPECT STATED "THE FIRST FLOOR". OFFICER HENRIQUEZ STATED HE THEN OPENED THE GATE TO THE FRONT WALK WAY AND THE SUSPECT STATED "I WOULDN'T DO THAT IF I WERE YOU". OFFICER HENRIQUEZ STATED HE ALONG WITH OFFICER WRIGHT APPROACHED THE SUSPECT AND BEGAN TO QUESTION HIM AS TO WHY HE WAS AT 67 GOODALE ST. OFFICER HENRIQUEZ STATED THE SUSPECT WOULD NO LONGER RESPOND TO ANY OF THEIR QUESTIONS. OFFICER WRIGHT STATED HE OBSERVED THE SUSPECT TO HAVE HIS ARMS CROSSED, STARING AT HIM NOT ANSWERING HIS QUESTIONS, OR RESPONDING TO HIS COMMANDS. OFFICER HENRIQUEZ STATED HE TOLD THE SUSPECT THAT HE NEEDED TO LEAVE, AND THE SUSPECT WOULD NOT RESPOND TO ANY OF THEIR REQUESTS. OFFICER WRIGHT STATED HE THEN PLACED HIS HAND ON THE SUSPECTS ARM TO ASSIST HIM IN EXITING THE YARD. OFFICER WRIGHT STATED THE SUSPECT THEN BEGAN TO RESIST. OFFICER HENRIQUEZ STATED HE THEN GRABBED THE SUSPECTS OTHER ARM, AND THE SUSPECT THEN BECAME COMBATIVE. OFFICER HENRIQUEZ STATED HE AND OFFICER WRIGHT STRUGGLED TO GAIN CONTROL OF THE SUSPECT. OFFICER HENRIQUEZ STATED THAT THE SUSPECT WAS PLACED ON THE GROUND, BUT WAS ABLE TO PULL HIMSELF UP, AND ATTEMPT TO REGAIN ACCESS BACK INTO 67 GOODALE RD. OFFICER HENRIQUEZ STATED HE AND OFFICER WRIGHT GRABBED THE SUSPECT AGAIN ON TOP OF THE STAIRS, AT WHICH POINT OFFICER HENRIQUEZ BEGAN TO FEEL THE SUSPECT PULLING AT HIS GUN ATTEMPTING TO REMOVE IT FROM IT'S HOLSTER, AND HE STATED TO OFFICER

WRIGHT THAT HE IS TRYING TO GET MY GUN. OFFICER WRIGHT STATED HE HEARD HENRIQUEZ STATE HE'S TRYING
TO GET MY GUN. OFFICER WRIGHT STATED HE THEN GRABBED THE SUSPECTS HANDS IN ATTEMPT TO SECURE
OFFICERS HENRIQUEZ FIREARM, THE SUSPECT RESISTED AND OFFICER HENRIQUEZ FELL BACKWARDS FROM THE
TOP STEP HITTING HIS HEAD ON THE FRONT WALK WAY WHICH WAS A DISTANCE OF ABOUT 3 TO 4 STEPS. OFFICER
WRIGHT STATED THE SUSPECT THEN FELL ON TOP OF OFFICER HENRIQUEZ, ALONG WITH OFFICER WRIGHT FALLING
ON TOP OF THE SUSPECT AND OFFICER HENRIQUEZ. OFFICER WRIGHT STATED OTHER OFFICERS THEN BEGAN TO
ARRIVE ON-SCENE AND SECURE THE SUSPECT. OFFICER WRIGHT STATED HIS DEPARTMENT RADIO WAS DAMAGED
DURING THE ALTERCATION. OFFICER HENRIQUEZ STATED WHILE ON-SCENE HE NO LONGER HAD HIS DEPARTMENT
POLICE BADGE, AND PERSONAL CELL PHONE. OFFICER WRIGHT STATED HE OBSERVED OFFICERS HENRIQUEZ
DEPARTMENT BADGE IN THE SUSPECTS HAND. DURING A SEARCH FOR WEAPONS ON-SCENE OFFICER PUGLIA
RECOVERED OFFICER HENRIQUEZ CELL PHONE FROM THE SUSPECTS HANDS, AND OFFICER HENRIQUEZ BADGE
FROM THE FRONT STAIRS. OFFICER PUGLIA STATED HE HAD TO FORCEFULLY REMOVE THE CELL PHONE FROM THE
SUSPECTS HANDS. SGT. KELLY SECURED FIREARM AND RADIO FROM OFFICERS HENRIQUEZ, WRIGHT, PUGLIA, AND
YOUNGER. SUSPECT CHARGED WITH ASSAULT AND BATTERY ON A POLICE OFFICER, WITH INJURIES, 4 COUNTS,
RESISTING ARREST, TRESPASSING, ASSAULT AND BATTERY DANGEROUS WEAPON (SHOD FOOT), ATTEMPTED
LARCENY OF FIREARM (OFFICER'S GUN), LARCENY OF OFFICER'S BADGE. OFFICER BRADSHAW REQUESTED EMS TO
RESPONDED TO AREA B3 TO EVALUATE THE SUSPECT FOR A CUT TO HIS RIGHT SIDE FACE AND NOSE. EMS STATED
INJURIES WERE MINIMAL AND THE SUSPECT DID NOT NEED BE TRANSPORTED TO THE HOSPITAL. SUSPECT WAS
TREATED FOR HIS INJURIES AND REMAINED AT AREA B3 IN CUSTODY. THE FOLLOWING UNITS RESPONDED CA81- LT.
DET. AVERILL, CA01 - LT. MCDONOUGH, C982 - SGT. DET. MACDONALD, C905 - SGT. TROY, C904 - SGT. KELLY, C101D -
HENRIQUEZ & WRIGHT, C103D - DELEON & VALMOND, CK01D - PUGLIA & CLARK, C411D - HARLOW, C202D - DOTTIN-
JORDAN & YOUNGER, C426D - ESPINOLA.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C411D | 2 | DANIEL P. HARLOW | 12020 | | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
| 10/26/04 | | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME | DUTY. SUP. ID |
| 03:03 PM | | | | JOHN H DANILECKI | 8947 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒  SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO 040581326 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT INJURED OFFICER | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/26/04 | B. |
| LOCATION OF INCIDENT 67 GOODALE RD | | APT. | DISPATCH TIME | TIME OF OCCUR. A.12:34 PM | B. |

| VICTIM-COMP (LAST, FIRST, MI) | PHONE | | MARITAL STATUS |
|---|---|---|---|
| ADDRESS | APT. | | AGE |

| PERSON REPORTING P.O. HENRIQUEZ | ADDRESS 1165 BLUE HILLAVE,DORCHESTER,MA,02124-0000 | APT. | PHONE (617)-343-4700 |
|---|---|---|---|

**WAS THERE A WITNESS TO THE CRIME**  ☒ YES ☐ NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|
| P.O. WRIGHT | 0 | ON-SCENE | | 1165 BLUE HILL AVE,DORCHESTER,MA,02124-0000 | | (617)-343-4700 RES (000)-000-0000 BUS |

NUMBER OF PERPETRATORS : 0 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME  ☐ YES ☒ NO B.

| P E R S O N | STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | WARRANT NO. | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | BUILD | HAIR | EYES |

CAN SUSPECT VEHICLE BE DESCRIBED  ☐ YES ☒ NO C.

| V E H I C L E S | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | LICENSE NO | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | OWNER'S ADDRESS | | | |

CAN PROPERTY BE IDENTIFIED  ☐ YES ☒ NO D.

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.  ☐ YES ☒ NO E.

| M O | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|---|
| | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)  ☒ YES ☐ NO F.

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)  ☒ YES ☐ NO G.

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 12:40 PM ON TUESDAY, OCTOBER 26, 2004 OFFICER HENRIQUEZ AND WRIGHT IN THE C101D RESPONDED TO A RADIO CALL AT 67 GOODALE RD. WHILE TRYING TO PLACE THE SUSPECT INTO CUSTODY, ▒▒▒▒▒▒▒▒▒▒▒▒ SUSTAINED THE FOLLOWING INJURIES: A LACERATION TO THE RIGHT SIDE OF THE FOREHEAD ALONG WITH SCRAPES TO THE SIDE OF THE FACE AND NECK INJURIES. OFFICER AS A RESULT WENT TO BOSTON MEDICAL CENTER AND WAS TREATED FOR INJURIES TO THE HEAD. REFER TO ORIGINAL CC# 040580797

| UNIT ASSIGNED C101D | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME ISMAEL  HENRIQUEZ | REPORTING OFFICER'S ID 91894 | PARTNER'S ID 10747 | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/26/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| TIME COMPLETED 04:56 PM | PATROL SUPERVISOR NAME | | PAT. SUP. ID | DUTY SUP. NAME JOHN H DANILECKI | DUTY SUP. ID 8947 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS | | | COMPLAINT NO 040581399 | | REPORT DIST. B3 | | CLEARANCE DIST |
|---|---|---|---|---|---|---|---|
| TYPE OF INCIDENT INJURED OFFICER | | CRIME CODE 0 | STATUS | | DATE OF OCCUR. A.10/26/04 | | B. |
| LOCATION OF INCIDENT 67 GOODALE RD | | | APT. | DISPATCH TIME | TIME OF OCCUR. A.12:34 PM | | B. |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|

| ADDRESS | APT. | OCCUPATION | AGE | D.O.B |
|---|---|---|---|---|

| PERSON REPORTING P.O. PUGLIA | ADDRESS 1165 BLUE HILL AV,DORCHESTER,MA,00000-0000 | | APT. | PHONE (617)-343-4700 |
|---|---|---|---|---|

| WAS THERE A WITNESS TO THE CRIME | | | | | | | A. | ☒ |
|---|---|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | YES | NO |
| | | | | | | RES | | |
| | | | | | | BUS | B. | |

| NUMBER OF PERPETRATORS : 0 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME | | | | | | | ☒ |
|---|---|---|---|---|---|---|---|
| **P E R S O N S** STATUS | NAME (LAST, FIRST, MI) | | S.S. NO. | BOOKING NO | PHOTO NO | ALIAS | YES NO |
| WARRANT NO. | ADDRESS | | SEX | RACE | | AGE HEIGHT DOB | |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | WEIGHT | BUILD | HAIR | EYES | |

| CAN SUSPECT VEHICLE BE DESCRIBED | | | | | | C. ☒ |
|---|---|---|---|---|---|---|
| **V E H I C L E S** STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL | YES NO |
| VEHICLE MAKE YEAR | VEHICLE NO | | STYLE | COLOR(TOP-BOTTOM) | | |
| OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | | |
| OWNERS'S NAME | | | OWNERS'S ADDRESS | | | D. |

| CAN PROPERTY BE IDENTIFIED | | | | | | | ☒ |
|---|---|---|---|---|---|---|---|
| **P R O P E R T Y** STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | YES NO |
| | N/A | | | | | | E. |

| IS THERE A SIGNIFICANT M.O. | | | | | ☒ |
|---|---|---|---|---|---|
| **M O** TYPE OF WEAPON-TOOL HANDS/FEET/TEETH | NEIGHBORHOOD COMMERCIAL & RESIDENTIAL | TYPE OF BUILDING RESIDENTIAL HOUSE | PLACE OF ENTRY N/A | | YES NO |
| WEATHER CLEAR | LIGHTING NATURAL | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY N/A | | |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM NONE | | F. |

| IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) | ☒ |
|---|---|
| | G. |

| IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) | ☒ |
|---|---|

| BLOCK NO. | NARRATIVE AND ADDITIONAL INFORMATION |
|---|---|
| | At about 12:44 pm Officers Puglia & Clark in the CK01D responded to an officer in trouble call at 67 Goodale Rd. Officers engaged in a violent struggle with the suspect during which I sustained an injury to my lower back. I surrendered my department issued firearm (CTF#008), ammunition, and radio (#5674) to Sgt Kelly and was transported by EMS to Boston Medical Center to be treated. Dr Hutlin diagnosed my injury as a muscle strain and prescribed bed rest and Motrin as needed. I will seek a follow up appointment with my primary care physician in the near future. |

| UNIT ASSIGNED CK01D | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME JOHN F. PUGLIA | REPORTING OFFICER'S ID 11385 | PARTNER'S ID | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/26/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| TIME COMPLETED 05:31 PM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME JOHN H DANILECKI | | DUTY. SUP. ID 8947 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒     SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO 040581535 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT INJURED OFFICER | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/26/04 | B. 10/26/04 |
| LOCATION OF INCIDENT 67 GOODALE RD | | APT. | DISPATCH TIME | TIME OF OCCUR. A.12:34 PM | B.12:50 PM |

| VICTIM'S | PHONE | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|
| AL | APT. | OCCUPATION | | AGE |

| PERSON REPORTING SAME | ADDRESS | | APT. | PHONE |
|---|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME     A. ☒ YES ☒ NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|
| | | | | | | RES BUS |

NUMBER OF PERPETRATORS ; 0 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME     B. ☒ YES ☒ NO

| PERSONS | STATUS | NAME (LAST, FIRST, MI) | | S.S. NO | BOOKING NO. | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|---|
| | WARRANT NO. | ADDRESS | | SEX | RACE | AGE | HEIGHT | DOB |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | WEIGHT | BUILD | HAIR | EYES |

CAN SUSPECT VEHICLE BE DESCRIBED     C. ☒ YES ☒ NO

| VEHICLES | STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| | VEHICLE MAKE YEAR | | VEHICLE NO. | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | | LICENSE NO | STATE | OPERATOR'S ADDRESS |
| | OWNERS'S NAME | | | | OWNERS'S ADDRESS | |

CAN PROPERTY BE IDENTIFIED     D. ☒ YES ☒ NO

| PROPERTY | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.     E. ☒ YES ☒ NO

| MO | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|---|---|
| | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)     F. ☒ YES ☒ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)     G. ☒ YES ☒ NO

| BLOCK NO | NARRATIVE AND ADDITIONAL INFORMATION |
|---|---|
| | ON OCTOBER 26, 2004 OFFICER WRIGHT ASSIGNED TO THE C101D WITH ▓▓▓▓▓▓▓▓▓ RESPONDED TO 67 GOODALE RD FOR A REMOVAL. WHILE OFFICERS WERE ATTEMPTING REMOVE SUSPECT, SUSPECT VIOLENTLY RESISTED CAUSING INJURIES TO BOTH OFFICERS. SUSPECT WAS ARRESTED AND TRANSPORTED TO B-3. OFFICER WAS TRANSPORTED BY H&H TO BOSTON MEDICAL CENTER WERE SEEN BY ▓▓▓▓▓▓▓ |

| UNIT ASSIGNED C101D | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME MARLON T WRIGHT | REPORTING OFFICER'S ID 10747 | PARTNER'S ID | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/26/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
| TIME COMPLETED 06:38 PM | PATROL SUPERVISOR NAME | PAT SUP ID | DUTY SUP NAME JOHN H DANILECKI | | DUTY. SUP. ID 8947 |

# BOSTON POLICE
# INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS | | | COMPLAINT NO 040580913 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|---|---|
| TYPE OF INCIDENT INJURED OFFICER | CRIME CODE 0 | | STATUS | DATE OF OCCUR. A.10/26/04 | B. |
| LOCATION OF INCIDENT 67 GOODALE RD | | APT. | DISPATCH TIME | TIME OF OCCUR. A.02:20 PM | B. |

| VICTIM-COMP. (LAST) | PHONE (617)-343-4700 | SEX FEMALE | RACE BLACK NON-HISPANIC | MARITAL STATUS N/A |
|---|---|---|---|---|
| ~~ADDRESS~~ | APT. | OCCUPATION | | |
| PERSON REPORTING SAME | ADDRESS 1165 BLUEHILL AVE,DORCHESTER,MA,02124-0000 | APT. | PHONE (617)-343-4700 | |

| WAS THERE A WITNESS TO THE CRIME | | | | | | A. ☐ YES ☒ NO |
|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE RES BUS |

NUMBER OF PERPETRATORS : 1 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME

| | STATUS ARRESTED | NAME (LAST, FIRST, MI) | S.S. NO. 00 | BOOKING NO. | PHOTO NO. | ALIAS | B. ☒ YES ☐ NO |
|---|---|---|---|---|---|---|---|
| PERSONS | WARRANT NO. | ADDRESS | | | | | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | BUILD | | | |

| CAN SUSPECT VEHICLE BE DESCRIBED | | | | | | C. ☐ YES ☒ NO |
|---|---|---|---|---|---|---|
| VEHICLES | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | | OWNERS'S ADDRESS | | |

| CAN PROPERTY BE IDENTIFIED | | | | | | | D. ☐ YES ☒ NO |
|---|---|---|---|---|---|---|---|
| PROPERTY | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |

IS THERE A SIGNIFICANT M.O.   E. ☐ YES ☒ NO

| | TYPE OF WEAPON-TOOL HANDS/FEET/TEETH | NEIGHBORHOOD RESIDENCE/HOME | | TYPE OF BUILDING N/A | PLACE OF ENTRY N/A |
|---|---|---|---|---|---|
| MO | WEATHER SUNNY | LIGHTING NATURAL | TRANSPORTATION OF SUSPECT N/A | VICTIM'S ACTIVITY WORKING | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR NONE | | | RELATIONSHIP TO VICTIM NONE | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)   F. ☒ YES ☐ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)   G. ☐ YES ☒ NO

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 14:20 ON OCTOBER 26, 2004 WHILE ON DUTY AS THE C202D WITH MY PARTNER OFFICER DOTTIN RESPONDED TO 67 GOODALE RD FOR OFFICERS NEEDING ASSISTANCE. UPON ARRIVAL I OBSERVED 4 OFFICERS IN A STRUGGLE WITH A SUSPECT WHO CONTINUED TO RESIST POLICE. AT THIS TIME I GRABBED THE LEG OF THE SUSPECT TO GAIN CONTROL UNTIL THE SUSPECT WAS IN CUSTODY. AFTER SEVERAL MINUTES I FELT STIFFNESS AND A DULL PAIN IN MY LEFT WRIST. I THEN APPLIED AN ICE PACK AND WENT TO CARNEY HOSPITAL VIA AMBULANCE. AFTER BEING SEEN IN THE EMERGENCY DEPARTMENT I WAS SENT HOME IN AN ARM SPLINT AND A PRESCRIPTION FOR 600MG MOTRIN. I WAS ADVISED TO ELEVATE MY ARM AND CONTINUE TO APPLY AN ICE PACK FOR THE NEXT FEW DAYS, AND TO FOLLOW UP WITH MY PRIMARY CARE PHYSICIAN IF NEEDED. MY GUN GLOCK 23 CTE 225, 3 MAGAZINE AND RADIO #6186 WAS LEFT IN THE CUSTODY OF SGT KELLY.

| UNIT ASSIGNED C202D | TOUR OF DUTY 2 | REPORTING OFFICER'S NAME ATIYA  YOUNGER | REPORTING OFFICER'S ID 11532 | PARTNER'S ID | FI NO |
|---|---|---|---|---|---|
| DATE OF REPORT 10/26/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
| TIME COMPLETED 03:50 PM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME JOHN H DANILECKI | | DUTY. SUP. ID 8947 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO<br>040586215 | REPORT DIST<br>B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT<br>WARRANT ARREST | CRIME CODE<br>0 | STATUS | DATE OF OCCUR.<br>A.10/28/04 | B. |
| LOCATION OF INCIDENT<br>749 MORTON ST | | APT | DISPATCH TIME | TIME OF OCCUR.<br>A.10:40 PM | B. |

| VICTIM-COMP. (LAST, FIRST, MI)<br>COMM OF MASS | PHONE | SEX | RACE | | MARITAL STATUS |
|---|---|---|---|---|---|
| ADDRESS | APT. | OCCUPATION | | AGE<br>0 | D.O.B. |
| PERSON REPORTING<br>P.O A WILLIAMS | ADDRESS<br>1165 BLUEHILL AVE,DORCHESTER,MA,02124-0000 | | | APT | PHONE<br>(617)-343-4700 |

WAS THERE A WITNESS TO THE CRIME                                                                                    A. ☒ YES ☐ NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | |
|---|---|---|---|---|---|---|---|
| P.O  GREG BOWDEN | 0 | | | 1165 BLUEHILL<br>AVE,DORCHESTER,MA,02124-0000 | | (617)-343-4700 | RES<br>BUS |
| P.O LUCAS TAXTER | 0 | | | 1165 BLUEHILL<br>AVE,DORCHESTER,MA,02124-0000 | | (617)-343-4700 | RES<br>BUS |

NUMBER OF PERPETRATORS : 1 -- CAN SUSPECT BE IDENTIFIED AT THIS TIME                                      B. ☒ YES ☐ NO

| P E R S O N S | STATUS<br>ARRESTED | NAME (LAST, FIRST) | IS SUSPECT RELATING NO. | PHOTO NO | ALIAS |
|---|---|---|---|---|---|
| | WARRANT NO         ADD | | SEX | | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | |

CAN SUSPECT VEHICLE BE DESCRIBED                                                                                    C. ☐ YES ☒ NO

| V E H I C L E S | STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL | |
|---|---|---|---|---|---|---|---|
| | VEHICLE MAKE YEAR | | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | | | OWNER'S ADDRESS | | |

CAN PROPERTY BE IDENTIFIED                                                                                            D. ☐ YES ☒ NO

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

IS THERE A SIGNIFICANT M.O.                                                                                            E. ☐ YES ☒ NO

| M O | TYPE OF WEAPON-TOOL<br>N/A | NEIGHBORHOOD<br>RESIDENCE/HOME | | TYPE OF BUILDING<br>N/A | PLACE OF ENTRY<br>N/A | |
|---|---|---|---|---|---|---|
| | WEATHER<br>CLEAR | LIGHTING<br>ARTIFICIAL | TRANSPORTATION OF SUSPECT<br>N/A | VICTIM'S ACTIVITY | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM | | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)                              F. ☒ YES ☐ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)                                               G. ☒ YES ☐ NO

BLOCK NO | NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 2245 10/27/2004 OFFICER WILLIAMS & SWAN ASSIGNED TO THE CK01F ANTI-CRIME UNIT UNDER THE DIRECT SUPERVISION OF THE C912 SGT. LONG ARRESTED ABOVE SUSPECT. OFFICERS RESPONDING TO ASSIST SEVERAL B3 OFFICERS ON A CALL FOR A PERSON WITH A GUN AT 749 MORTON ST (CC#040586144) OBSERVED ABOVE SUSPECT STANDING ON THE PORCH. SUSPECT WAS UNRULY AND BOISTEROUS CAUSING A CROWD TO GATHER. OFFICERS ASKED THE SUSPECT SEVERAL TIMES TO CALM DOWN AND TO LOWER HIS VOICE. AT THIS TIME THE SUSPECT WALKED INTO THE HALLWAY AND BEGAN PUNCHING THE WALLS AND SHOUTING "I HATE FUCKING COPS!" OFFICERS WERE ATTEMPTING TO INVESTIGATE THE ORIGINAL CALL AND WERE INFORMED THAT 3 UNKNOWN SUSPECTS DISPLAYED FIREARMS AND ROBBED A MAN THEN RAN INTO ABOVE ADDRESS. THE SUSPECT WAS IDENTIFIED AS BEING OUT FRONT AT THE TIME OF THE ROBBERY BUT DID NOT DISPLAY A FIREARM. SUSPECT ENTERED THE FRONT DOOR AFTER THE SUSPECT FLED INTO THE APARTMENT. OFFICERS SEARCHED THE APARTMENT FOR THE POSSIBLE SUSPECTS TO NO AVAIL. AT THE TIME OF THE INCIDENT OFFICERS COULD SMELL AN ALCOHOLIC BEVERAGE EMANATING FROM THE SUSPECT'S BREATH. THE SUSPECT IS A ████████████ SUSPECT IS CURRENTLY ON PAROLE WITH THE DEPARTMENT OF YOUTH SERVICES. OFFICER ██████ CONTACTED THE SUSPECT'S PAROLE OFFICER WHO ISSUED A ██████████ OFFICER FOR VIOLATING HIS ██ CONDITIONS. SUSPECT TRANSPORTED TO B3 FOR BOOKING AND WILL BE SENT TO DYS LOCATED AT 420 HARVARD ST (DORCHESTER,MA). SUSPECT'S ████████ WAS ON SCENE AT THE TIME OF THE ARREST.

| UNIT ASSIGNED<br>CK01F | TOUR OF DUTY<br>3 | REPORTING OFFICER'S NAME<br>ANTHONY  WILLIAMS | REPORTING OFFICER'S ID<br>11187 | PARTNER'S ID<br>80402 | FI<br>NO |
|---|---|---|---|---|---|
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |

| 10/28/04 | | | | |
| --- | --- | --- | --- | --- |
| TIME COMPLETED 11:17 PM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME RICHARD J SEXTON | DUTY. SUP. ID 10738 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO | | REPORT DIST. | CLEARANCE DIST |
|---|---|---|---|---|---|
| JUVENILE | | 040588692 | | B3 | |

| TYPE OF INCIDENT | | CRIME CODE | STATUS | | DATE OF OCCUR | |
|---|---|---|---|---|---|---|
| ROBBERY, UNARMED PERSON | | 0 | | | A.10/30/04 | B. |

| LOCATION OF INCIDENT | APT. | DISPATCH TIME | TIME OF OCCUR. |
|---|---|---|---|
| 10 DEERING RD | 2 | 02:27 AM | A.02:26 AM    B. |

| VICTIM-COMP. (LAST, FIRST, MI) | SEX | RACE | MARITAL STATUS |
|---|---|---|---|
| ██████████ | | | |

| ADDRESS | APT. | OCCUPATION |
|---|---|---|
| ██████████ | | |

| PERSON REPORTING | ADDRESS | APT. | PHONE |
|---|---|---|---|
| SAME | | | |

| WAS THERE A WITNESS TO THE CRIME | | | | | A. ☐ YES ☒ NO |
|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |

NUMBER OF PERPETRATORS : 5 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME    B. ☐ YES ☒ NO

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO | PHOTO NO | ALIAS |
|---|---|---|---|---|---|---|
| | SUSPECT | UNK, JAMIE | 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 | 000000000 | | |
| | WARRANT NO | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | UNK UNK,,MA,00000-0000 | FEMALE | BLACK NON-HISPANIC | 14 | 5-07 | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | WEIGHT | BUILD MEDIUM | HAIR | EYES |

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | S.S NO | BOOKING NO | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | SUSPECT | UNK, EDDY | | | | |
| | WARRANT NO | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | UNK UNK,,MA, | MALE | BLACK NON-HISPANIC | 25 | 5-07 | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) SUSPECT #1 BROTHER. DARK SKIN SHORT HAIR. | | WEIGHT | BUILD MEDIUM | HAIR | EYES |

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | SUSPECT | UNK, FRITZ | 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 | 000000000 | | |
| | WARRANT NO. | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | UNK UNK,,MA,00000-0000 | MALE | BLACK NON-HISPANIC | 20 | 5-04 | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) LONG BRAIDS, BLACK CLOTHING, LIGHT SKINNED | | WEIGHT | BUILD MEDIUM | HAIR BLACK | EYES |

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | SUSPECT | UNK, UNK | 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 | 000000000 | | |
| | WARRANT NO. | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | UNK UNK,,MA,00000-0000 | MALE | BLACK NON-HISPANIC | 0 | 5-04 | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) LIGHT BROWN EYES, BLACK SCULLY HAT | | WEIGHT | BUILD | HAIR | EYES |

| P E R S O N S | STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | SUSPECT | UNK, UNK | 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 | 000000000 | | |
| | WARRANT NO. | ADDRESS | SEX | RACE | AGE | HEIGHT | DOB |
| | | UNK UNK,,MA,00000-0000 | MALE | WHITE HISPANIC | 0 | 5-09 | |
| | SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) LIGHT SKIN, SPANISH LOOKING | | WEIGHT | BUILD MEDIUM | HAIR | EYES C. ☐ YES ☒ NO |

CAN SUSPECT VEHICLE BE DESCRIBED

| V E H I C L E S | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| | SUSPECT VEHICLE | MA | | | | UNK |
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE PICK UP | COLOR(TOP-BOTTOM) BLACK - BLACK | |
| | OPERATOR'S NAME UNK | | LICENSE NO. | STATE NA | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME UNK | | | OWNERS'S ADDRESS | | |

| V E H I C L E S | STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| | SUSPECT VEHICLE | MA | | | | UNK |
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE SEDAN | COLOR(TOP-BOTTOM) SILVER - SILVER | |
| | OPERATOR'S NAME UNK | | LICENSE NO. | STATE NA | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME UNK | | | OWNERS'S ADDRESS | | |

CAN PROPERTY BE IDENTIFIED    D. ☐ YES ☒ NO

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|
| | STOLEN | CELLULAR PHONE | (617) 817-3565 | SAMSUNG - SAMSUNG AT&T | | 83.00 | |

**Exhibit C, part 4**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.

| M O | TYPE OF WEAPON-TOOL<br>HANDS/FEET/TEETH | NEIGHBORHOOD<br>RESIDENCE/HOME | | TYPE OF BUILDING<br>RESIDENTIAL HOUSE | PLACE OF ENTRY<br>N/A | | E<br>☒ YES ☐ NO |
|---|---|---|---|---|---|---|---|
| | WEATHER<br>CLEAR | LIGHTING<br>HALLWAY | TRANSPORTATION OF SUSPECT<br>CAR | VICTIM'S ACTIVITY | | | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR<br>TOOK VICTIM'S CELL PHONE | | | RELATIONSHIP TO VICTIM | | | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)    F ☐ YES ☒ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)    G ☐ YES ☒ NO

BLOCK NO.   NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 2:26AM ON 10/30/04 OFFICER'S COOPER / HICKS IN THE C101A UNIT RESPONDED TO A R/C FOR A PERSON WITH A GUN AT 10 DEERING RD #2 DORCHESTER. UPON ARRIVAL OFFICERS SPOKE WITH THE VICTIM ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ WHO STATED THAT THE ABOVE LISTED 5 SUSPECTS KNOCKED ON THE DOOR OF APT #2, ASKING WHERE SUSPECT #2 "NEXTEL" CELL PHONE WAS. VICTIM STATED TO THE SUSPECTS THAT ▓▓▓ DID NOT HAVE THE PHONE, AND SUSPECT #4 GRABBED ▓▓▓ CELL PHONE FROM HER HANDS. SUSPECT #4 GESTURED AS IF ▓▓▓ HAD A WEAPON IN HIS WAIST, BUT THE VICTIM STATED THAT ▓▓▓ DID NOT SEE ONE. SUSPECT #4 STATED TO THE VICTIM THAT IF ▓▓▓ DID NOT HAVE HIS CELL PHONE IN 20 MINUTES THERE WOULD BE TROUBLE. SUSPECTS FLED THE SCENE IN UNK DIRECTION.

| UNIT ASSIGNED<br>C101A | TOUR OF DUTY<br>1 | REPORTING OFFICER'S NAME<br>KEVIN R. COOPER | REPORTING OFFICER'S ID<br>11807 | PARTNER'S ID<br>11824 | FI<br>NO |
|---|---|---|---|---|---|
| DATE OF REPORT<br>10/30/04 | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
| TIME COMPLETED<br>03:31 AM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME<br>JOHN J FORD | | DUTY. SUP. ID<br>11756 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☐    SUPPLEMENTARY ☒

| KEY SITUATIONS | COMPLAINT NO. 030170948 | REPORT DIST. B3 | CLEARANCE DIST |
|---|---|---|---|

| TYPE OF INCIDENT WARRANT ARREST | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.10/30/04 | B. |
|---|---|---|---|---|

| LOCATION OF INCIDENT 1220 BLUE HILL AV | APT. | DISPATCH TIME | TIME OF OCCUR. A.07:30 PM | B. |
|---|---|---|---|---|

| VICTIM-COMP (LAST, FIRST, MI) COMM OF MASS | PHONE (617)-343-4700 | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|

| ADDRESS 1165 BLUE HILL AVE,DORCHESTER,MA,02124-0000 | APT. | OCCUPATION | AGE 0 | D.O.B. |
|---|---|---|---|---|

| PERSON REPORTING P.O. BOWDEN AND ACE | ADDRESS 1165 BLUE HILL AVE,DORCHESTER,MA,02124-0000 | APT. | PHONE (617)-343-4700 |
|---|---|---|---|

**WAS THERE A WITNESS TO THE CRIME**    A ☒ YES NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|
| | | | | | | RES BUS |

**NUMBER OF PERPETRATORS : 1 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME**    B ☒ YES NO

PERSONS
| STATUS ARRESTED | NAME | PHOTO NO. | ALIAS |
|---|---|---|---|
| WARRANT | SEX | | |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | MULTI | |

**CAN SUSPECT VEHICLE BE DESCRIBED**    C ☒ YES NO

VEHICLES
| STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | LICENSE NO. | STATE | OPERATOR'S ADDRESS | |
| OWNERS'S NAME | | OWNERS'S ADDRESS | | | |

**CAN PROPERTY BE IDENTIFIED**    D ☒ YES NO

PROPERTY
| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

**IS THERE A SIGNIFICANT M.O.**    E ☒ YES NO

MO
| TYPE OF WEAPON-TOOL N/A | NEIGHBORHOOD COMMERCIAL & RESIDENTIAL | TYPE OF BUILDING N/A | PLACE OF ENTRY N/A |
|---|---|---|---|
| WEATHER CLOUDY | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY PATROL |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR N/A | | RELATIONSHIP TO VICTIM N/A | |

**IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)**    F ☒ YES NO

**IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)**    G ☒ YES NO

| BLOCK NO | NARRATIVE AND ADDITIONAL INFORMATION |
|---|---|
| | ABOUT 1930HRS OFFICERS BOWDEN AND ACE IN THE CK02F UNIT ARRESTED THE ABOVE SUSPECT ▮▮▮▮ ▮▮▮▮▮▮ ON AN OUTSTANDING DORCHESTER COURT DEFAULT WARRANT. WARRANT DOCKET# ▮▮▮▮▮▮▮ FOR UNLAWFUL POSSESSION OF A FIREARM, PROBATION VIOLATION. SUSPECT WAS TRANSPORTED TO B3 AND BOOKED IN THE USUAL MANNER. WARRANT UNIT NOTIFIED VIA FAX. |

| UNIT ASSIGNED CK02F | TOUR OF DUTY 3 | REPORTING OFFICERS NAME GREGG RICHARD BOWDEN | REPORTING OFFICER'S ID 12106 | PARTNER'S ID 91873 | FI NO |
|---|---|---|---|---|---|

| DATE OF REPORT 10/30/04 | SPECIAL UNITS NOTIFIED(REPORTING) WARRANT UNIT | | | | TELETYPE NO. |
|---|---|---|---|---|---|

| TIME COMPLETED 08:12 PM | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME BRIAN E RILEY | DUTY SUP. ID 8773 |
|---|---|---|---|---|

Incident Search

Page 1 of 2

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒     SUPPLEMENTARY ☐

| KEY SITUATIONS | | | COMPLAINT NO | | REPORT DIST. | CLEARANCE DIST. |
|---|---|---|---|---|---|---|
| DRUGS OTHERS | | | 030170948 | | B3 | |
| TYPE OF INCIDENT | | CRIME CODE | STATUS | | DATE OF OCCUR. | B. |
| AMMUNITION, POSSESSION | | 0 | | | A.04/03/03 | |
| LOCATION OF INCIDENT | | | APT. | DISPATCH TIME | TIME OF OCCUR. | B |
| WELLINGTON HILL ST , DEERING RD | | | | 01:28 AM | A.01:28 AM | |
| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | | SEX | RACE | | MARITAL STATUS |
| COMM OF MASS | | | | | | |
| ADDRESS | | APT. | OCCUPATION | | AGE 0 | D.O.B. |
| PERSON REPORTING | | ADDRESS | | | APT. | PHONE |
| OFFICERS WANT/LAHAM | | 1165 BLUE HILL AVE,MATTAPAN,MA,02126-0000 | | | | (617) 343-4700 |

| WAS THERE A WITNESS TO THE CRIME | | | | | | | A. ☐ ☒ |
|---|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | YES NO |
| | | | | | | | RES |
| | | | | | | | BUS |

NUMBER OF PERPETRATORS : 2 — CAN SUSPECT BE IDENTIFIED AT THIS TIME — B. ☒ ☐ YES NO

| P E R S O | STATUS SUSPECT SUMMONS | NAME (LAST, FIRST, MI) ▓▓▓ | S.S.N. ▓ | BOOKING NO. | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| | WARRANT NO. ▓▓▓ | | SEX | RACE ▓▓ | AGE | HEIGHT DOB |
| | SPECIAL CHAR. ▓▓▓ | | | HAIR ▓▓ | | |

CAN SUSPECT VEHICLE BE DESCRIBED — C. ☐ ☒ YES NO

| V E H I C L E S | STATUS | REG STATE | REG NO | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|---|
| | VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| | OPERATOR'S NAME | | LICENSE NO | STATE | OPERATOR'S ADDRESS | |
| | OWNERS'S NAME | | OWNERS'S ADDRESS | | | |

CAN PROPERTY BE IDENTIFIED — D. ☐ ☒ YES NO

| P R O P E R T Y | STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O. — E. ☒ ☐ YES NO

| M O | TYPE OF WEAPON-TOOL | NEIGHBORHOOD | | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|---|---|
| | AMMO/PIPE | RESIDENCE/HOME | | | |
| | WEATHER CLEAR | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY | |
| | UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR "YES, I HAVE A PIPE ON ME" | | | RELATIONSHIP TO VICTIM | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE) — F. ☒ ☐ YES NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW) — G. ☒ ☐ YES NO

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 01:28AM ON THURSDAY OFFICERS WANT AND LAHAM ASSIGNED TO THE C102A WERE ON RANDOM PATROL IN THE AREA OF LANDOR ROAD/ BLUE HILL AVE WHEN THEY OBSERVED THE TWO SUSPECTS ON THE CORNER OF DEERING ROAD AND BLUE HILL AVENUE. THE OFFICERS HAD OBSERVED SUSPECT #2 ▓▓▓▓▓ THE PREVIOUS NIGHT IN THE SAME LOCATION SPEAKING WITH VARIOUS INDIVIDUALS, OBSERVE THE OFFICERS' VEHICLE AND QUICKLY WALK AWAY FROM THE OFFICERS' VEHICLE. THE LANDOR ROAD/BLUE HILL AVE/DEERING ROAD AREA IS KNOWN TO BOTH OFFICERS AS A HIGH CRIME AND HIGH DRUG AREA. OFFICER WANT HAS MADE NUMEROUS DRUG ARRESTS IN THE AREA. RESIDENTS IN THE LANDOR ROAD/ BLUE HILL AVE AREA HAVE MADE COMPLAINTS TO OFFICER WANT CONCERNING DRUG ACTIVITY. THE OFFICERS THEN TURNED THEIR MARKED VEHICLE AROUND AND DRIVE UP DEERING ROAD WHERE THEY OBSERVED THE TWO SUSPECTS SPLIT UP, SUSPECT #▓▓▓▓▓ WALKED FAR AHEAD OF SUSPECT #2 UP DEERING ROAD TOWARD WELLINGTON HILL STREET. THE OFFICERS THEN CONDUCTED A THRESHOLD INQUIRY OF SUSPECT #1 ▓▓▓▓▓ SUSPECT #1 STATED THAT HE HAD BEEN RECENTLY RELEASED BY THE BRISTOL COUNTY SHERIFF'S DEPARTMENT AND HAD BEEN ARRSTED FOR DRUG ACTIVITY IN THE PAST. OFFICER WANT THEN ASKED SUSPECT #1 WHY HE HAD BEEN TALKING TO VARIOUS INDIVIDUALS AT SUCH A LATE HOUR TWO NIGHTS IN A ROW TO WHICH HE REPLIED "JUNKIES AREN'T GARBAGE THEY'RE PEOPLE, I'M JUST WALKING AROUND". THE OFFICERS COMPLETED AN FIO AND THEN CONTINUED UP DEERING ROAD. THE OFFICERS THEN OBSERVED SUSPECT #2 ▓▓▓▓▓ AND STOPPED TO SPEAK WITH THE SUSPECT. THE OFFICERS BEGAN SPEAKING WITH THE SUSPECT ASKED IF HE HAD BEEN ARRESTED TO WHICH HE REPLIED "YES". P.O. WANT THEN ASKED THE SUSPECT IF HE HAD ANYTHING ON HIM TO WHICH HE REPLIED "YES I HAVE A PIPE ON ME". THE OFFICERS THEN EXITED THEIR VEHICLE, BEGAN A PAT FRISK FOR WEAPONS AND A SEARCH FOR THE CRACK PIPE

BASED ON THE SUSPECT'S ADMISSION. THE OFFICERS RECOVERED A NIP BOTTLE OF ALCOHOL WITH HOLES IN IT COMMONLY USED TO SMOKE CRACK COCAINE FROM THE SUSPECT'S RIGHT INNER PANTS POCKET. DURING THE SEARCH OFFICER WANT FELT A HARD OBJECT IN THE SUSPECT ██████████ INNER LEFT JACKET POCKET. WHEN OFFICER WANT ASKED THE SUSPECT WHAT THE OBJECT WAS, THE SUSPECT REPLIED "A SHELL". OFFICER LAHAM THEN RECOVERED A LIVE WINCHESTER 20 GAUGE 3/4" SHOTGUN SHELL FROM THE SUSPECT'S INNER LEFT JACKET POCKET. THE OFFICERS THEN CHECKED THE SUSPECT FOR WARRANTS TO NO AVAIL. THE OFFICERS THEN INFORMED THE SUSPECT HE WOULD ████████████████████████████████████████████

██████████████████████████████████████████ THE SHELL WAS LOGGED INTO THE B-3
BALLISTICS LOG BOOK #2 PAGE #12 AND SECURED IN THE B-3 GUN LOCKER.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI NO. |
|---|---|---|---|---|---|
| C102A | 1 | MICHAEL R WANT | 12284 | 80406 | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
|---|---|---|---|---|---|
| 04/03/03 | BALLISTICS UNIT | | | | |

| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | DUTY. SUP. ID |
|---|---|---|---|---|
| 03:10 AM | | | KEITH A WEBB | 10743 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒    SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO 040597447 | REPORT DIST B3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT A D/W | CRIME CODE 0 | STATUS | DATE OF OCCUR. A.11/03/04 | B |
| LOCATION OF INCIDENT 10 SUTTON ST | APT | DISPATCH TIME 10:12 AM | TIME OF OCCUR. A.10:12 AM | B |

| VICTIM NAME (LAST, FIRST, MI) | PHONE | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|
| ADDRESS | APT. 3 | OCCUPATION | | |

| VICTIM COMP (LAST, FIRST, MI) | PHONE | SEX | | MARITAL STATUS |
|---|---|---|---|---|
| ADDRESS | | OCCUPATION | AGE | D.O.B. |

| PERSON REPORTING PO ESPINOLA, TAMMI | ADDRESS 1165 BLUE HILL AVE,DORCHESTER,MA,02124-0000 | APT | PHONE (617)-343-4700 |
|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME                                                                                        A ☐☒

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | |
|---|---|---|---|---|---|---|---|
| | | | | | | | RES |
| | | | | | | | BUS |

NUMBER OF PERPETRATORS : 0 --- CAN SUSPECT BE IDENTIFIED AT THIS TIME                                        B ☐☒

| STATUS ARRESTED SUSPECT | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | PHOTO NO. | ALIAS | YES ☐ NO ☒ |
|---|---|---|---|---|---|---|
| WARRANT NO | ADDRESS | SEX | | | DOB | |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) | | | | HAIR | EYES | |

| STATUS ARRESTED | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | PHOTO NO. | ALIAS | |
|---|---|---|---|---|---|---|
| WARRANT NO | ADDRESS | | | SEX | DOB | |

CAN SUSPECT VEHICLE BE DESCRIBED                                                                                        C ☐☒

| STATUS | REG. STATE | REG. NO | PLATE TYPE | YEAR(EXP) | MODEL | |
|---|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | VEHICLE NO | | STYLE | COLOR(TOP-BOTTOM) | | |
| OPERATOR'S NAME | | LICENSE NO | STATE | OPERATOR'S ADDRESS | | |
| OWNERS'S NAME | | | OWNERS'S ADDRESS | | | |

CAN PROPERTY BE IDENTIFIED                                                                                              D ☐☒

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|
| | | | | | | |

IS THERE A SIGNIFICANT M.O.                                                                                             E ☐☒

| TYPE OF WEAPON-TOOL HANDGUN | NEIGHBORHOOD RESIDENTIAL | | TYPE OF BUILDING | PLACE OF ENTRY | |
|---|---|---|---|---|---|
| WEATHER CLEAR | LIGHTING NATURAL | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY HOME DEPOT | | |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | RELATIONSHIP TO VICTIM | | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)                                        F ☐☒

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)                                                        G ☐☒

BLOCK NARRATIVE AND ADDITIONAL INFORMATION                                                                            ☐☒
NO

ABOUT 10:12 AM PO ESPINOLA IN THE C431D CAR AND PO DOTTIN-JORDAN IN THE C436D CAR RESPONDED TO 10 SUTTON STREET FOR A PERSON WITH A GUN  ON ARRIVAL SPOKE TO VICTIM #2 WHO STATED A GENTLEMAN HE WORKS WITH JUST PULLED A FIREARM ON HIM  VICTIM #2 THEN SHOWED OFFICER ESPINOLA A WORK SCHEDULE PRINT OUT FROM HOME DEPOT IN NATICK. (THERE WAS A LANGUAGE BARRIER HAITIAN CREOLE) HOWEVER VICTIM #2 POINTED TO HIS NAME, THE NAME OF HIS BOSS ▓▓▓▓▓▓▓▓▓▓▓) AND THE NAME OF THE SUSPECT ▓▓▓▓▓DESCRIBED AS A BLACK HAITIAN MALE WEARING A BLUE SECURITY TOP WITH A BLACK FLEECE COVERING IT VICTIM #2 ALSO STATED ▓▓▓▓▓▓▓▓ WAS IN THE COMPANY OF ANOTHER BLACK MALE WHOM

Incident Report Search

HE DID NOT KNOW (B/M WEARING BLACK PANTS BLACK JACKET WHITE SHIRT. OFFICER ESPINOLA THEN SPOKE TO VICTIM #1 VIA TELEPHONE ( VICTIM #1 HAD JUST CALLED VICTIM #2, PASSED OFFICER ESPINOLA THE PHONE) VICTIM #1 RELAYED TO OFFICER ESPINOLA THAT HE DROVE THREE OF HIS EMPLOYEE'S HOME THIS MORNING FROM HOME DEPOT IN NATICK ( ████████████████████ AND ANOTHER PARTY THAT ALSO LIVED AT 10 SUTTON. DURING THE RIDE THEY ARGUED ABOUT EVERYONE BEING FIRED BECUASE OF THE BEHAVIOR OF ████████████████ VICTIM #1 DROPPED OF OCCUPANTS OF 10 SUTTON ST AND CONTINUED WITH ONLY ████ MV. ONCE ON MORTON STREET ████████ BEGAN TO THREATEN VICTIM #1 STATING HE WAS GOING TO FIGHT HIM, THE TWO ARGUED AND ████████ MADE A CALL FROM VICTIM #1 CELL PHONE AND EXITED THE VEHICLE. FURTHER INVESTIGATION REVEALED THAT ████████ AND A SECOND B/M ████ ████████████ THEN WENT TO 10 SUTTON STREET AND CONFRONTED ████████████ VICTIM #2 AND SUSPECT #2 ████████████████ FIREARM AND POINTED IT AT VICTIM #2 ████████ THEN BOTH SUSPECTS FLED. WHILE STILL ON-SCENE VICTIM #2 RELAYED VIA TELEPHONE TO OFFICER ████████ THAT SUSPECT ████████ HAD JUST CALLED HIM AND TOLD HIM TO MEET HIM AT 93 WELLES AV IN DORCHESTER TO FINISH DISCUSSING THE SITUATION WITH WORK. IMMEDIATELY FOLLOWING VICTIM #2 STATES HE RECEIVED A PHONE CALL FROM SUSPECT ████████████████ WHO STATED DO NOT MEET ████ BECAUSE HE HAS A GUN ( MARGARET POSSIBLE LIVES AT 93 WELLES). IMMEDIATELY FOLLOWING THAT CALL VICTIM #2 THEN GOT A CALL FROM VICTIM #1 ████████ STATING SUSPECT ████████ AND ANOTHER BLACK MALE CAME TO HIS HOME AND PULLED A FIREARM ON HIM. PO ESPINOLA GAVE OUT A BROADCAST VIA CHANNEL THREE AND THE CK01D PO GRIFFITHS AND GRIFFIN AND C101D PO MALONE AND ROSSI WENT TO 93 WELLES AVE WHERE THEY FOUND BOTH SUSPECT IN THE HALLWAY. OFFICER MALONE PERFORMED A PAT FRISK OF SUSPECT ████████ AND RECOVERED A BLACK COLORED 25 CALIBER BROWNING FIREARM FROM SUSPECTS WAIST BAND WITH 3 ROUNDS IN THE MAG. THE C101D BROUGHT BACK ████████ TO 10 SUTTON AND THE CT55 PO BROWN BROUGHT BACK VANGILISTE TO 10 SUTTON. THE C411D PO VEGA-JONES BROUGHT VICTIM ████████ BACK TO 10 SUTTON. PO VALMOND RESPONDED TO THE SCENE AND ASSISTED WITH THE TRANSLATION AND BOTH SUSPECTS WERE POSITIVELY I'D. BOTH SUSPECTS ARRESTED AND TRANSPORTED TO B-3 FOR BOOKING. ONCE AT THE DISTRICT FURTHER INVESTIGATION REVEALED SUSPECT VANGELISTE HAD 3 WARRANTS, DEFAULT WARRANT ████████ OUT OF CAMBRIDGE, DEFAULT WARRANT ████████ OUT OF DORCHESTER DISTRICT COURT, AND DEFAULT WARRANT ████ WARRANT UNIT NOTIFIED. FURTHER INVESTIGATION ALSO REVEALED THAT SUSPECT ████████ HAS ALSO USED AN ALIAS OF ████████ AND ████████ FIREARM SECURED AND TO BE FORWARDED TO BALLISTICS.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C42 | 2 | TAMARA M ESPINOLA | 10414 | | NO |
| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO |
| 11/03/04 | | | | | |
| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | | DUTY. SUP. ID |
| 11:59 AM | | | JOSEPH H CANNEY | | 8363 |

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO 040601611 | REPORT DIST B.3 | CLEARANCE DIST |
|---|---|---|---|---|
| TYPE OF INCIDENT A D/W | CRIME CODE 0 | STATUS | DATE OF OCCUR A.11/05/04 | B. |
| LOCATION OF INCIDENT 1475 DORCHESTER AV | APT. | DISPATCH TIME 09:47 AM | TIME OF OCCUR A.07:45 AM | B. |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE | MARITAL STATUS |
|---|---|---|---|---|

| ADDRESS | | | AGE | D.O.B. |

| PERSON REPORTING P.O. SANDEFUR | ADDRESS 1165 BLUE HILL AVE,DOR,MA,02124-0000 | APT. | PHONE |
|---|---|---|---|

| WAS THERE A WITNESS TO THE CRIME | | | | | | | RES | YES ☐ NO ☒ |
|---|---|---|---|---|---|---|---|---|
| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | | APT. | TELEPHONE | BUS |

NUMBER OF PERPETRATORS : 2 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME     B. YES ☒ NO ☐

**PERSONS**

| STATUS SUSPECT | NAME (LAST, FIRST, MI) UNK | | S S NO. | BOOKING NO. | PHOTO NO. | ALIAS POOH |
|---|---|---|---|---|---|---|
| WARRANT NO | ADDRESS UNK ,MA, | | SEX MALE | RACE BLACK NON-HISPANIC | AGE 14 | HEIGHT 5-05 DOB |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) WHT ALL TEAMS CAP, BLK FLIGHT JACKET, BLK JEANS, BLK/GRY TIMS | | WEIGHT | BUILD THIN | HAIR | EYES | |

| STATUS SUSPECT | NAME (LAST, FIRST, MI) UNK | | S.S. NO. 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 | BOOKING NO 000000000 | PHOTO NO. | ALIAS |
|---|---|---|---|---|---|---|
| WARRANT NO | ADDRESS UNK ,MA,00000-0000 | | SEX MALE | RACE BLACK NON-HISPANIC | AGE 17 | HEIGHT 5-04 DOB |
| SPECIAL CHARACTERISTICS(INCLUDING CLOTHING) GRY FUR COAT, BLUE JEANS, WHT/BLUE TOP TENS, HAIR UNKEPT BUT BRAIDED UP | | WEIGHT | BUILD STOCKY | HAIR BLACK | EYES | |

CAN SUSPECT VEHICLE BE DESCRIBED     C. YES ☐ NO ☒

**VEHICLES**

| STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| VEHICLE MAKE YEAR | | VEHICLE NO. | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | | LICENSE NO | STATE | OPERATOR'S ADDRESS |
| OWNERS'S NAME | | | OWNERS'S ADDRESS | | |

CAN PROPERTY BE IDENTIFIED     D. YES ☐ NO ☒

**PROPERTY**

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|

IS THERE A SIGNIFICANT M.O.     E. YES ☒ NO ☐

**M O**

| TYPE OF WEAPON-TOOL HANDGUN | NEIGHBORHOOD AIR / BUS / TRAIN TERMINAL | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|
| WEATHER CLEAR | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT FOOT | VICTIM'S ACTIVITY GOING TO SCHOOL |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR COME AROUND THE CORNER, IDONT WANT TO DO YOU IN FRONT OF ALL THESE PEOPLE. | | | RELATIONSHIP TO VICTIM ACQUAINTANCE |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)     F. YES ☐ NO ☒

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)

BLOCK NARRATIVE AND ADDITIONAL INFORMATION     YES ☒ NO ☐

ABOUT 10:00AM P.O. SANDEFUR IN THE C421D UNIT RESPONDED TO A R/C FOR AN ASSAULT REPORT AT THE LEWENBERG SCHOOL, 20 OUTLOOK RD. MATT. UPON ARRIVAL SPOKE TO VICTIM ▮▮▮▮ WHO STATED THAT ▮ WAS SHOT AT BY AN UNKNOWN BLK MALE WHILE IN THE FIELDS CORNER T-STATION. ▮ FURTHER STATED THAT ▮ LEFT HIS HOUSE LATE FOR SCHOOL AND MISSED HIS SCHOOL BUS. AS A RESULT ▮ WALKED TO THE FIELDS CORNER T-STATION TO CATCH THE TRAIN. WHILE WALKING ▮ OBSERVED A GROUP OF KIDS ▮ USED TO HANG WITH KNOWN AS "SQUAD UP". A TEEN THE VICTIM HAD A FIGHT WITH THE PREVIOUS SCHOOL YEAR NAMED "POOH" WAS IN THAT GROUP. POOH AND ANOTHER TEEN, UNKNOWN TO THE VICTIM, APPROACHED ▮ AN UNKNOWN MALE ASKED IF THE VICTIM JUMPED ▮ BOY LAST YEAR. THE VICTIM RESPONDED BY SAYING NO BUT ANYTHING THAT DID HAPPEN GOT SQUASHED LAST YEAR. VICTIM BELIEVES THEY WERE REFERRING TO THE INCIDENT WITH POOH. THE UNKNOWN BLK MALE THEN SAID NO IT'S NOT SQUASHED. THE VICTIM THEN TURNED AND CONTINUED ON HIS WAY INTO THE T-STATION. VICTIM CONTINUED STATING THE GROUP OF APPROXIMATELY 15 GIRLS AND BOYS FOLLOWED ▮▮▮ INTO THE T-STATION AND BEFORE HE COULD GET TO THE TRAIN THEY

SURROUNDED ████ THEN SAID SOME ONE PUNCHED ███ IN THE FACE BUT ██ DIDN'T KNOW WHO DID IT ██ DIDN'T RETALIATE BECAUSE ██ WAS OUT NUMBERED. THIS IS WHEN THE UNKNOWN BLK MALE, WHO SEEMED TO BE THE LEADER OF THE PACK (DESCRIBED ABOVE) SHOWED █ A SMALL HANDGUN TUCKED IN ██ WAIST. THIS SUSPECT THEN TOLD THE VICTIM TO COME AROUND THE CORNER WITH ██ SUSPECT ALSO TOLD VICTIM ██ DID NOT WANT TO SHOOT ███ IN FRONT OF ALL THOSE PEOPLE. VICTIM REFUSED TO GO WITH THE SUSPECT. VICTIM THEN NOTICED THE TRAIN COMING AND MADE A BREAK FOR THE PLATFORM. THIS IS WHEN THE SUSPECT PULLED THE GUN OUT AND SHOT 2 ROUNDS IN THE AIR. VICITIM CONTINUED RUNNING TO THE TRAIN AND GOT ON AND THE SUSPECTS RAN IN THE OTHER DIRECTION. VICTIM STATED THAT THERE WERE THREE PEOPLE THAT HE NOTICED ON THE RAMP TO THE PLATFORM THAT WITNESSED THE INCIDENT. VICTIM DID FEEL HE COULD IDENTIFY THE SUSPECT THAT HAD THE GUN IF ██ SAW HIM AGAIN. THE C904 RESPONDED AND ASSISTED AT THE LEWENBERG SCHOOL. THE MBTA POLICE WERE CONTACTED AND DET. OTOOLE RESPONDED TO INVESTIGATE. THE YOUTH VIOLENCE STRIKE FORCE AND C-11 DETECTIVES WERE ALSO CONTACTED. VICTIM'S PARENTS WERE UNREACHABLE AT TIME OF THE REPORT.

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C421D | 2 | ROLAND D. SANDEFUR | 11360 | | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | | TELETYPE NO. |
|---|---|---|---|---|---|
| 11/05/04 | YVSF | | | | |

| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | DUTY SUP. ID |
|---|---|---|---|---|
| 12:38 PM | | | ANTHONY E TROY | 10597 |

## BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| KEY SITUATIONS | | COMPLAINT NO | REPORT DIST. | CLEARANCE DIST |
|---|---|---|---|---|
| DOMESTIC VIOLENCE | | 040608099 | B3 | |

| TYPE OF INCIDENT | CRIME CODE | STATUS | DATE OF OCCUR | B. |
|---|---|---|---|---|
| 209A, ADW | 0 | | A.11/08/04 | |

| LOCATION OF INCIDENT | APT. | DISPATCH TIME | TIME OF OCCUR |
|---|---|---|---|
| 1187 BLUE HILL AV | | 03:42 PM | A.03:40 PM B. |

VICTIM-COMP. (LAST, FIRST, MI) | PHONE | SEX | RACE

ADDRESS | APT. | OCCUPATION | AGE | D.O.B.

PERSON REPORTING | ADDRESS | APT. | PHONE

WAS THERE A WITNESS TO THE CRIME

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | ☐ YES ☒ NO |
|---|---|---|---|---|---|---|---|
| | | | | | | RES | |
| | | | | | | BUS | |

NUMBER OF PERPETRATORS : 1 ---- CAN SUSPECT BE IDENTIFIED AT THIS TIME   B ☒ YES ☐ NO

**PERSO**

| STATUS | NAME (LAST, FIRST, MI) | S.S. NO. | BOOKING NO. | PHOTO NO. | ALIAS | ☒ YES ☐ NO |
|---|---|---|---|---|---|---|
| ARRESTED | | | | | | |

WARRANT NO.

CAN SUSPECT VEHICLE BE DESCRIBED   ☐ YES ☒ NO

**VEHICLES**

| STATUS | REG. STATE | REG. NO. | PLATE TYPE | YEAR(EXP) | MODEL |
|---|---|---|---|---|---|
| | | | | | |

| VEHICLE MAKE YEAR | VEHICLE NO. | STYLE | COLOR(TOP-BOTTOM) |
|---|---|---|---|
| | | | |

| OPERATOR'S NAME | LICENSE NO | STATE | OPERATOR'S ADDRESS |
|---|---|---|---|
| | | | |

| OWNERS'S NAME | OWNERS'S ADDRESS |
|---|---|
| | |

CAN PROPERTY BE IDENTIFIED   D ☐ YES ☒ NO

**PROPERTY**

| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|
| | | | | | | |

IS THERE A SIGNIFICANT M.O.   E ☒ YES ☐ NO

**MO**

| TYPE OF WEAPON-TOOL | NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY |
|---|---|---|---|
| HANDGUN | COMMERCIAL & RESIDENTIAL | OUTSIDE | N/A |

| WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT | VICTIM'S ACTIVITY |
|---|---|---|---|
| CLOUDY | NATURAL | FOOT | MEET SUSPECT OUTSIDE 1187 BHA |

| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | RELATIONSHIP TO VICTIM |
|---|---|
| SEE NARRATIVE | EX-BOYFRIEND |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)   F ☐ YES ☒ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)   G ☐ YES ☒ NO

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

AT ABOUT 3:42 PM ON MONDAY , NOVEMBER 8 , 2004 C431D AND CT56D WERE DISPATCHED TO 1187 BLUE HILL AV FOR A PERSON WITH A GUN ON ARRIVAL SPOKE WITH ▇▇▇▇▇ WHO STATED ▇▇▇ WAS INVOLVED IN A HEATED ARGUMENT WITH ▇▇▇▇▇▇▇▇▇▇▇▇ WEARING A GREY SHIRT , BLUE JEANS , BLACK SNEAKERS AND ▇▇▇▇▇▇ WHEN ▇▇▇ POINTED HER FINGER AT ▇▇▇ AND ▇ STATED TO ▇▇▇▇▇ T'S LIKE THAT" AND HE REACHED UNDER HIS GREY SHIRT AND PULLED A GREY COLORED LONG BARREL HANDGUN FROM HIS WAIST AND POINTED IT AT ▇▇▇ HEAD AND ▇▇▇▇▇▇ TOLD HIM TO STOP AND PUSHED ▇▇▇ AWAY ▇ THEN LEFT THE SCENE ON FOOT GOING UP DEERING RD , HIS DESCRIPTION WAS BROADCAST ON CH-3 AND A SHORT TIME LATER ▇▇ WAS APPREHENDED BY CT56D AT 54 GREENDALE RD , PLACED UNDER ARREST , INFORMED OF HIS RIGHTS AND TRANSPORTED TO B-3 FOR BOOKING . SUSPECT STATED ▇ HAD AN ARGUMENT WITH HIS ▇▇▇▇▇▇▇ UT DID NOT HAVE NO GUN .

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S NAME | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| C431D | 2 | JAMES A COWART | 6851 | | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED (REPORTING) | | | | TELETYPE NO. |
|---|---|---|---|---|---|
| 11/08/04 | N/A | | | | |

| TIME COMPLETED | PATROL SUPERVISOR NAME | PAT. SUP. ID | DUTY SUP. NAME | DUTY SUP. ID |
|---|---|---|---|---|
| 05:40 PM | | | JOHN H DANILECKI | 8947 |

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

───────────────────

CRIMINAL NO. 05-10001-WGY

───────────────────

UNITED STATES

v.

GREGORY R. WRIGHT

───────────────────

**FURTHER AFFIDAVIT OF CHARLES W. RANKIN**

Being duly sworn, Charles W. Rankin states:

1.    I submit this further affidavit on the question of whether the area of 1222 Blue Hill Avenue,

Boston, could legitimately be considered a high crime area as of the date of this incident on

November 8, 2004.

2.    At the hearing on July 18, 2005, Officer Mark Bordley testified that members of the Youth

Violence Strike Force attended bi-weekly meetings in October and November 2004 and

reviewed maps and other reports that identified recent crimes and hot spots.  During the

course of the hearing, the government agreed to obtain the two reports that preceded the

November 8 encounter with the defendant.  On July 20, 2005, I received an affidavit of ATF

agent Rudnicki regarding the availability of those reports, along with the two most recent

reports.   The Rudnicki affidavit and the reports are attached to this affidavit as Exhibit 1.

I have reviewed those reports, from August 2004.  Each report identifies "hot spots," which

is consistent with Officer Bordley's testimony.  Neither report supports the conclusion that

**Exhibit D, part 1**

the area around 1222 Blue Hill Avenue was a high crime area.

3.  For the period of August 4 to August 16, the closest hot spot is described as the Blue Hill/Columbia Area, depicted on page 11 of Exhibit 1.  That location, in the vicinity of 600 Blue Hill Avenue, is 1.5 miles away from 1222 Blue Hill Avenue, according to Goggle maps.  See Exhibit 2.

4.  For the period of August 17 to August 30, the closest hot spot is described as Geneva/Normandy/BHA Area, depicted on page 25 of Exhibit 1.  That location, in the vicinity of 400 Blue Hill Avenue, is 2.1 miles away from 1222 Blue Hill Avenue, according to Goggle maps.  See Exhibit 3.

Signed under the penalty of perjury on July 27, 2005.

/s/

_____

Charles W. Rankin

-2-

# ATTACHMENT    A

EXHIBIT 1 TO RANKIN AFFIDAVIT

001



**Boston Police**
DEPARTMENT

*Office of Research and Evaluation*

# Armed Violent Crime

*Year-to-date,*
*August 4th – August 16th*

*Gang Meeting*
*8-17-04*



002

# Year-to-date Violent Crime Stats
## January 1 – August 16, 2003 v. 2004

| Crime Category | January - August 16, 2003 vs. 2004 | | |
|---|---|---|---|
| | 2003 | 2004 | % Chg. |
| Homicide | 26 | 45 | 73% |
| Robbery & Attempted | 1,689 | 1,459 | -14% |
| Aggravated Assault | 2,541 | 2,486 | -2% |
| **Total** | **4,256** | **3,990** | **-6%** |

| Incidents Involving a Firearm | | | |
|---|---|---|---|
| Crime Category | January - August 16, 2003 vs. 2004 | | |
| | 2003 | 2004 | % Chg. |
| Homicide | 14 | 34 | 143% |
| Robbery & Attempted | 485 | 292 | -40% |
| Aggravated Assault | 279 | 195 | -30% |
| **Total** | **778** | **521** | **-33%** |

003

# Year-to-Date Shootings 2003 vs. 2004

## All Cases

### January 1st - August 9th

| Crime Category | 2003 | 2004 | # chg. | % chg. |
|---|---|---|---|---|
| Homicides with a Gun | 13 | 33 | 20 | 154% |
| Non-Fatal Shootings | 85 | 136 | 51 | 60% |
| All Shootings | 98 | 169 | 71 | 72% |
| Total Victims | 98 | 169 | 71 | 72% |



004





**Boston Police**
DEPARTMENT
*Office of Research and Evaluation*

# Armed Violent Crime

## August 4th – August 16th



005

# Armed Incidents:

## August 4th – August 16th

## 103 Total Armed Incidents

### 5 Homicides

-All with a firearm

### 45 Robberies

53% with a firearm, 27% with a knife, 20% with other

### 53 Assaults*

36% with a knife, 34% with other, 30% with a firearm

*Non-Domestic Assaults



006





# Armed Incidents
## Over the Past 6 Weeks

**Past Two Weeks**

### 8/4 - 8/16
103 Incidents
5 Homicides
45 Robberies
53 Assaults

**3-4 Weeks Ago**

### 7/21 - 8/3
162 Incidents
4 Homicides
58 Robberies
100 Assaults

**5-6 Weeks Ago**

### 7/7 - 7/20
125 Incidents
5 Homicides
45 Robberies
75 Assaults

*Non-Domestic Assaults

007



## Armed Violent Crime
### August 4th – August 16th, 2004



| District | # of Incidents |
|----------|----------------|
| B2       | 19             |
| C11      | 17             |
| A1/A15   | 14             |
| D4       | 12             |
| B3       | 12             |
| A7       | 10             |
| E13      | 8              |
| E18      | 3              |
| D14      | 3              |
| C6       | 3              |
| E5       | 2              |
| Total    | 103            |

008



*Armed Violent Crime HotSpots*
*August 4th – August 16th, 2004*

Tremont & Stuart St Area

Blue Hill/ Columbia Area

009



*Armed Incidents:*
*August 4ᵗʰ – August 16ᵗʰ*
*Tremont/Stuart Street Area*
*D-4 / A-1*

2 Robberies
6 Assaults

4 Arrests
- One Robbery
- Three Assault

010



*Armed Incidents:*
*August 4th – August 16th*
*Blue Hill/Columbia Area*
*B-2 / B-3*

5 Assaults:    1 Arrest

-2 with Firearm
-1 Non-Fatal Shootings
  - 8/4  Jaime Owens
  - 8/9  Frantz Smith





Boston Police

DEPARTMENT

*Office of Research and Evaluation*

*Questions??*



012

ATTACHMENT    B

Exhibit D, part 2





**BostonPolice**

DEPARTMENT

*Office of Research and Evaluation*

# Armed Violent Crime

## August 17th – August 30th, 2004

## Gang Intelligence Meeting

## 8-31-04



014

# Year-to-date Violent Crime Stats
## January 1 – August 30, 2003 v. 2004

| Crime Category | January - August 30, 2003 vs. 2004 | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | % Chg. |
| Homicide | 28 | 43 | 54% |
| Robbery & Attempted | 1,801 | 1,554 | -14% |
| Aggravated Assault (Non-Dom.) | 1,903 | 1,836 | -4% |
| **Total** | **3,732** | **3,433** | **-8%** |

### Incidents Involving a Firearm

| Crime Category | January - August 30, 2003 vs. 2004 | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | % Chg. |
| Homicide | 15 | 35 | 133% |
| Robbery & Attempted | 511 | 438 | -14% |
| Aggravated Assault (Non-Dom.) | 273 | 315 | 15% |
| **Total** | **799** | **788** | **-1%** |

# Year-to-Date Shootings 2003 vs. 2004

## All Cases

### January 1st - August 30th

| Crime Category | 2003 | 2004 | # chg. | % chg. |
|---|---|---|---|---|
| Homicides with a Gun | 15 | 35 | 20 | 133% |
| Non-Fatal Shootings | 102 | 146 | 44 | 43% |
| All Shootings | 117 | 181 | 64 | 55% |



016

| 2004 Shootings by 2 week period | |
|---|---|
| 8/11 – 8/24/04 | 6 |
| 7/28 – 8/10/04 | 20 |
| 7/14 – 7/27/04 | 17 |
| 6/30 – 7/13/04 | 17 |
| 6/16 – 6/29/04 | 16 |
| 6/2 – 6/15/04 | 14 |
| 5/19 – 6/1/04 | 6 |
| 5/6 – 5/18/04 | 7 |
| 4/21 – 5/5/04 | 16 |
| 4/7 – 4/20/04 | 6 |
| 3/24 – 4/6/04 | 8 |
| 3/10 – 3/23/04 | 3 |
| 2/25 – 3/9/04 | 2 |
| 2/11 – 2/24/04 | 10 |
| 1/28 – 2/10/04 | 7 |
| 1/14 – 1/27/04 | 2 |
| 1/1 – 1/13/04 | 9 |

**Operation Neighborhood Shield 8/7/04**

**(8/25 – 8/30) – 6 days:**

5 Shootings (including one homicide)

B3: 3

B2: 1

A7: 1

· 017





**Boston Police**
DEPARTMENT
*Office of Research and Evaluation*

# Armed Violent Crime

# August 17th – August 30th



018

*Armed Incidents:*

*August 17th – August 30th*

## 119 Total Armed Incidents

### 1 Homicide

### 46 Robberies

52% with a firearm, 28% with a knife, 20% with other

### 72 Assaults*

33% with a knife, 40% with other, 26% with a firearm

*Non-Domestic Assaults



019



# Armed Incidents
## Over the Past 6 Weeks

**Past Two Weeks**

**8/17 - 8/30**
119 Incidents
1 Homicide
46 Robberies
72 Assaults

**3-4 Weeks Ago**

**8/4 - 8/16**
103 Incidents
5 Homicides
45 Robberies
53 Assaults

**5-6 Weeks Ago**

**7/21 - 8/3**
162 Incidents
4 Homicides
58 Robberies
100 Assaults

*Non-Domestic Assaults

020

# Armed Violent Crime
## August 17th – August 30th, 2004





| District | Homicide | Robbery | Assaults* | Total |
|----------|----------|---------|-----------|-------|
| B2 | 1 | 11 | 18 | 30 |
| D4 | 0 | 8 | 9 | 17 |
| B3 | 0 | 3 | 11 | 14 |
| A1 | 0 | 5 | 8 | 13 |
| C11 | 0 | 5 | 6 | 11 |
| A7 | 0 | 2 | 6 | 8 |
| C6 | 0 | 3 | 3 | 6 |
| D14 | 0 | 3 | 3 | 6 |
| E18 | 0 | 3 | 3 | 6 |
| A15 | 0 | 2 | 3 | 5 |
| E13 | 0 | 1 | 2 | 3 |
| Total | 1 | 46 | 72 | 119 |

*Non-Domestic Assaults Only

25% of the incidents occurred in B2

14% occurred in D4

12% in B3

021



*Armed Violent Crime Hot Spots*
*August 17th – August 30th, 2004*

D4: Lenox/Mass. Ave/Tremont Area

6 Aggravated Assaults and 1 Armed Robbery

B2: Roxbury/Shawmut/Wash. Area

6 Aggravated Assaults and 1 Homicide

B2: Geneva/Normandy/BHA Area

4 Armed robberies (Including One Car-jacking) and 3 Assaults

0.22



D4: Lenox/Mass. Ave/Tremont Area

023



B2: Roxbury/Shawmut/Wash. Area

Tyrone Britton
8/28/04, 1.19 am
Homicide

024



B2: Geneva/Normandy/BHA Area



**BostonPolice**
DEPARTMENT

*Office of Research and Evaluation*

*Questions??*



**Exhibit D, part 3**

026

# ATTACHMENT    C

## AFFIDAVIT OF SPECIAL AGENT LISA RUDNICKI

I, Lisa Rudnicki, under the pains and penalties of perjury, do hereby depose and state as follows:

1.  On July 18th, 2005, in connection with the case entitled United States v. Gregory Wright, and at the direction of the United States Attorney's Office, I contacted Officer Earl Perkins of the Intelligence Division of the Boston Police Department ("BPD"). As a result of this conversation, I learned the following:

2.  In 2004, the BPD would hold biweekly meetings called gang meetings. These meetings were attended by members of several BPD units and law enforcement agencies, including the BPD Youth Violence Task Force, the BPD Drug Control Unit, the Massachusetts Probation Department, and the Suffolk County District Attorney's Office.

3.  At these meetings, attendees received statistics and maps regarding firearm arrests, gun recoveries, shootings, and other violent crimes that had occurred in Boston over the previous two weeks. Based upon this description, it is my understanding that these meetings were those referred to by BPD Officer Mark Bordley in his testimony on July 18, 2005 during the suppression hearing of this case.

4.  The format and procedures used during the gang meetings were revamped between August 31, 2004, and November 17, 2004.

028

Thus, no meetings took place during that time and there are no statistics and maps available for that time period.

5. Prior to November 17, 2004, the most recent gang meetings occurred on August 17 and August 31. I was able to retrieve the statistics and maps that were distributed at both of those meetings. Copies of those documents are included with the Government's filing in this case as Attachments A and B.

Signed under the pains and penalties of perjury on July 20, 2005,

LISA A. RUDNICKI
Special Agent
Bureau of Alcohol, Tobacco, and Firearms

029

TOTAL P.03

Google Maps - from: 1222 blue hill avenue, boston, ma to: 600 Blue Hill Ave, Dorchester...   Page 1 of 1



**Directions**
Start address  **1222 blue hill avenue, boston, ma**
End address  **600 Blue Hill Ave, Dorchester, MA 02121**



Start address: 1222 Blue Hill Ave
              Mattapan, MA 02126
End address:   600 Blue Hill Ave
              Dorchester, MA 02121
Distance:      1.5 mi (about 2 mins)

1  Head from **Blue Hill Ave** - go **1.5 mi**

These directions are for planning purposes only  You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results

Map data ©2005 NAVTEQ™ Tele Atlas

**EXHIBIT 2 TO RANKIN AFFIDAVIT**

Google Maps - from: 400 blue hill avenue, boston, ma to: 1222 Blue Hill Ave, Dorchester...  Page 1 of 1



**Directions**

Start address  **400 blue hill avenue, boston, ma**
End address  **1222 Blue Hill Ave, Dorchester, MA 02121**



Start address:  400 Blue Hill Ave
Dorchester, MA 02121

End address:  1222 Blue Hill Ave
Mattapan, MA 02126

Distance:  2.1 mi (about 3 mins)

1  Head **southwest** from **Blue Hill Ave** - go 2.1 mi
2  Make a **U-turn** at **Blue Hill Ave** - go 0.0 mi

These directions are for planning purposes only  You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results

Map data ©2005 NAVTEQ™  Tele Atlas



EXHIBIT 3 TO RANKIN AFFIDAVIT

**Other Documents**                                                    7.27
1:05-cr-10001-WGY USA v. Wright

<div align="center">

**United States District Court**

**District of Massachusetts**

</div>

Notice of Electronic Filing

The following transaction was received from Rankin, Charles entered on 7/27/2005 at 6:29 AM EDT
and filed on 7/27/2005

| | |
|---|---|
| **Case Name:** | USA v. Wright |
| **Case Number:** | 1:05-cr-10001 |
| **Filer:** | Dft No. 1 - Gregory Wright |
| **Document Number:** | 55 |

**Docket Text:**
AFFIDAVIT of Charles W. Rankin by Gregory Wright [21] MOTION to Suppress filed by Gregory
Wright, (Rankin, Charles)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/27/2005] [FileNumber=1066150-0
] [35ba3b605c40135935dd7db3e16c421ea1ad4a3db27380647d10fc71006d4f4c110
a97adda82e424b19509ff365b53b869ae4ecdf23f63aadffeaca9087837ae]]

**1:05-cr-10001-1 Notice will be electronically mailed to:**

S. Waqar Hasib    waqar.hasib@usdoj.gov, sylvia.cooper@usdoj.gov

Nadine Pellegrini    nadine.pellegrini@usdoj.gov

Charles W. Rankin    crankin@rankin-sultan.com, charles_rankin@hotmail.com

**1:05-cr-10001-1 Notice will not be electronically mailed to:**