IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA        :
                                :          CRIMINAL ACTION
             v.                 :
                                :          NO. 05-10001-WGY
GREGORY WRIGHT                  :
```

## GOVERNMENT'S POST-REMAND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by Michael J. Sullivan, United States Attorney, and Nadine Pellegrini, Assistant United States Attorney for the District of Massachusetts, files this SUPPLEMENTAL MEMORANDUM OF LAW as follows:

### I. Procedural History

On January 5, 2005, a federal grand jury returned a one-count indictment charging Gregory Wright ("Wright") with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §922(g)(1). [D. 1]. [1] On April 4, 2005, Wright moved to suppress the gun and firearm evidence, claiming that it was the result of an unlawful stop. [D. 21-34]. After four days of hearings held on June 10, July 18, July 27 and July 29, 2005, the district court denied the motion to suppress. [D. 46, 51, 57,

---

[1] Citations are as follows. The citation "[D. _]" refers to a docket entry. Citations to transcripts of the suppression hearing held in this case are to the day and page of the transcript; "[2:45]," for example, refers to page 45 of the second day of the hearing. The Defendant's post-remand memorandum is cited as "[Memo.   ]."

58].

On September 27, 2005, Wright entered a conditional guilty plea, reserving his right to appeal the suppression ruling.  [D. 60].  The district court sentenced Wright to 70 months' imprisonment, to be followed by 3 years' supervised release.  [D. 71]. On appeal, Wright claimed, *inter alia*, error on the part of the district court due to the court's "self-described 'backwards' reasoning." United States v. Wright, 485 F.3d 45, 52 (1st Cir.2007). On May 4, 2007, the First Circuit vacated the judgment and remanded the case for further proceedings consistent with its opinion.

## II. The First Circuit's Opinion

With respect to the First Circuit's opinion, it is important to note not only what the Court did find but also what the Court *did not* address. The First Circuit's opinion focused on two areas: (1) the district court's factual findings regarding flight and (2) the question of whether or not the area where Wright was located was, in fact, a high-crime area.

With respect to flight, the Court did not reach the issue of whether or not there was a sufficient factual basis for the officers to reasonably believe that Wright was engaged in criminal activity.  The Court did not address the reasonable suspicion analysis due to "an impermissible error in the antecedent factual findings."  This error related solely to the

2

issue of the "backwards" reasoning. The Court found that it was
"impossible to discern whether the court would have concluded
that Wright knowingly fled from the police if it had not
considered the eventual recovery of the gun." Wright, 585 F.3d at
52. Upon remand, the district court is now charged with applying
the reasonable suspicion analysis as set forth in Terry v. Ohio,
392 U.S. 1 (1968) and its progeny to the facts as found by the
court.  It is the government's position that the court's error
was a temporal one; easily corrected by an analysis that
considers all the evidence prior to the discovery of the gun.

With respect to the district court's conclusion that the
area where Wright was stopped was a not a "high crime area," the
First Circuit noted that its decision was responding to "the
court's acknowledged uncertainty about the nature of the high
crime determination and the factors relevant to that
determination." Wright, 485 F.3d at 53. The Court further noted
that "the district court, upon remand, may wish to reevaluate the
high crime area issue," but made it clear that it was not
suggesting what the finding should be. Wright, 485 F.3d at 54.
The government contends that the evidence supports the conclusion
that this was a high crime area; however, that finding is not
necessary to the finding of reasonable suspicion which is
supported on its own accord by the evidence in the record.

## III. Post-Remand Issues

Wright has filed a post-remand memorandum challenging both the facts as previously found by the district court as well as the law to be applied. As set forth, *infra*, Wright's motion to suppress should be denied as it proffers both facts and law which are neither accurate or controlling.

The government contends that the circumstances were more than sufficient for the police to reasonably believe that Wright was running and to infer that he was running because he recognized them. It was a reasonable inference on the part of experienced law enforcement officers that Wright was fleeing. The police cars, although unmarked, were recognizable, and when the first car pulled in front of the vehicle in which Wright is seated, he immediately stepped out and ran in the opposite direction.[2] The coincidence in timing and direction support a reasonable inference of flight. This inference is further supported by Wright's leaning forward in the car, which is consistent with observing the lead vehicle. While these actions

---

[2]In his Post-Appeal Memorandum, Wright argues that he was running **toward** the police cars. [Memo, 9](emphasis added). This is not an accurate statement of the facts. The police cars were, in fact, traveling in the opposite direction. Wright grabbed with his right hand towards the front of his sweatshirt, near his waist, then began running down the street to the rear of his car, away from the parked cruiser. [1:19-20, 45, 73, 2:22]. Further, the officers testified that they were traveling inbound on Blue Hill Avenue toward Morton and Wright ran up Blue Hill Avenue toward Clarkwood. [2:20-22].

could possibly have an innocent explanation, as discussed, *infra*, that does not defeat reasonable suspicion if the actions could reasonably be interpreted by a police officer as indicating flight.

In addition to the flight, there is another factor observed by police - that of appearing to carry something heavy while running. The police did not have to know what the object or item might be. A person running, after appearing to recognize police in the area, who appears to be concealing something while doing so was simply another set of facts to be considered as part of the totality of the circumstances.  Under these circumstances, the police could reasonably infer that whatever Wright was carrying was related to his action of fleeing – that he possessed some form of contraband with which he did not wish to be found.

Finally, the government submits that there is sufficient evidence to determine that this particular area met the definition of high crime. Defining an area as such is not wholesale defamation of a neighborhood nor a reason to engage in wholesale speculation so as to infer a sinister purpose to the testimony of the law enforcement officers. [Memo, 13].  In this case, there are two factors to consider. The first is the testimony of each officer regarding his particular knowledge of what previously occurred in the area. The second factor is the specific knowledge of at least one officer, chargeable to all

5

under the doctrine of collective knowledge, that another person
in the car with Wright had previously been the victim of a
violent crime involving a gun.

## IV.  **Factual Background**

On the evening of November 8, 2004, four unmarked Crown
Victoria police cruisers drove up Blue Hill Avenue in Dorchester,
Massachusetts.  [1:14-15].  The cruisers held law enforcement
officers belonging to the Boston Police Department's ("BPD") Youth
Violence Strike Force, an interagency program using aggressive
patrols in cars and on foot to "saturate" high crime areas and
deter criminal activity.  [1:13-14, 69, 77; 2:17].  The Strike
Force members included BPD officers, MBTA police and Massachusetts
state troopers.  [1:14-16].  They dressed in plain clothes but did
not seek to hide their identities, wearing jerseys and sweaters
bearing the names of their departments and wearing their badges on
chains across their chests.  [1:80; 2:20].

Around 7:45 pm, the cruisers approached the intersection of
Blue Hill Avenue and Morton Street, a well-lighted area with "a lot
of activity."  [1:15-16, 27, 37].  The procession slowed, until the
cruisers were "rolling at 10 to 15 miles per hour."  [1:36-37, 40].
As they moved forward, BPD officer Gregory Brown ("Brown"), who sat
in the front passenger seat of the first cruiser, observed a
stopped car partially blocking the entrance to a parking lot.
[1:18, 37].  Brown's car drove slowly past the parked vehicle and,

as it did so, Brown saw that three men were inside, two in the front seats and one in the back. [1:17-18]. Brown recognized the man in the front passenger seat as Omar Edwards, a resident of the neighborhood who had previously been seriously injured in a shooting. [1:17, 38, 4:12].

At this point, Officer Craig Jones ("Jones"), who drove the cruiser in which Brown rode, pulled over about ten feet ahead of the stopped car. [1:43]. When Jones did, Officer Mark Bordley, riding in the passenger seat of the cruiser following Brown's, saw the person in the back seat of the parked car – later identified as Gregory Wright – lean forward to look at the car that had just pulled in front of his. [2:20-21]. Moments later, the officers saw Wright open the rear door of the parked car. [1:19, 73; 2:22]. Wright grabbed with his right hand towards the front of his sweatshirt, near his waist, then began running down the street to the rear of his car, away from the parked cruiser. [1:19-20, 45, 73, 2:22].

As Wright fled, several of the law enforcement officers jumped out of their cruisers and began yelling for Wright to stop. [1:20, 2:22-23]. When Wright did not stop, the police pursued him, ultimately catching up with him after a short chase. [1:20-21, 74; 2:14, 22].

7

**V. Legal Analysis**

*A. Under the reasonable suspicion standard, the police had sufficient facts upon which to reasonably infer that Wright was involved in possible criminal activity.*

In <u>Terry v. Ohio</u>, 392 U.S. 1, 22 (1968), the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to effect an arrest." The now familiar inquiry is "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 19-20. The Supreme Court recognized that "there is no ready test for determining reasonable suspicion other than by balancing the need to search against the invasion which the search entails." <u>Terry</u>, 392 U.S.. at 21 (quoting <u>Camara v. Municipal Court</u>, 387 U.S. 523, 534-535, 536-537 (1967). To assess the need to search or seize, the Supreme Court established the "articulable suspicion" standard against which officers conduct must be measured." In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21.

The articulable suspicion standard is not a stringent one.
"The Fourth Amendment requires 'some minimal level of objective
justification for making the stop.' " United States. v. Solkolow,
490 U.S. 1, 7 (1989), (quoting INS v. Delgado, 466 U.S. 210, 217
(1984)).  As the Court further stated: "That level of suspicion
is considerably less than proof of wrong doing by a preponderance
of the evidence. We have held that probable cause means "a fair
probability that contraband or evidence of a crime will be
found." Illinois v. Gates, 462 U.S. 213, 238 (1983), and the
level of suspicion required for a Terry stop is obviously less
demanding than that for probable cause, see United States v.
Montoya de Hernandez, 473 U.S. 531 541, 544 (1985)."

In further expounding upon the reasonable suspicion
standard, the First Circuit has had occasion to sharpen the focus
of such an analysis.  First, the officers' conduct must be viewed
in the context of the circumstances as a whole. United States v.
Cortez, 449 U.S. 411, 417 (1981) ("the totality of the
circumstances – the whole picture – must be taken into account."
"The circumstances 'are not to be dissected and viewed singly;
rather they must be considered as a whole.'" Stanlary, 915 F.2d
at 55 (quoting Trullo, 809 F.2d F2d at 11.    Secondly, the
analysis proceeds "from the perspective of the searching
officers," United States v. Aitoro, 446 F.3d 246, 253 (1st Cir.
2006), but does not depend upon the officer's actual, subjective

9

beliefs, see United States v. Andrade, 94 F.3d 9, 12 (1st Cir. 1996) (noting that the Fourth Amendment "allows certain actions to be taken in certain circumstances, regardless of motives"). Instead, it depends on "an objectively reasonable appraisal of the facts" available to the police. United States v. Coplin, 2006 WL 2686529, *4 (1st Cir. 2006).

Under a "reasonable appraisal of the facts" available to the officers, the inference that Wright recognized the unmarked car that pulled in front of him was reasonable. [4:37]. To begin with, the cars the police were driving, although unmarked, were hardly undercover. The Strike Force officers drove Crown Victorias, a type of vehicle "bought in bulk" by the police department. [4:22]. Frequent use of these cars by police officers made them, as the court noted, "readily identifiable to those people who interest themselves in what the police are driving." [4.22] While this court made its determination that Officer Brown could not see the movement of Wright in the car, the additional findings with respect to the other officers, coupled with Brown's knowledge of the passenger with Wright and added to that of Wrights's conduct, do provide the necessary reasonable suspicion.

Wright claims that "the only fair interpretation of the circumstances is that Wright was simply being dropped off at his destination when the police first observed him." [Memo, 8]. This

10

interpretation conveniently omits some pertinent facts which the court previously found and from which the officers could reasonably infer that criminal activity was afoot. It also erroneously suggests that a possibly innocent interpretation trumps that of reasonable suspicion. While Wright challenges the district court's conclusion that it was reasonable to believe that Wright recognized their unmarked vehicle and fled in response to the police presence, this conclusion also has ample support in the record.[3]

Wright contends that his specific actions in leaving his car could have been consistent with innocent motives.  For example, Wright suggests that his actions could mean that he "was simply being dropped off at his destination." [Memo,8].  However, that characterization ignores the importance of context to the reasonable suspicion analysis.  See Cook, 277 F.3d at 85 (noting that, in evaluating reasonable suspicion, "a court must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior").  What the police

---

[3] In the analysis that follows, the government discusses the information available collectively to the officers who testified at the suppression hearing.  Given that the officers were jointly involved in the stop, this Court may reasonably draw on the information available to them as a group in determining whether reasonable suspicion existed.  See United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) (noting that "where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed  to [the] others").

saw was not simply a person get up and leave a car.  They saw
someone who leaned forward to look at them, then almost
immediately afterwards exited and ran in the opposite direction,
clutching at some apparently heavy object at his waist.[4]  This
chain of events, happening just after an identifiable police
cruiser had passed within a few feet of Wright, cannot so easily
be given an innocent explanation, even if the individual elements
in isolation would not have aroused suspicion.

     In any event, the police were not required by the reasonable
suspicion standard to await information establishing for certain
that they had been recognized, but only to "react[] reasonably on
seeing [Wright] flee."  Aitoro, 446 F.3d at 253.  The reasonable
suspicion standard "accepts the risk that officers may stop
innocent  people" based on "ambiguous" conduct in order to
"resolve the ambiguity."  Illinois v. Wardlow, 528 U.S. 119, 125-
26 (2000); cf. Coplin 2006 WL 268529 at*4 (explaining that
reasonable suspicion is not precluded by fact that it relies on

---

     [4] Wright suggests that the direction he ran undercuts this
inference, because it caused him to run towards the other police
cruisers that were stopped in the travel lane.  This argument
carries little weight.  Nothing in the record suggests that Wright
would have seen any car other than Brown's at the time he got out
of his car and began to run.  Nor does Wright point to evidence in
the record that suggests he could have taken an alternative path
that would not have brought him past one or more of the officers.
See Baskin, 401 F.3d at 793 (fact that defendant drove his car past
the officer's car after coming upon it on a back road, rather than
attempting a U-turn, did not undercut inference of flight given the
"uncertain feasibility of performing an abrupt U-turn on that
narrow, dirt road").

officer's reasonable belief in a fact that turns out not to be true). Here, Wright's actions, viewed in context, provided a more than sufficient objective basis for the police to infer that they had been recognized and that Wright fled to avoid encountering them.

Wright argues that there is no observation that evidenced his "purpose for leaning forward." [Memo, 7]. Wright's purpose, however, cannot be the focus of this court's inquiry. Wright's mental state, intent and/or motive at the time is irrelevant to the Terry analysis. Indeed, the First Circuit's ruling in Wright highlighted the fact that the court's error was, in part, due to 'irrelevant comments on Wrights motives for running." The officers are not charged with knowing exactly Wright was thinking when he leaned forward – the **act** of leaning forward is enough to provide the officers with a basis for a reasonable inference; that is, that Wright was leaning forward because he recognized that the vehicle was a police cruiser. In determining reasonable suspicion, courts consider whether "specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant [the] intrusion," United States v. Woodrum, 202 F.3d 1, 6 (1st Cir. 2000).

Moreover, the circumstances immediately preceding the stop gave the police additional reasons to suspect their presence had been detected. Prior to pulling over in front of Wright's car,

13

the cruiser in which Brown rode had rolled by Wright's car at a distance of less than ten feet and a speed of ten to fifteen miles an hour. [1:36, 43, 47]. Brown had looked directly at Omar Edwards, the front seat passenger, who Brown knew as a resident of the neighborhood and the victim of a shooting. [1:17, 38, 47; 2:59]. When this happened, Brown could reasonably have assumed that Edwards also recognized him and reported this to the others in his car. In addition, the officers could reasonably have suspected that one of the individuals in Wright's car recognized them by the badges visibly displayed on their chests. See [2:20]; United States v. Edmonds, 240 F.3d 55, 62 (D.C. Cir. 2001) (finding that, where an officer wearing his badge on his chest drove by a defendant at a close distance, "it is a fair inference that [the defendant] in turn saw [the officer], perceived his badge, [and] recognized him as a police officer").

Whatever inferences the police could have drawn while Wright was still in his car, they had still greater reason to believe they had been recognized once Wright, after observing Brown's cruiser, exited his car and ran down Blue Hill Avenue in the opposite direction. [1:19-20]. Indeed, the close proximity in time between Wright's observation of police and his flight – and the absence of any other apparent reason for his speedy departure – make the inference that Wright fled because he had recognized

14

the police almost inescapable.  Cf. United States v. Baskin, 401 F.3d 788, 793 (7th Cir. 2005) (finding it reasonable for officer to infer that, where car driven by defendant had immediately accelerated when it observed the officer's car on a darkened road, the defendant was attempting to flee).

B. *The police had reasonable suspicion to stop Wright.*

Wright argues that, even if the police reasonably believed that he fled in response to their arrival, they had no reasonable suspicion to detain him because reasonable suspicion requires more than flight alone.  In fact, the police had substantial evidence, beyond mere flight, to justify the stop.

Even without consideration of the high crime area in which the stop occurred, the police had information, beyond mere flight, to support their suspicion that criminal activity was afoot.  When the police encountered Wright, he was in the company of Omar Edwards, who the police knew as a person seriously injured in an earlier shooting.  [4:36].  The First Circuit has recognized, the fact that a person has been injured by gun violence can suggest the person's involvement in violent criminal activity.  United States v. Martins, 413 F.3d 139, 150 (1st Cir.), cert.denied, 126 S.Ct. 644 (2005) (upholding the inference "that victims in gang-area shootings often [are] gang members themselves").  So too, police know from experience that individuals involved in crime often congregate with others

15

involved in similar activity.  United States v. Silva, 957 F.2d
157, 160-61 (5th Cir. 1992) (noting that companionship with a
person "independently suspected of criminal activity is a factor
to be considered in assessing the reasonableness of a seizure");
United States v. Gonzalez, 70 F.3d 1236, 1238 (11th Cir. 1995)
("A person's proximity to a person whom officers have probable
cause to believe is committing a crime may be considered as a
factor in assessing reasonable suspicion.").  Thus, Wright's
presence in the car with Edwards suggested the possibility of
Wright's involvement in violent crime.

     The circumstances in which Wright fled the police provided
additional grounds for suspicion beyond the flight alone.  To
begin with, the fact that Wright specifically followed the
movements of the police, and then exited a car in which he had
been sitting to flee in the opposite direction, suggested an
unusual level of concern with encountering the police that could
have reasonably fueled the officer's suspicions.  More
significantly, when Wright turned to run, he was seen grabbing or
clutching at his sweatshirt near his waist. [1:19, 20; 4:43].  As
the district court found, this action suggested at a minimum that
Wright carried something heavy in his sweatshirt.  [4:43].
Viewed in light of the presence of Edwards, and Wright's
suspicious behavior, the police could reasonably have suspected
that the "something heavy" – which Wright's method of carrying

kept hidden – was a gun.  See United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998) (holding that a "bulge" in the defendant's jacket "when viewed in light of the other details surrounding the encounter, permitted a reasonable inference that [the defendant] was armed and dangerous"); cf. Aitoro, 446 F.3d at 253 (reasonable belief that a bulge in clothing is a gun support reasonable suspicion).[5] Wright has argued that the police did not testify to the presence of a gun. [Memo, 11]. Such testimony is not required. As the Supreme Court explained in Whren v. United States, the Fourth Amendment imposes an objective standard, which "allows certain actions to be taken in certain circumstances, whatever the subjective intent." 517 U.S. 806, 814 (1996). Courts must make "an objective assessment of the circumstances" and may uphold a stop "even though [the justification found adequate by court] was not the search officer's motivation." United States v. Cofield, 391 F.3d. 334, 337 n.1 (1st Cir. 2004).

Finally, although several of the officers called to him to stop, Wright did not do so, providing a further basis for the police to suspect that Wright was not simply running because he "had an appointment" [Br. 16], but because he was involved in

---

[5] Wright argues that the police did not testify regarding what might have been in his book. Reasonable suspicion to stop may be established based on "an objective assessment of the circumstances . . . even though [a particular justification] was not the searching officer's motivation."  United States v. Cofield, 391 F.3d 334, 337 n.1 (1st Cir. 2004).

some illegal activity.  United States v. Lenoir, 318 F.3d 725,

729 (7th Cir. 2003) (explaining that "[a] suspects failure to

halt upon police command to do so . . . support[s] a finding of

reasonable suspicion") (internal citation omitted).

This context, which supported a particular suspicion that

Wright was involved in violent crime, distinguishes this case

from United States v. McKoy, 428 F.3d 38 (1st Cir. 2005), on

which Wright seeks to rely. [Memo, 8].  In McKoy, this Court

found that the government had introduced no evidence, other than

the character of the neighborhood, that could tie the defendant

to gun violence.  The stop took place during the day and

addressed a traffic violation.  428 F.3d at 40.  Under the

circumstances, the Court declined to infer that the defendant's

reaching for the dashboard suggested reaching for a gun.  [Id.].

Here, the officers had information tying Wright to gun violence

and actions that directly amplified that suspicion.  Viewed in

their totality, Wright's actions provided an objective,

articulable basis for making the stop.

The reasonable suspicion standard is "considerably less

demanding than the level of proof required to support a finding

of probable cause."  United States v. Martins, 413 F.3d 139, 149

(1st Cir.), cert. denied, 126 S.Ct. 644 (2005).  It requires

"more than a naked hunch" but does not require "evidence of a

direct connection linking the suspect to [a] suspected crime."

18

United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  To
determine whether reasonable suspicion exists in a given case,
courts "use a wide lens and survey the totality of the
circumstances."  Romain, 393 F.3d at 71.  A court will uphold an
investigative stop if the court makes the "practical, commonsense
judgment based on the idiosyncracies of the case at hand,"
Chhien, 266 F.3d at 6, that police had "a particularized and
objective basis for suspecting legal wrongdoing."  United States
v. Golab, 325 F.3d 63, 66 (1st Cir. 2003) (internal punctuation
and citation omitted).

    In Illinois v. Wardlow, the Supreme Court held that an
individual's "unprovoked flight" at the sight of police
constituted a relevant factor in determining the existence of
reasonable suspicion.  528 U.S. at 124.  The Court relied on
prior cases recognizing that "nervous, evasive behavior" was a
"pertinent factor" in the Fourth Amendment inquiry, reasoning
that "[h]eadlong flight – wherever it occurs – is the consummate
act of evasion: It is not necessarily indicative of wrongdoing,
but it is certainly suggestive of such."  Id.  The Wardlow Court
further held that, where  the defendant's flight occurred when
police observed him in an area "known for heavy narcotics
trafficking," these combined factors provided reasonable
suspicion to detain the defendant.  Id. at 124-25.  Subsequent
cases have construed Wardlow to stand generally for the

19

proposition that "[a]n individual's flight from police combined with other observations may support reasonable suspicion for detention under <u>Terry</u>."  <u>United States v. Scott</u>, 270 F.3d 30, 41 (1st Cir. 2001); <u>see also</u> <u>United States v. Bonner</u>, 363 F.3d 213, 217-18 (3rd Cir. 2004) (explaining that, after <u>Wardlow</u>, "flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion").[6]

Wright argues on that this case falls outside the scope of <u>Wardlow</u>, because the area where Wright was stopped was not a high crime area and that Wright was "running to his destination oblivious to the presence of undercover police." [Memo, 10]. Neither contention withstands scrutiny.  While this court declined to find that the stop occurred in a high crime area, the record supports that conclusion.  Even if it did not, the testimony establishes other circumstances that, coupled with Wright's flight, provided reasonable suspicion for the stop.
C. *The stop occurred in a high crime area.*

Wright now argues that the First Circuit has detailed that a factual finding of a high crime area includes (1)the nexus between the type of crime most prevalent or common in the area and type of crime suspected in instant case,"(2) limited

---

[6] The government does not believe that <u>Wardlow</u> compels the conclusion that flight alone may not establish reasonable suspicion.  However, the court need not reach that question here, since the information available to the police provided substantial additional indicia of criminal activity.

geographic boundaries for the 'area' or neighborhood being evaluated and (3)temporal proximity between the evidence of heightened criminal activity and the date of the stop or search at issue.

It must be noted that the First Circuit did not intend this listing to be all inconclusive or to apply in all cases. Additionally, there is nothing to preclude the court from considering character of the area as another articulable fact in the reasonable suspicion analysis. The Court stated that "[i]n most cases, relevant evidence for this factual finding will include some combination of the following," going on to the list the factors noted above. The Court went on to add that "[w]e see no reason to treat the character of the stop's location as other than a factual issue," citing <u>United States v. Trullo</u>, 8009 F.2d 108,111 (1st Cir. 1987)(collecting cases showing that the character of an area is an "articulable fact" that may be considered in the reasonable suspicion analysis.)" <u>Wright</u>, 485 F.3d at 53.

Wright argues that there is no specificity between crimes noted and himself; that the limited geographic boundaries of the area were not met; and that there was no temporal proximity. In a conclusory manner Wright suggests that the testimony of the officers is nothing more than "mere war stories." [Memo, 13]. The testimony at the suppression hearing proves otherwise. At the

suppression hearing, the government introduced testimony from
each of the three officers characterizing the area in which they
observed Wright as an area with an extensive history of criminal
activity.  Officer Brown, a 17-year veteran of the BPD,
characterized this part of Blue Hill Avenue as a "very high crime
area consisting of firearms violence, drug activity, street
robberies, breaking and enterings." [1:16].  Officer Celester,
who had been with the BPD for 11 years, testified that this
particular block on Blue Hill Avenue was "a trouble spot . . .
[t]here's been shootings there, there's been a lot of crime
there." [1:70].  Officer Bordley, also an 11-year veteran,
testified to making "numerous arrests for drug offenses, violent
crimes, violent assaults, assaults and batteries, firearms
arrests" in the neighborhood surrounding the block where police
found Wright.  [2:17-18; see also 2:43-44].  What is striking in
this regard is that all of the officers mentioned firearms and
violent crimes. In addition, the government introduced testimony
explaining that this area had been targeted by the Strike Force
specifically because it had a high incidence of crime.  [2:17–18,
24-27].  Officer Bordley explained that the Strike Force members
met on a regular basis to identify such crime hot spots based on
city reports and information collected on the street by the
officers.  [2:17, 24-27, 45].  Officer Bordley also testified
that he went to the block at least once every time he was on

22

patrol, because of its history.  [2:18].

The evidence clearly established the reasonableness of the officer's belief that Wright was observed in a "high crime area."[7]  Indeed, the testimony in this case was, if anything, more detailed and developed than appears to have grounded other cases applying the "high crime area" rationale.  See Vargas, 369 F.3d at 100-01; Jordon, 232 F.3d at 448; see also United States v. Quinn, 83 F.3d 917, 919 & n.1 (7th Cir. 1996)(explaining that stop took place during "street sweep" conducted to target an area "known for drug trafficking").  Moreover, that testimony indicated a particular reputation for violent crimes and shootings, which, as discussed below, fit with police observations of Wright suggesting that he might have a gun.  Cf. United States v. Valentine, 232 F.3d 350, 356 (3rd Cir. 2000) (applying Wardlow analysis where police encountered an individual that police believed had a gun at an intersection the court described as "a high-crime area known for shootings").

---

[7] That reasonableness was not significantly undercut by the fact that the defense pointed to several reports that, it argued, showed the actual incidence of crime in this area was not particularly high.  As the officer's testimony made clear, they relied on their extensive experience and a longer history of information collected from the area in drawing the conclusion that the neighborhood had experienced a high incidence of crime.

The final point is Wright's misplaced reliance upon United States v. Moore, 235 F.3d 700 (1st Cir.2000). Wright appears to argue that Moore supports the requirement that the officer must testify to particular suspicious inferences; in Moore's case it was that the suspect was concealing contraband or a weapon. This is both a mis-reading of the objective standard to be applied as well as the specific facts of Moore. In the case of Moore, the court was concerned with the scope of the Terry stop and the subsequent frisk. The Court upheld the frisk "because [the officer's actions] were based on an objectively reasonable concern for officer safety under the circumstances." Moore, 235 F.3d at 703. The Court's opinion serves to remind that, in evaluating Terry stops, courts "balance the nature of the intrusion with the governmental interests that are served." Officer safety is just one of several governmental interests. "...[R]easonable suspicion calculus 'defies precise definition.'" "No prefigured mold or cookie-cutter design exists to delineate whether or not a law enforcement officer, at a given time place, acted on the basis of reasonable suspicion. Instead, that evaluation comprises "a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances," United States v. Espinosa, 490 F.3d 41 (1st Cir. 2007), quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir.2001).

Based upon all of the foregoing, and viewed in the totality

24

of the circumstances, the officers had reasonable suspicion to
stop Wright.

The Defendant's Motion should be denied.


Respectfully submitted,

_____
Michael J. Sullivan
UNITED STATES ATTORNEY


  /s/Nadine Pellegrini
_____
ASSISTANT UNITED STATES ATTORNEY

United States Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by electronic filing.

Charles Rankin, Esq.
Rankin & Sultan
151 Merrimac Street, Second Floor
Boston, MA 02114

This 11th day of , 2007.

<u>/s/Nadine Pellegrini</u>

ASSISTANT UNITED STATES ATTORNEY

26