UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 05-10001-WGY

UNITED STATES

v.

GREGORY WRIGHT

**DEFENDANT'S POST-REMAND MEMORANDUM OF LAW
IN RESPONSE TO GOVERNMENT'S OPPOSITION**

**INTRODUCTION**

The government argues that the record supports an inference that Gregory Wright was "fleeing" the police, rather than simply running down the street for innocent reasons, and that he was fleeing to evade apprehension for criminal wrongdoing, rather than desiring to avoid the police for lawful reasons. To maintain this position, the government strings together a series of innocuous movements and attempts to cast them in a sinister light by reference to the reputation of the neighborhood, the shooting of Omar Edwards, and the experience of the street-wise officers. To be sure, evasive movements combined with other factors – even seemingly innocent ones – can add up to reasonable suspicion, and deference is due to the experienced perceptions of police. However, as the First Circuit has emphasized, police are not owed "blind deference." *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000). Police perceptions "must be reasonable under an objective standard." *Id*. The proposed link between Omar Edwards' shooting, the past street crime in the area, and Wright's movements is simply too attenuated to be deemed 'objectively reasonable."

Further, it must be noted that most of the inferences posited by the government were not articulated by the police on the witness stand. According to the arresting officers, they stopped Wright because he fled from them (they inferred that he had recognized him), in an area known for all manner of street crime, while carrying something. They never testified that they thought he had a gun, or even that he appeared to be "concealing" anything – that term was supplied after the fact by the United States Attorney's Office (Opposition Mem. p. 5). This Court may of course consider all of the circumstances known to police in assessing reasonable suspicion, whether relied upon by the officers in fact or not, but it is not appropriate to draw inferences that are purportedly informed by police experience but which are actually the creative product of the United States' attorneys. A conclusion that police had reasonable suspicion to stop Wright in this case depends on deductive leaps that lack foundation in fact or public policy. The fruits of the impermissible stop should be excluded

## I. THE GOVERNMENT'S EFFORT TO DEFEND THE FINDING THAT WRIGHT RECOGNIZED THE POLICE IS UNAVAILING.

### A. Wright's Forward Lean.

The government posits that "the act of leaning forward is enough to provide the officers with a basis for a reasonable inference; that is, that Wright was leaning forward because he recognized that the [unmarked Crown Victoria parked in front of him] was a police cruiser" (Opposition Mem. p. 13). This is not an accurate statement of the law. The First Circuit considered the significance of this sort of movement in *United States v. Woodrum*, a case in which the police had approached a taxicab, believing the occupant to be a suspect in a recently reported crime in the area, and the occupant had "slouched" down in his seat while reaching his right hand inside his jacket. *Woodrum*,

202 F.3d at 5, 7. The court declined to decide whether police had reasonable suspicion to stop the taxi, observing that the circumstances in that case could be "argued persuasively either way." *Id*. at 7. It was emphasized that "a slouching movement is inherently ambiguous," and that such conduct might be "combined with other factors particular to the defendant or his vehicle [to] add up to reasonable suspicion." *Id*. It must be noted that Officer Bordley testified to nothing more than a simple forward lean; the government's assertion that "Wright specifically followed the movements of the police" mischaracterizes the evidence (Opposition Mem. p. 16).[1] As such, the movement was ambiguous and does not alone permit a reasonable inference that Wright had recognized the unmarked car as a police vehicle.

The government offers Wright's subsequent act of running down Blue Hill Avenue as an additional factor coloring the forward lean. It is urged that the temporal proximity between the arrival of police and Wright's exiting his car made the conclusion that Wright exited in response to

---

[1] Officer Bordley testified:

Q: ... [J]ust try to duplicate as best you can what you remember seeing if you, I mean, if you can be that specific.
A: I just remember him leaning forward.
Q: Okay.
A: I couldn't tell if he was to the right of the person that was seated to his, he was sitting behind or not.
Q: Okay. And you couldn't, obviously you couldn't hear anything being said in that car?
A: No.
Q: And you couldn't tell what, for what reason he was leaning forward, I take it?
A: Not specifically, no.

Tr.II/40. Bordley did not claim that Wright was tracking the police car as it passed; it is undisputed that the suspect "lean" occurred only after the police car had parked directly in front of Wright's. Tr.II/39; Tr.IV/23-24. Indeed, the evidence is clear that the occupants of the car that Wright was in did not return Officer Brown's gaze as Brown passed by. Tr.I/60-61.

the police presence "almost inescapable" (Opposition Mem. pp. 14-15). The government has completely ignored the following facts known to the police, none of which is addressed in its memorandum: (a) Wright's car had pulled over beside the mini mart only moments before Officer Brown's car pulled up; (b) Wright's car was still idling when he got out; (c) there were houses on that block, and Omar Edwards, the front-seat passenger in Wright's car, had friends who lived in one of those houses; (d) Omar Edwards frequented that precise location; and (e) Wright ran toward the houses, directly past the three other police vehicles aligned in his path.[2] Tr.I/32,38,53; Tr.II/20. The totality of the circumstances actually favors an innocent interpretation of Wright's conduct.

The government urges this Court to disregard the fact that Wright ran directly toward the police whom he was supposedly trying to avoid, claiming that there is no evidence that Wright "would have seen any other car," or "could have taken an alternative path" (Opposition Mem. p. 12, n. 4). Remarkably, as discussed in the next section, the government itself touts the close distance between the Crown Victorias and the claimed ease with which Wright would have identified the Crown Victorias as police vehicles. The government cannot have it both ways. If Wright recognized Brown's car, he must surely have recognized the identical car parked right behind his, and the next behind that one, and the next behind that one. After all, the officers testified that Wright looked around when he got out of his car, and that Wright's car was sandwiched between the first and

---

[2] The government's memo obscures this evidence, urging that Wright could not have run "toward" the other cars because the cars were going "in the opposite direction" (Opposition Mem. p. 4, n.2). The record is clear on the order and direction of the cars in this case. All four Task-Force vehicles, as well as the car that Wright was in, were headed north on Blue Hill Avenue. At the time of the stop, the car that Wright was in was sandwiched between the first and second police vehicles, and all five cars were stopped on the north-bound side of Blue Hill Avenue. Tr.I/19, 53. Wright exited his car and traveled southward on Blue Hill Avenue, placing him face-to-face with three oncoming police vehicles.

second vehicles in the caravan. Tr.I/19,53. If Wright truly meant to avoid the police, he could have gone into the mini-mart (the record reveals that the stores were open at the time), for example, or he might have crossed the street to the southbound side of Blue Hill Avenue. Tr.I/25-26,37. The location of this stop was a far cry from the area described in *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005), relied upon by the government, where police and their suspect were alone on a narrow, remote, darkened, dirt road with limited avenues of escape. The mere coincidence in time between the arrival of police and Wright's rapid movement is not an objectively reasonable basis to infer that Wright knew the police were there.

**B.  Other Factors Not Cited by Police.**

The government asks this Court to look beyond the officers' testimony for additional grounds from which to infer that Wright recognized the police. First, the government urges that the Crown Victorias driven by the Strike Force were easily identifiable as police vehicles (Opposition Mem. p. 10). This contention is utterly devoid of record support. This Court did ruminate in the course of oral arguments that Crown Victorias are "readily identifiable to those people who interest themselves in what the police are driving." Tr.IV/22. Yet, the Court explained: "Now, those are inferences but they're drawn from this case and my presiding over time ... I'm not now in my fact finding mode." Tr.IV/22-24. In fact, there was no basis in the evidence to suppose that Wright could be expected to recognize a Crown Victoria as a police vehicle, so the posited inference is wholly inappropriate. *Compare United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000) (observing that police officer's testimony that his unmarked car was "one of those ones that everybody knows it's a police cruiser" might not be permissible without factual foundation for opinion testimony on "public identification of police vehicles"). Indeed, if Crown Victorias were

actually as conspicuous as imagined by the motion judge, then the Boston Police Department's purpose for dispatching a fleet of plainclothes officers in unmarked cars would be baffling.

The government next urges that the occupants of Wright's car may have recognized the police when Officer Brown's unmarked car passed slowly by (Opposition Mem. p. 14). The government reasons that since Officer Brown could identify the front-seat passenger in Wright's car as Omar Edwards, "Brown could reasonably have assumed that Edwards also recognized him and reported this to the others in his car." *Id*. The contention is baseless. The evidence was clear that the police officers did not make eye contact with any occupant of Wright's car, and there was no evidence whatsoever that Omar Edwards ever even looked at the police car. Tr.I/60-61. The only person in Wright's car seen looking at the police car was Wright himself, *after* the car had stopped in front of Wright (meaning Wright would be looking at the back of the officers' heads), and none of the police officers recognized Wright. Tr.II/39; Tr.IV 23.

Equally unfounded is the assertion that as Brown's car passed, "the individuals in Wright's car recognized [the plainclothes officers] by the badges visibly displayed on their chests." *Id*. The evidence regarding the badges worn by Task Force members was that badges were worn on a chain of some length around the officers' necks. Tr.I/80; Tr.II/20. There was no evidence as to whether those badges would be visible outside of the car in which the officers were seated, or whether, instead, they would have been hanging too low to be seen from Wright's vantage point inside another car. The case relied upon by the government to support an inference that the badges could have been seen, *United States v. Edmonds*, 240 F.3d 55, 62 (D.C. Cir. 2001), actually reveals the flaws in its reasoning. In *Edmonds*, the officer was standing outside of his car, walking toward the defendant while "prominently wearing his police badge on his chest." *Id*. at 57, 62. The D.C. Circuit Court

noted the "crucial contrast" between these facts and the facts in *Johnson*, 212 F.3d at 1316, where the police officer was seated inside an unmarked car. *Id*. at 62. As in *Johnson*, the record in this case is devoid of any reasonable basis to infer that the officers' badges were even potentially visible to the occupants of the car Wright was in, let alone that the badges were actually seen.

In any event, even if the circumstances would warrant a reasonable belief that Wright's conduct was a response to police presence, that alone would not entitle the police to detain him. Wright was constitutionally entitled to flee the scene. Police would need some additional articulable reason to suspect Wright of criminal wrongdoing in order to justify an incursion of his liberty.

## II.    NO OTHER CIRCUMSTANCES EXISTED TO WARRANT A REASONABLE BELIEF THAT WRIGHT WAS ENGAGED IN CRIMINAL ACTIVITY.

### A.    Neither the Character of the Area Nor Wright's Clutching His Pocket Suggested Any Particularized Wrongdoing.

To justify a *Terry* stop, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch'" linking an individual to criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The First Circuit has interpreted this requirement as meaning that "some of the facts on which the officer relies must be particular, that is, specific to the individual." *Woodrum*, 202 F.3d at 6-7. The only particularized factor cited by police was Wright's holding his sweatshirt pocket as he ran. As the government's memorandum apparently acknowledges, this fact, standing alone, suggests simply "that Wright carried something heavy in his sweatshirt" (Opposition Mem. p. 16). That observation must be combined with other factors to give rise to an inference that the heavy object was contraband.

The factor relied upon by the police was the reputation of the area for various street crime, including, for example, "firearms violence, drug activity, street robberies, breaking and enterings."

Tr.I/16. The government suggests that the mention of firearms "fit with police observations of Wright suggesting that he might have a gun" (Opposition Mem. p. 23). Yet the officers never testified that they thought Wright had a gun, or any other contraband for that matter. Of course, this Court could consider the character of the area as indicative of what might have been in Wright's pocket if the record supported such an inference. However, on this record, the object might as easily have been his own wallet, cell phone, I-Pod, or bottle of Gatorade.

### B.  Other Factors Not Cited by Police.

The only detail pointed to by the government as indicative of possible gun possession is Wright's association with Omar Edwards, the front-seat passenger. It is urged that since Officer Brown recognized Omar Edwards as the victim of an earlier shooting, Omar Edwards and anyone congregating with him could reasonably be suspected of "violent criminal activity" (Opposition Mem. p. 15-16). There are a number of critical flaws with this reasoning. First, it must be noted that Officer Brown never claimed to have drawn such an inference, and the presence of Omar Edwards was nowhere relied upon below. Second, the government has impermissibly stacked inference upon inference to make the leap from Omar Edward's victimization to Gregory Wright's gun possession, without adequate evidentiary support. *Compare, e.g., United States v. DeLutis*, 722 F.2d 902, 905-06 (1st Cir. 1983) (reversing conspiracy conviction where government "piled inference upon inference" to prove defendant's involvement, making "a series of unfounded deductive leaps for which no evidence existed"). The cases cited in support of the government's dubious proposition offer little aid. In *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005), relied upon for the notion that victims of gang-area shootings are often gang members themselves, evidence that a shooting victim had retreated into an apartment, *inter alia*, entitled police to conduct a protective

sweep of the apartment the same evening on suspicion of its connection to the shootings. In Wright's case, by contrast, there was no evidence of any gang activity, and Edwards' injury was not fresh enough to warrant suspicion of gun play at the time that Wright was stopped. The government's other cases concern a suspect's proximity to a person who is himself subject to arrest, which could not be said of Omar Edwards. *See United States v. Silva*, 957 F.2d 157, 160-61 (5th Cir. 1992); *United States v. Gonzales*, 70 F.3d 1236, 1238 (11th Cir. 1995). "Based upon that whole picture [the totality of circumstances] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Third, the government does not suppose that this inference alone cast Wright's holding of his sweatshirt pocket in a suspicious light. Rather, the government explains that Wright's association with Omar Edwards, combined with his leaning forward in the car and then running down the block, together warranted an inference that there was a gun in the sweatshirt. To sustain this theory, the government relies heavily upon the doctrine of collective knowledge – where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer may be imputed to the others (Opposition Mem. p. 11, n. 3, citing *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002)). The First Circuit has explained, however, that police may not be charged with knowledge of a fact which they specifically denied. *United States v. Zurosky*, 614 F.2d 779, 786 (1st Cir. 1979). It is only when the officers are "working together in close cooperation" that joint knowledge may be presumed. *Id*. In this case, Officer Celester denied knowledge of Wright's conduct inside the car, and this Court expressly discredited Officer Brown's claim to have seen Wright lean forward in his seat. Tr.II/13; Tr.IV/37. Knowledge of Wright's leaning motion may not

be imputed to Officers Brown or Celester. Moreover, each of the officers testified that they had no communication, either by radio, cellular telephone, or otherwise, with their counterparts in the other cars as the events were unfolding. Tr.I/35-36, 81-82; Tr.II/39. According to *Zurosky*, this evidence ought to preclude any reliance on the collective knowledge doctrine in this case.

The government's effort to describe the totality of the circumstances with reference to all of the circumstances known to all of the officers in fact grossly overstates the grounds for the stop. The central focus of the reasonable suspicion analysis in this case – whether Wright's running and clutching his pocket suggested criminal wrongdoing – must be viewed through *either* Bordley's lens (including the observation of Wright's leaning motion inside the car) *or* through Brown's lens (including knowledge of the identity of Omar Edwards). Since the government's argument depends upon the convergence of all of the purportedly suspicious circumstances, it must be rejected.

## CONCLUSION

Neither the police officers' testimony nor the government's opposition memorandum pointed to anything in the manner of Wright's running while clutching his pocket that suggested he was carrying a gun. The only innately suspicious conduct exhibited by Wright was his departure upon the arrival of police. Yet this behavior alone could not justify a *Terry* stop. The other potentially viable inferences proposed after-the-fact in the government's memorandum are grossly inadequate

to elevate the circumstances to the level of particularized suspicion required by the Fourth Amendment to the United States Constitution. The defendant's motion to suppress should be ALLOWED.

Respectfully submitted,
**GREGORY R. WRIGHT**
By his attorneys,

/s/ Charles W. Rankin

_____
Charles W. Rankin, BBO #411780
Michelle Menken, BBO #644537
Rankin & Sultan
151 Merrimac St.
Boston, MA 02114
(617) 720-0011

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non participants on October 18, 2007.

/s/ Charles W. Rankin

_____
Charles W. Rankin
